IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ELIJAH BARKSDALE,

                    Plaintiff,

                                        Civ. Action No.
                                        9:10-CV-00831 (MAD/DEP)

        v.

R.T. FRENYA, *et al.*,

                    Defendants.

_____

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

ELIJAH BARKSDALE, *pro se*
70 Baruch Drive #6E
New York, NY 10002

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN        DAVID COCHRAN, ESQ.
Attorney General of              Assistant Attorney General
the State of New York
The Capitol
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

        Plaintiff Elijah Barksdale, a former New York prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action

against the Commissioner of the New York State Department of
Corrections and Community Supervision ("DOCCS") as well as the
superintendent and two corrections officers stationed at the prison in
which he was confined at the relevant times, pursuant to 42 U.S.C. §
1983, alleging deprivation of his civil rights.  In his complaint, Barksdale
contends that defendants violated his Eighth and Fourteenth Amendment
rights by failing to protect him from an attack by another inmate, denying
him the right to call a witness at a disciplinary hearing arising out of the
incident, affirming the findings from the hearing, and subjecting him to
cruel and unusual punishment by confining him in a special housing unit
("SHU") for a period of 120 days.   As relief, plaintiff seeks damages in the
amount of $100 per day spent in the SHU and punitive damages of
$10,000, awardable against each defendant.

Currently pending before the court is a motion for summary
judgment brought by the defendants, seeking dismissal of plaintiff's
claims.  In support of their motion, defendants assert that 1)
Commissioner Fischer is entitled to dismissal of plaintiff's claims against
him based upon a lack of personal involvement; 2) Barksdale's claims are
subject to dismissal based upon his failure to exhaust his administrative

remedies; and 3) plaintiff cannot sustain a due process violation related to his disciplinary hearing because he cannot establish a protected liberty interest in remaining free from the challenged SHU confinement. For the reasons set forth below, I recommend that defendants' motion, which the plaintiff has not opposed, be granted in part, but otherwise denied.

I.    BACKGROUND[1]

Plaintiff, though no longer incarcerated, was formerly a prison inmate confined under the supervision of the DOCCS; at the times relevant to his claims in this action, plaintiff was designated to the Clinton Correctional Facility ("Clinton"), located in Dannamora, New York. *See generally* Complaint (Dkt. No. 1).

On September 8, 2009, plaintiff was involved in a physical altercation with another inmate. Complaint (Dkt. No. 1) § 6. While plaintiff was delivering meals to SHU inmates, Corrections Officer ("CO") Frenya was conducting showers for SHU inmates. *Id.* As a fellow inmate named Aiken "exited the shower and was returning to his cell", he turned around and attacked plaintiff. *Id.* A direct order was given for the two inmates to

---

[1]    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

cease fighting, but was ignored.  *Id.*  When the altercation ended, a weapon was discovered in the area.  *Id.*

As a result of the incident, plaintiff was issued a misbehavior report accusing him of multiple prison rule infractions, including possession of a weapon, refusing a direct order, and fighting.  Complaint (Dkt. No. 1) § 6. An assistant, J. Kelsh, was assigned to help plaintiff prepare a defense for the charges against him.  *Id.*  Kelsh interviewed two potential witnesses on plaintiff's behalf - inmate Aiken and CO Frenya.  During those interviews both agreed to testify at a disciplinary hearing scheduled to address the charges, and Aiken indicated that he would confirm that Barksdale did not possess, display or use a weapon during the incident.  *Id.*

A Tier III disciplinary hearing was held on September 14, 2009 before Corrections Hearing Officer ("CHO") Curtis Drown in connection with the charges against the plaintiff.[2]  *Id.*  Although CO Frenya was made available as a witness on plaintiff's behalf, inmate Aiken was not

---

[2]     The DOCCS conducts three types of inmate disciplinary hearings.  *See* 7 N.Y.C.R.R. § 270.3.  Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU.  Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

4

produced.  *Id.*  Plaintiff did not receive "any written notice or oral statements" stating the reason that inmate Aiken was not presented to testify.  Complaint (Dkt. No. 1) § 6.  At the close of the hearing, defendant Drown found plaintiff guilty of assaulting an inmate, fighting, weapon possession, and refusing to obey a direct order.  Complaint (Dkt. No. 1) Exh. A.  As a result, a penalty which included 120-days of disciplinary SHU confinement was imposed by the hearing officer.  *Id.*

Plaintiff appealed defendant Drown's decision to Clinton Superintendent Dale Artus, resulting in a decision by Deputy Superintendent LaValley affirming the Tier III hearing determination on the Superintendent's behalf.  Complaint (Dkt. No. 1) § 6 and Exh. E.  On September 28, 2009, plaintiff appealed LaValley's affirmation to Commissioner Brian Fischer.  Complaint (Dkt. No. 1) § 6 and Exh. E.  In response, plaintiff received a letter from Norman Bezio, the DOCCS Director of Special Housing and Inmate Disciplinary Program, affirming the hearing on behalf of the Commissioner Fischer.[3]  *Id.* at  Exh. G.

On November 10, 2009, plaintiff commenced a proceeding under

---

[3]       A subsequent request for relief from that determination resulted in the issuance of a letter from Director Bezio rejecting plaintiff's call for reconsideration. *See* Complaint (Dkt. No. 1) Exh. H.

Article 78 of the New York Civil Practice Law and Rules in the New York State Supreme Court, challenging the Tier III disciplinary hearing determination. Complaint (Dkt. No. 1)  Exh. I.  In that proceeding the state court found in plaintiff's favor and reversed the disposition of the detention hearing, finding that Barksdale's constitutional rights were violated by the failure of the hearing officer to make any attempt to obtain inmate Aiken's testimony at the hearing.  *Id.* at Exh. J.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on July 8, 2010, and was thereafter granted leave to proceed *in forma pauperis*.  Dkt. Nos. 1, 4.  Plaintiff's complaint names CO Frenya, CHO Drown, Superintendent Artus, and Commissioner Fischer as defendants and, broadly construed, asserts three causes of action.  *See generally* Complaint (Dkt. No. 1) §§ 3, 7. First, plaintiff claims that defendant Frenya failed to protect him by not following proper protocol for conducting showers for SHU inmates.  *See id.*  Second, plaintiff asserts that his Fourteenth Amendment Due Process rights were violated by defendant Drown, by virtue of his failure to call a requested witness during plaintiff's disciplinary hearing, and that defendants Artus and Fischer are liable for the resulting procedural due

6

process violation by virtue of their having affirmed the disciplinary

determination despite claims of due process violations.  *Id.*  Third, plaintiff

claims that, in violation of the Eighth Amendment, he was subjected to

cruel and unusual punishment when he was sentenced to 120 days of

SHU confinement.  Complaint (Dkt. No. 1) § 6.

On December 2, 2011, defendants moved for summary judgment

dismissing plaintiff's complaint for lack of personal involvement on the part

of defendant Fischer, failure to exhaust administrative remedies, and lack

of a protected liberty interest in remaining free from the challenged

confinement.[4]  Dkt. No. 44.  Plaintiff has not responded to the motion,

despite having requested and secured an extension of time for doing so.

Defendants' motion, which is now ripe for determination, has been

referred to me for the issuance of a report and recommendation pursuant

to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

---

[4]       In their motion defendants do not address plaintiff's cruel and unusual punishment claim.

Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477

U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d

Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.

Ct. at 2511 (summary judgment is appropriate only when "there can be

but one reasonable conclusion as to the verdict").

     B.    <u>Plaintiff's Failure to Oppose Defendants' Motion</u>

Before turning to the merits of plaintiff's claims, a threshold issue to

be addressed is the legal significance, if any, of his failure to oppose

defendants' summary judgment motion. That failure is not without

potential consequences.

The court's rules require that a motion seeking the entry of summary

judgment must be accompanied by a statement of material facts with

respect to which, the moving party contends, there exists no genuine

issue.  *See* N.D.N.Y.L.R. 7.1(a)(3).  The purpose underlying this rule,

which is typical of many local court rules governing summary judgment

motion practice, is to assist the court in framing the issues and

determining whether there exist any triable issues of fact that would

preclude the entry of summary judgment.  *Anderson v. Dolgencorp of N.*

*Y.,* Nos. 1:09-cv-360, 1:09-cv-363, 2011 WL 1770301, at *1 n.2 (N.D.N.Y.

May 9, 2011) (Sharpe, J.).[5]  In order to fulfill this salutary purpose, it is

---

     [5]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

essential for the court to have the benefit of both the moving party's statement and an opposition statement addressing the facts set forth in the initial statement.

In this instance, the defendants have complied with Local Rule 7.1(a)(3), providing a statement setting forth fourteen facts as to which, they contend, there is no genuine triable issue.  Plaintiff has failed to respond to that statement.  By its express terms, the governing rule provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  N.D.N.Y.L.R. 7.1(a)(3).  Based upon his failure to respond, I recommend that the court invoke this rule and deem the facts set forth in defendants' Local Rule 7.1(a)(3) to have been admitted by Barksdale.[6] *See Elgamil v. Syracuse Univ.*, No. 99-cv-611, 2011 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, J.) (listing cases);  *see also Monehan v. New York City Dep't of Cor. RR.,* 214 F.3d 275, 292 (2d Cir. 2000) (discussing a district court's discretion to adopt local rules similar to 7.1(a)(3)).

C      Personal Involvement

---

[6]      Defendants' notice of motion in this case was accompanied by a document entitled "notification of the Consequences of Failing to Respond to a Summary Judgment Motion," as required by this court's local rules in cases involving *pro se* litigants.  *See* N.D.N.Y.L.R. 56.2.

In their motion, defendants assert that plaintiff's due process claim against defendant Fischer should be dismissed based on his lack of personal involvement in the conduct giving rise to plaintiff's constitutional claims.  Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Defendants assert that Commissioner Fischer is only named as a defendant because of his supervisory position, and therefore cannot be held liable for the violations alleged.  It is true that defendant Fischer, as Commissioner of the DOCCS, cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  Responsibility on the part of a

supervisory official for a civil rights violation can, however, be established

in one of several ways, including when that individual 1) has directly

participated in the challenged conduct; 2) after learning of the violation

through a report or appeal, has failed to remedy the wrong; 3) created or

allowed to continue a policy or custom under which unconstitutional

practices occurred; 4) was grossly negligent in managing the subordinates

who caused the unlawful event; or 5) failed to act on information indicating

that unconstitutional acts were occurring.  *Iqbal v. Hasty*, 490 F.3d 143,

152-53 (2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*,

556 U.S. 662,129 S. Ct. 1937 (2009); *see also Richardson*, 347 F.3d at

435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d

at 501.[7]

---

[7]     The Second Circuit has yet to address the impact of the Supreme Court's decision in *Iqbal* upon the categories of supervisory liability under *Colon*.  Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability.  *See Sash v. United States*, 674 F. Supp. 2d at 531, 542-44 (S.D.N.Y. 2009); *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued viability of some of the categories set forth in *Colon.*") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010) .  While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801 (SAS), 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 346-47 (S.D.N.Y. 2010), *aff'd,* 2012 WL

In his deposition plaintiff testified that the "sole reason" he sued Commissioner Fischer was because Fischer affirmed the disciplinary hearing determination at issue.  Rule 7.1(a)(3) Statement (Dkt. No. 44-7) ¶ 8.  Within this circuit there is a severe division among the district courts as to whether mere review by a DOCCS official of an appeal from a disciplinary hearing, which an inmate claims to have been infected by due process violations, can lead to personal liability on the part of that individual.  *See Thomas v. Calero*, 824 F. Supp. 2d 488, 508-09 (S.D.N.Y. 2011) ("a number of courts in this Circuit have concluded that merely affirming the hearing officer's determination is not a sufficient basis to impose liability under the second *Colon* factor. . . . On the other hand, other courts have found that affirming a hearing officer's determination on appeal is sufficient to establish personal involvement under the second *Colon* factor.").  However, "the Second Circuit has, on at least one occasion, allowed a due-process claim to proceed against an upper-level prison official based on the allegation that the official 'affirmed [plaintiff's disciplinary] conviction on administrative appeal.'" *Thomas*, 824 F. Supp. 2d at 507 (alteration in original) (quoting *Williams v. Smith*, 781 F.2d 319,

---

498854 (2d Cir. Feb. 16, 2012); *Qasem v. Toro*, 737 F. Supp. 2d 147, 151-52 (S.D.N.Y. 2010).

324 (2d Cir. 1986)).

In *Rodriguez v. Selsky*, I followed those cases holding that a supervisory official's affirmance "of a constitutionally defective disciplinary determination at a time when the inmate is still serving his or her disciplinary sentence, and the violation can therefore be abated, falls within the *Colon* factors articulated in the Second Circuit for informing the supervisory liability analysis."  No. 9:07-CV-0432, 2011 WL 1086001, at *6 (N.D.N.Y. Jan. 25, 2011) (Peebles, M.J.), *report and recommendation adopted,* 2011 WL 830639 (N.D.N.Y. Mar. 3, 2011) (Kahn, J.) (citing *Colon*, 58 F. 3d at 873); *see also Thomas*, 824 F. Supp. 2d at 509 ("Director Bezio's actions fall squarely within the second *Colon* factor - after he learned, via an appeal, of an alleged violation of plaintiff's rights, he not only failed to remedy the wrong, but allowed it to continue."); *but see Tafari v. McCarthy*, 714 F. Supp. 2d 317, 383 (N.D.N.Y. 2010) ("the affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation").  In my view, those cases concluding that a plaintiff's allegations that a supervisory defendant reviewed and upheld an alleged constitutionally suspect disciplinary determination are enough to show his or her personal involvement in the

alleged violation appear to be both better reasoned and more consonant with the Second Circuit's position regarding personal involvement.  *See Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996) (criticizing a district court's denial of leave to amend to add Donald Selsky as a defendant in a due process setting and appearing to assume that Selsky's role in reviewing and affirming a disciplinary determination is sufficient to establish his personal involvement).

In this case the question of which line of supervisory personal liability cases should be followed is not outcome-determinative.  The record reflects that plaintiff's appeal of his disciplinary sentence to the Commissioner's office was reviewed by Norman Bezio.  There is no evidence of defendant Fischer's involvement in the review of that disciplinary determination.  In the absence of such evidence, defendant Fischer is entitled to dismissal of plaintiff's claims against him.

D.     Exhaustion of Remedies

Defendants next assert that plaintiff's claim against defendant Frenya is procedurally barred based upon his failure to exhaust administrative remedies.  The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes

several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see Woodford v. Ngo*, 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley*, No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 992 (2002) (citation omitted).

If the court finds that an inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).  "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims

"compl[ying] with the system's critical procedural rules."  *Woodford*, 548 U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F. 3d 37, 43 (2d Cir. 2007) (citing *Woodford*).[8]

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[9]  *Macias*, 495 F. 3d at 41; *see Hemphill v. New York*, 380 F. 3d 680, 686 (2d Cir. 2004).  Under the prescribed catechism, a court must first determine whether adminsitrative remedies were available to the plaintiff at the relevant times.  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.  If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether through their own actions in preventing the

---

[8]     While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA.  *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted).

[9]     Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford*, has been a matter of some speculation.  *See, e.g., Newman v. Duncan*, NO. 04-CV-395, 2007 WL 2847304, at *2 n.4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.).

exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense.[10]  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.  In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[11]  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.

Plaintiff does not contest the availability of a mechanism for seeking internal administrative relief with respect to complaints regarding prison conditions at Clinton.  New York prison inmates are subject to an Inmate Grievance program ("IGP") established by the DOCCS and recognized as an "available" remedy for purposes of the PLRA.  *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir. 1999)).  The IGP consists of a three-step

---

[10]      Defendants have preserved the defense of non-exhaustion by raising it in their answer.  *See* Answer (Dkt. 18) ¶ 13 ("Plaintiff failed to exhaust administrative remedies.").

[11]       In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap.  *See Hargrove*, 2007 WL 389003, at *8 n.14); *see also Giano v. Goord*, 380 F.3d 670, 677 n.6 (2d Cir. 2004).

review process.  First, a written grievance is submitted to the Inmate

Grievance Review Committee ("IGRC") within twenty-one days of the

incident.[12]  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of

inmates and facility employees, then issues a determination regarding the

grievance.  *Id.* at §§ 701.4(b), 701.5(b).  If an appeal is filed, the

superintendent of the facility next reviews the IGRC's determination and

issues a decision.  *Id.* at § 701.5(c).  The third level of the process affords

the inmate the right to appeal the superintendent's ruling to the Central

Office Review Committee ("CORC"), which makes the final administrative

decision.  *Id.* at § 701.5(d).  Ordinarily, absent the finding of a basis to

excuse non-compliance with this prescribed process, only upon

exhaustion of these three levels of review may a prisoner seek relief

pursuant to section 1983 in a federal court.  *Reyes v. Punzal*, 206 F.

Supp. 2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia, Sulton v. Greiner*,

No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

### 1.   Failure to Protect Claim

The record now before the court firmly establishes that plaintiff failed

to file any grievances regarding his failure to protect claim against

---

[12]   The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

defendant Frenya.  Bellamy Aff. (Dkt. No. 44-4); *see also* Complaint (Dkt. No. 1) § 4.  In his inmate civil rights complaint, which is given under penalty of perjury, Barksdale states that he did not present facts relating to his complaint through the grievance program, nor did he complain to prison authorities about the facts alleged, noting as a reason the fact that the incident in issue allegedly occurred at Clinton, and that he was incarcerated in the Upstate Correctional Facility at the time the complaint was filed.  *See* Complaint (Dkt. No. 1) § 4.  While it is true that in his subsequent deposition in this action plaintiff claims to have filed several grievances that were "intercepted" and "ripped", and vaguely describes grievances related to the assault, misconduct, and disciplinary hearing, the plaintiff's complaint and accompanying submissions show the filing of three grievances alleging misconduct on the part of hearing officer Drown, with no response received to any of the three, but no grievances relating to his claim that defendant Frenya failed to protect him.  *See* Complaint (Dkt. No. 1) Exh. D.  Based upon the foregoing, and in particular the admission in plaintiff's complaint concerning the lack of any grievances, I recommend a finding that no genuine issue of material fact exists concerning exhaustion with regard to plaintiff's failure to protect the cause

21

of action against defendant Frenya, and that it be dismissed on this procedural ground.   *Baker v. Krieger,* 287 F. Supp. 2d 207, 209 (W.D.N.Y. 2003); *Hernandez v. Nash*, No. 9:00CV1564FJSGLS, 2003 WL 22143709, at * 4 (N.D.N.Y. Sep. 10, 2003).

## 2.   Due Process Claim

Plaintiff's due process claims stand on different footing.  As an exception to the requirement of exhaustion through resort to the IGP, "under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding."[13] *Murray v. Palmer*, No. 9:03-CV-1010, 2010 WL 1235591, at *3 (Mar. 31, 2010) (Suddaby, D.J.) (emphasis omitted) (citing *Giano*, 380 F.3d at 678-79; *Johnson*, 380 F.3d at 697).  An appeal from a disciplinary hearing that presents the precise procedural infirmities raised in the section 1983 action, for example, may be sufficient to exhaust administrative remedies. *LaBounty v. Johnson*, 253 F. Supp. 2d 496, 502 n.5 (W.D.N.Y. 2003) (citing and quoting *Flanagan v. Maly*, 99 Civ. 12336, 2002 WL 122921, *2 (S.D.N.Y. Jan. 29, 2002)).  In *Flanagan*, for example, the court declined to

---

[13]     Notably, "'an individual decision or disposition resulting from a disciplinary proceeding . . . is not grievable.'" *Murray*, 2010 WL 1235591, at * 3 (quoting 7 N.Y.C.R.R. § 701.(3)(e)(2)).

dismiss the plaintiff's due process claim for failure to exhaust, reasoning

that

> [t]o require Flanagan to file an administrative
> grievance in these circumstances would be absurd,
> and Congress cannot have intended such a
> requirement. When an inmate challenges the
> procedure at a disciplinary hearing that resulted in
> punishment, he exhausts his administrative
> remedies by presenting his objections in the
> administrative appeals process, not by filing a
> separate grievance instead of or in addition to his
> ordinary appeal. Pursuit of the appellate process
> that the state provides fulfills all the purposes of
> the exhaustion requirement of § 1997a(e), by
> giving the state an opportunity to correct any errors
> and avoiding premature federal litigation. Once the
> alleged deprivation of rights has been approved at
> the highest level of the state correctional
> department to which an appeal is authorized,
> resort to additional internal grievance mechanisms
> would be pointless.

*Flanagan*, 2002 WL 122921, at * 2.

The Second Circuit has explicitly upheld the reasoning of the court

in *Flanagan* on at least two separate occasions.  In *Ortiz v. McBride*, the

Second Circuit "expressly agreed with the parties that Ortiz exhausted his

administrative remedies with respect to his due process claim by

successfully appealing the hearing which resulted in his confinement."

*Davis v. Barrett*, 576 F.3d 129,132-33 (2d Cir. 2009) (citing *Ortiz v.*

23

*McBride*, 380 F.3d 649, 653 (2d Cir. 2004)).  In *Davis v. Barrett*, the Court

held that the inmate-plaintiff's "successful appeal of his administrative

hearing constitutes exhaustion under the PLRA for purposes of rendering

his due process claim ripe for adjudication in federal court."  *Davis*, 576

F.3d at 132.  Citing to its previous decision in *Ortiz*, the court indicated

"that a prisoner may exhaust his administrative remedies for segregated

confinement by appealing the adverse hearing determination."  *Id.* (citing

*Ortiz*, 380 F.3d at 653-54).

In my view, the plaintiff should enjoy the benefit of this exception

based upon his pursuit of a challenge to the disciplinary determination,

ultimately resulting in the determination being overturned by the state

court after plaintiff served his 120 days of disciplinary confinement.

Complaint (Dkt. No. 1) § 6.  Accordingly, I recommend that the motion to

dismiss plaintiff's due process claim for failure to exhaust administrative

remedies be denied.

     E.     Merits of Plaintiff's Due Process Claim

Plaintiff claims his Due Process rights were violated because a

requested witness was not called to testify at his disciplinary hearing, and

as a result he was sentenced to 120 days of disciplinary SHU

confinement.  To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).  In their motion, defendants assert that plaintiff's disciplinary confinement was of insufficient duration to qualify as a liberty interest deprivation of constitutional significance.

In *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293 (1995), the United States Supreme Court determined that to establish the deprivation of a liberty interest, a prison inmate must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation order imposed and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Id.* at 483-84, 115 S. Ct. at 2300; *Tellier*, 280 F.3d at 80; *Hynes*, 143 F.3d at 658.  Atypicality in a *Sandin* inquiry is normally a question of law.[14]  *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000);

---

[14]    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit the

*Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).   When determining

whether a plaintiff possesses a liberty interest, the court must examine the

specific circumstances of confinement, including analysis of both the

length and conditions of confinement.  *See Sealey,* 197 F.3d at 586; *Arce*

*v. Walker*, 139 F.3d 329, 335-36 (2d Cir. 1998); *Brooks v. DiFasi*, 112

F.3d 46, 48-49 (2d Cir. 1997).  In cases involving shorter periods of

segregated confinement where the plaintiff has not alleged any unusual

conditions, however, a detailed explanation of this analysis is not

necessary.[15]  *Hynes*, 143 F.3d at 658; *Arce*, 139 F.3d at 336.

Although the Second Circuit has "not established a bright-line rule

as to how lengthy a SHU confinement will be considered atypical and

significant", *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000), that court has

held that "[w]here the plaintiff was confined for an intermediate duration -

between 101 and 305 days - 'development of a detailed record' of the

conditions of the confinement relative to ordinary prison conditions is

required."[16]  *Palmer v. Richards*, 364 F.3d 60, 64-65 (2d Cir. 2004)

---

question to a jury for resolution.  *Colon,* 215 F.3d at 230-31; *Sealey,* 197 F.3d at 585.

[15]     While not the only factor to be considered, the duration of a disciplinary
confinement remains significant under *Sandin.  Colon*, 215 F.3d at 231.

[16]     In *Colon v. Howard,* a Second Circuit panel split markedly on whether or
not adoption of a 180-day "bright line" test for examining SHU confinement would be

(quoting *Colon*, 215 F.3d at 232). "In the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short - less than the 30 days that the *Sandin* plaintiff spent in SHU - and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65-66.

In *Palmer*, the Second Circuit agreed with the district court that despite the plaintiff's relatively short confinement - 77 days - in the absence of evidence concerning the conditions of the confinement, summary judgment was inappropriate. *Palmer*, 364 F.3d at 66 (agreeing that "'Palmer should have the opportunity to demonstrate that the conditions of his confinement vis-a-vis both the conditions in administrative confinement and in the general prison population were sufficiently harsh' to violate a liberty interest despite the 'comparative shortness' of his confinement." (quoting *Palmer v. Goss*, No. 02 Civ. 5804, 2003 WL 22327110 at *6 (S.D.N.Y. Oct. 10, 2003)). In *Ortiz v. McBride*, the Second Circuit also found that a 90-day SHU sentence was sufficiently "atypical and significant" to withstand dismissal where the plaintiff alleged

---

appropriate and helpful in resolving these types of cases. *See* 215 F.3d at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

that conditions differed from "normal SHU confinement".  380 F.3d at 655

(plaintiff alleged he was "kept in SHU for twenty-four hours a day, was not

permitted an hour of daily exercise, and was prevented from showering

'for weeks at a time'").

Very recently, in a decision from the Southern District of New York in

a case involving confinement in SHU for 291 days, a motion to dismiss

was denied, the court concluding that

> plaintiff has not alleged that the conditions of his
> confinement differed from normal SHU
> circumstances.  Plaintiff simply alleges that he was
> sentenced to twenty-two months in SHU, and
> actually confined in SHU for 291 days.  Looking to
> *Palmer* and considering plaintiff's status as a *pro se*
> litigant, we conclude that plaintiff's confinement in
> SHU for 291 days is sufficient for pleading purposes,
> to implicate a liberty interest . . . . The length of time
> of plaintiff's SHU confinement and the lack of
> information concerning the conditions of plaintiff's
> confinement leave open sufficient possibility that
> plaintiff had a valid liberty interest.

*Thomas*, 824 F. Supp. at 500-01.

As can be seen, there is considerable uncertainty within this circuit

as to whether a period of disciplinary SHU confinement for a period of 120

days is sufficiently atypical and significant to demonstrate the loss of a

constitutionally protected liberty interest.  In this instance, however, the

28

matter comes before the court on a motion for summary judgment.  To

support their summary judgment motion it was incumbent upon the

defendants to prove the lack of any issues of material fact.  In light of the

Second Circuit's cautionary notes, including in *Palmer*, calling for the

development of a detailed factual record concerning the conditions of an

inmate's confinement during the relevant period in cases such as this and

defendants' failure to show that it was not a sufficiently atypical and

significant departure from the ordinary incidents of general prison life, I

recommend a finding that defendants have not sustained their burden of

demonstrating entitlement to summary judgment on this claim. *Palmer*,

364 F. 3d at 67-68.

IV.   SUMMARY AND RECOMMENDATION

In seeking dismissal of plaintiff's claims defendants' motion raises

several issues, both procedural and substantive in nature.  Turning first to

the question of personal involvement, I recommend a finding that

defendant Fischer cannot potentially be found liable for any alleged due

process violation, based upon his lack of involvement in the relevant

conduct, and that defendants' motion to dismiss plaintiff's claims against

him on this basis therefore be granted.  Turning to the question of

exhaustion of remedies, I conclude that the uncontradicted record in the case reflects that plaintiff failed to exhaust available administrative remedies with respect to his failure to protect  claim against defendant Frenya before commencing this action, and therefore recommend dismissal of that claim on this procedural basis.  Finally, addressing plaintiff's procedural due process claim, I recommend a finding that because defendants have failed to successfully shoulder their initial burden of demonstrating the lack of any genuine issues of fact surrounding whether plaintiff was deprived of a cognizable liberty interest by virtue of his 120-day SHU confinement, their motion for summary judgment dismissing this cause of action should be denied.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 44) be GRANTED, in part, and that all claims in this action against defendants Frenya and Fischer be DISMISSED, but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.

30

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      August 17, 2012
            Syracuse, NY

31



Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Janet ANDERSON, Plaintiff,
v.
DOLGENCORP OF NEW YORK, INC., Defendant.
Betty Pulver, Plaintiff,
v.
Dolgencorp of New York, Inc., Defendant.
Nos. 1:09–cv–360 (GLS\RFT), 1:09–cv–363
(GLS\RFT).

May 9, 2011.

Beasley, Allen Law Firm, Roman A. Shaul, Esq.,
Elizabeth A. Cordello, Esq., of Counsel, Montgomery,
AL, for the Plaintiffs.

Hinman, Howard Law Firm, James S. Gleason, Esq.,
Dawn J. Lanouette, Esq., of Counsel, Binghamton, NY,
for the Defendant.

Morgan, Lewis Law Firm, Joel S. Allen, Esq., Ronald. E.
Manthey, Esq., of Counsel, Dallas, TX.

***MEMORANDUM–DECISION AND ORDER***

GARY L. SHARPE, District Judge.
**I. *Introduction***
    *1 In this consolidated action, plaintiffs Janet
Anderson and Betty Pulver allege that their former
employer, defendant Dolgencorp of New York, Inc.
(Dollar General) deprived them of lawful overtime wages
in violation of the Fair Labor Standards Act (FLSA).[FN1]
(*See* No. 09–cv–360, 2d Am. Compl., Dkt. No. 4; No.
09–cv–363, 2d Am. Compl., Dkt. No. 4.) Pending are
Dollar General's motions for summary judgment as against
each plaintiff and to strike certain evidence offered by
plaintiffs in opposition to the summary judgment motions.
(*See* No. 09–cv–360, Dkt. Nos. 38, 50; No. 09–cv–363,
Dkt. No. 27.) For the reasons that follow, the motions are
denied.

FN1. 29 U.S.C. § 201, *et seq.*

**II. *Background*[FN2]**

FN2. Unless otherwise noted, the facts are
derived directly from Dollar General's various
Statements of Material Facts (SMF) and
plaintiffs' responses thereto. (*See* No.
09–cv–360, Def. SMF (Anderson), Dkt. No.
38:1; No. 09–cv–360, Def. Common SMF, Dkt.
No. 39; No. 09–cv–360, Pls. Common SMF
Resp., Dkt. No. 44:1; No. 09–cv–360, Anderson
SMF Response, Dkt. No. 46:1; No. 09–cv–363,
Pulver SMF Resp., Dkt. No. 27:1; No.
09–cv–363, Def SMF (Pulver), Dkt. No. 29:1.)
In that regard, the court notes that plaintiffs have
failed in most instances to specifically admit or
deny Dollar General's factual assertions as
required by Local Rule 7.1(a)(3), instead
choosing—in a somewhat boilerplate
fashion—to "object" to the "implications" of
those assertions or to assert additional facts that
do not directly or necessarily contradict them.
(*See generally, e.g.,* Anderson SMF Resp., Dkt.
No. 46:1; *see also* N .D.N.Y. L.R. 7.1(a)(3)
(requiring a "non-movant's response [to] mirror
the movant's Statement of Material Facts by
*admitting and/or denying each of the movant's
assertions* in matching numbered paragraphs"
(emphasis added)).) As plaintiffs' counsel is
likely aware, however, the purpose of the Rule
7.1(a)(3) response requirement is not to highlight
and broadly contradict intended "implications"
of a movant's factual assertions, or to imply the
inaccuracy of those assertions; it is to aid the
court in isolating the relevant facts so that it may
discern whether and to what extent disputes
relating to those facts exist. Thus, a non-movant's
failure to tailor her responsive SMFs in
accordance with the Local Rules significantly
impedes the court's ability to effectively and
efficiently resolve these critical inquiries.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

Accordingly, to the extent plaintiffs have failed to properly respond to Dollar General's statements of fact, the court will, where it deems appropriate, treat those statements as admitted for purposes of this motion. *Id.* ("The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.").

**A. *Dollar General***

Defendant Dollar General is a retailer of basic consumable goods, such as cleaning supplies, health and beauty aids, foods and snacks, housewares, toys, and basic apparel. (*See* No. 09–cv–360, Def. Common SMF ¶ 1, Dkt. No. 39.) As of 2005, Dollar General operated approximately 7,500 stand-alone Dollar General Stores in thirty states, with an average sales volume of over $1 million per store. (*See id.* at ¶ 2.) Each Dollar General store is staffed by a Store Manager, an Assistant Manager (ASM), a Lead Clerk, and multiple store clerks. (*See id.* at ¶ 3.) Of these employees, Store Managers occupy the highest level of supervisory authority and are the only employees paid on a salaried basis. (*See id.*) Each Store Manager reports to a District Manager (DM), each of whom oversees from fifteen to twenty-five stores. (*See id.* at ¶ 4.)

During the relevant times, Dollar General described a Store Manager's general responsibilities as "the management of all employees in the effective planning and implementation of all store processes, including ordering, receiving, stocking, presentation, selling, staffing and support." (No. 09–cv–360, Shaul Aff., Ex. 11, Store Manager Job Description, Dkt. No. 45:11 (filed under seal) .) Encompassed within these broadly-defined responsibilities are the specific, "essential" duties to:

• Recruit, select and retain qualified employees according to federal and state labor laws and company policies; ensure store is properly staffed;

• Provide proper training for employees; conduct performance evaluations; identify gaps for appropriate solutions and/or counseling, up to and including termination;

• Make recommendations regarding employee pay rate and advancement;

• Communicate performance, conduct and safety expectations regularly; coordinate meetings and events to encourage safety, security and policies;

• Ensure that the store is appropriately staffed and effectively opened and closed each day;

• Evaluate operating statements to identify business trends (including sales, profitability, and turn), expense control opportunities, potential shrink, and errors;

• Ensure that all merchandise is presented according to established practices; utilize merchandise fixtures properly including presentation, product pricing and signage;

**\*2** • Maintain accurate inventory levels by controlling damages, markdowns, scanning, paperwork, and facility controls;

• Ensure the financial integrity of the store through strict cashier accountability, key control, and adherence to stated company security practices and cash control procedures;

• Provide superior customer service leadership;

• Maintain a clean, well-organized store; facilitate a safe and secure working and shopping environment;

• Ensure that store is adequately equipped with tools necessary to perform required tasks; and

• Complete all paperwork and documentation according to guidelines and deadlines.

(*Id.*)

The job description further outlines certain "Working Conditions and Physical Requirements" associated with the Store Manager position. (*See id.*) These include: "[f]requent walking and standing"; "[f]requent bending, stooping and kneeling to run check out station, stock merchandise, and unload trucks"; "occasional climbing";

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

and "frequent and proper lifting of up to 40 pounds [, and] occasional lifting of up to 65 pounds." (*Id.*)

With respect to compensation, in addition to their weekly salaries, Store Managers are generally eligible for certain bonuses, such as annual "Teamshare" bonuses and quarterly "in stock" bonuses. (*See* No. 09–cv–360, Def. Common SMF ¶ 13, Dkt. No. 39 .) Teamshare bonuses are tied to the financial performance of the Store Manager's individual store and the manager's individual performance as a manager. (*See id.*) To the extent that Assistant Managers have also been eligible for Teamshare bonuses, it appears that their eligibility never exceeded 30% of what a Store Manager could earn. (*See id.* at ¶ 14.) As to in-stock bonuses, they were awarded in the amount of $250 per quarter if certain in-stock goals were met, and only to Store Managers. (*See id.* at ¶¶ 13, 14.)

In assessing the financial performance of a Store Manager's individual store, Dollar General considers whether and to what extent the store is meeting its quarterly and annual sales goals, minimizing inventory shrink and controllable expense, and maximizing profit. (*See* No. 09–cv–360, Allen Aff., Ex. 3, Store Manager Performance Evaluation Form, Dkt. No. 41:3 (filed under seal). Relatedly, in evaluating a Store Manger's managerial and leadership skills, Dollar General examines the manager's performance in seven focus areas: sales volume, controllable expense, inventory shrink, merchandising/in stock, training and development, customer satisfaction, and safety awareness. (*See id.*)

**B. *Janet Anderson***

In February 2002, plaintiff Janet Anderson was hired by Dollar General as an ASM for Store No. 8576 in Burnt Hills, New York. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 1, Dkt. No. 38:1.) In April 2002, Anderson was promoted to the position of Store Manager, which she held until her resignation in November 2002. (*See id.* at ¶ 2.) According to Anderson, other than the on-the-job training she received as an ASM, she did not receive any training when she was promoted to Store Manager. (*See* No. 09–cv–360, Anderson SMF Resp., Additional Facts ¶ 20, Dkt. No. 46:1.)

**\*3** As a Store Manager, Anderson was paid a fixed

weekly salary of $425.00, was eligible for the performance-based bonuses discussed above, and worked an average of fifty hours per week. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶¶ 6, 8, 25, Dkt. No. 38:1.) According to Anderson, she understood when she took the Store Manager position that she would be working more than forty hours per week, and that her salary was to compensate her for all hours worked since she would not be paid for overtime. (*See id.* at ¶¶ 6, 7; No. 09–cv–360, Anderson SMF Resp. ¶ 7, Dkt. No. 46:1.) During Anderson's tenure as Store Manager, the next highest paid employee, an ASM, earned $7.00 per hour and worked an average of thirty-one hours per week. (*See id.*)

With respect to her job functions, Anderson acknowledged in deposition that she performed all of the duties outlined in the Store Manager job description, and agreed that the description provides an accurate general summary of her position as Store Manager. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 15, Dkt. No. 38:1.) In line with that testimony, Anderson explained that she was responsible for supervising the other store employees, including an ASM, a "Third–Key" or Lead Clerk, and the other store clerks, and for performing other managerial duties. (*See id.* at ¶ 3.)

As part of her supervisory duties, Anderson testified that she trained employees on store policy and other related issues; directed, supervised, and evaluated employees' work; coached, disciplined, and counseled employees where necessary; recommended employee pay raises and promotions to her DM (recommendations that were always accepted); and scheduled employees' hours. (*See id.* at ¶¶ 14, 16.) With respect to scheduling, Anderson managed approximately 168 to 212 labor hours per week, meaning that she allocated Dollar General's labor hour allotment amongst the employees she supervised. (*See id.* at ¶ 4.)

In addition to these supervisory tasks, Anderson also performed other duties, including interviewing and hiring employees; monitoring and evaluating weekly sales reports and store operating reports; ensuring that cash registers "balanced"; completing daily paperwork, such as payroll and bank deposits; managing inventory levels; ensuring that merchandise was properly staged and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

stocked, largely in accordance with Dollar General "Plan–O–Grams"[FN3]; leading team meetings; and ensuring that the store was properly open and closed. (*See id.* at ¶¶ 14, 16.)

> FN3. "Plan–O–Grams" are store diagrams that direct the placement of products in a store. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 23, Dkt. No. 38:1.) According to Anderson, however, because her store did not comport with the standard Plan–O–Gram layout, she relied largely on her own discretion to merchandise approximately fifteen of the store shelves. (*See id.*)

Anderson also performed non-managerial tasks in her role as Store Manager. Specifically, she testified to running the cash register, stocking shelves, facing products on the shelves, helping unload delivery trucks, and cleaning the store.[FN4] (*See* No. 09–cv–360, Anderson SMF Resp., Additional Facts ¶¶ 4, 6, 7, Dkt. No. 46:1.) With respect to the division of her time, Anderson testified to spending at least half of her time on managerial duties. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 26, Dkt. No. 38:1.) Anderson agreed, however, that when she was performing non-managerial tasks, she would continue to monitor and manage the operation of the store. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 27, Dkt. No. 38:1.) Anderson further testified that if Dollar General would have allotted larger labor hour budgets, she would have been able to focus more time on her managerial duties and less on non-managerial tasks. (*See* No. 09–cv–360, Anderson Dep. at 237:11–16, Dkt. No. 38:4.) According to Anderson, the labor budget was allocated such that only two employees, including herself, could typically be working at one time. (*See* No. 09–cv–360, Anderson SMF Resp., Additional Facts ¶¶ 5–7, Dkt. No. 46:1.) Often, then, as Anderson testified, she would stock the shelves, unload a delivery truck, or clean the store while the only other employee working would run the cash register. (*See id.*)

> FN4. In addition to her routine duties, Anderson was also sent to two other Dollar General stores for two days each to set up the stores by setting up shelving and stocking merchandise. (*See* No.

09–cv–360, Anderson SMF Resp., Additional Facts ¶ 19, Dkt. No. 46:1.)

**\*4** In performing her duties as Store Manager, managerial or otherwise, Anderson was expected to act in accordance with Dollar General's standard policies and procedures. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 19, Dkt. No. 38:1.) Those policies and procedures, which were contained in the company's Standard Operating Procedures Manual (SOP), provided direction in how to perform certain store operations. (*See id.*) According to Anderson, however, while the SOP provided general guidance and direction, it did not cover every issue that would arise in the store on a daily basis. (*See id.*)

During her tenure as Store Manager, Anderson reported to DM Bob Seaman. (*See id.* at ¶ 12.) Mr. Seaman, unlike Anderson, did not have an office in or a key to Anderson's store, but would visit the store on a periodic basis. (*See id.*) According to Anderson, Mr. Seaman visited her store approximately once every five to six weeks. (*See id.*) During those visits, which typically lasted one hour, Mr. Seaman would walk through the store with Anderson and provide her with ideas and recommendations for improving the store. (*See id.*) Anderson testified that implementation of these ideas and recommendations was not mandatory, explaining that she used some of Mr. Seaman's suggestions but not others. (*See id.*) Apart from these store visits, it appears from Anderson's testimony that her communications with Mr. Seaman were relatively infrequent. According to Anderson, she spoke with Mr. Seaman on the telephone approximately six times—about once per month—and received a voice mail message from him every four or five weeks. (*See id.*) And with respect to those voice mail messages, Anderson testified that they were typically "district wide" and not specific to Anderson or her store. (*See id.*) Overall, despite Mr. Seaman's oversight, Anderson felt that she was "in charge" of her store, and further testified that Mr. Seaman did not interfere with the performance of her managerial duties. (*See id.* at ¶¶ 13, 17.)

Ultimately, as noted above, Anderson resigned from her employment with Dollar General in November 2002. (*See id.* at ¶ 2.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

### C. *Betty Pulver*

Plaintiff Betty Pulver was hired as a Store Manager for Dollar General in April 2002. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 1, Dkt. No. 27:1.) At the time of her hiring, Pulver understood that she would be responsible for opening and managing a new store in Hudson, New York. (*See id.;* No. 09–cv–363, Pulver Dep. at 45–46, Dkt. No. 27:4.) Prior to opening the Hudson store, however, and for approximately one month after being hired, Pulver worked at the Broadway store in Schenectady, New York, apparently for training purposes. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 2, Dkt. No. 29:1.) Pulver testified, however, that while at the Broadway Store, the only training she received related to loading and unloading delivery trucks and stocking shelves. (*See* No. 09–cv–363, Pulver SMF Resp., Additional Facts ¶ 10, Dkt. No. 29:1.) According to Pulver, she received no instruction with respect to following Plan–O–Grams or completing paperwork, and was given no experience running a cash register, making a schedule, or opening or closing the store. (*See id.*) Pulver testified that the Store Manager who was supposed to train her went on vacation a week after she started, leaving no training instructions with the ASM who was left in charge of the store. (*See* No. 09–cv–363, Pulver Dep. at 50–51, Dkt. No. 27:4.)

**\*5** In May 2002, with the opening of the Hudson store behind schedule, Pulver was transferred to open a different store, the State Street store. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 2, Dkt. No. 27:1.) According to Pulver, it wasn't until this transfer that she received training on completing paperwork, scheduling, Plan–O–Grams, etc. (*See* No. 09–cv–363, Pulver Dep. at 53–54, Dkt. No. 27:4.) Anderson testified that this training, which was conducted over the telephone, occurred over the course of one month, but did not specify the frequency or duration of each session. (*See id.*) Ultimately, in July 2002, Pulver was transferred to open the Hudson store, where she remained as Store Manager until her resignation in July 2003. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 2, Dkt. No. 27:1.)

In "opening" the Hudson and State Street stores, Pulver supervised crews of twenty-five employees hired on a temporary basis to assist in setting up the stores. (*See id.* at ¶ 3.) Once the Hudson store was set up and ready to be opened, Pulver made recommendations as to which of the temporary employees should be hired on a permanent basis to staff the store's ASM and "Third Key Clerk" positions. (*See id.*) After the necessary hiring decisions were made and the Hudson Store was opened, Pulver began performing the duties and responsibilities associated with the day-to-day operations of the store. (*See, e.g., id.* at ¶¶ 4, 5, 12.)

Like Anderson, Pulver agreed in deposition that the duties she regularly performed as Store Manager matched those recited in Dollar General's description of the Store Manager position. (*See id.* at ¶ 14.) Those duties, as with Anderson, included managing the Hudson store's labor budget of 160 to 240 labor hours per week; directing and supervising the work of the ASM, Third Key Clerk, and store clerks Pulver supervised; ordering store merchandise; ensuring that merchandise was properly staged and stocked; interviewing and hiring employees; scheduling employees; ensuring the store was appropriately staffed and properly opened and closed each day; ensuring the safety and security of the store and employees; ensuring that all store paperwork was properly completed and forwarded to the Dollar General corporate office; recommending employees for promotion (recommendations that were always accepted); implementing Dollar General directives regarding, among other things, new store policies and procedures, product recalls, and compliance with state and local laws; and training, disciplining, counseling, and, under certain circumstances, firing employees.[FN5] (*See id.* at ¶¶ 4, 5, 12, 13, 15, 21.)

> [FN5.] Pulver had the authority to terminate employees for certain types of misconduct, such as failing to report to work or cash register shortages, without District Manager approval. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 13, Dkt. No. 29:1.) In other situations, however, such as those involving employee performance issues, Pulver was required to seek her District Manager's approval before she could terminate an employee. (*See id.*) According to Pulver, her termination recommendations were always

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

followed. (*See id.*)

In addition to these and similar duties, Pulver testified to also performing non-managerial duties, such as stocking shelves, running the cash register, cleaning the store, and unloading delivery trucks. (*See* No. 09–cv–363, Pulver SMF Resp., Additional Facts ¶ 2, Dkt. No. 29:1.) Like Anderson, Pulver testified to spending at least half of her time on managerial duties. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 26, Dkt. No. 27:1.) She further agreed in deposition that when she was performing nonmanagerial tasks, she was simultaneously managing the store, evaluating employees, and ensuring proper customer service. (*See id.*) And like Anderson, Pulver agreed that Dollar General's limited labor hour budget required her to spend more time on non-managerial tasks than she otherwise would have. (*See* No. 09–cv–363, Pulver Dep. at 287:12–16, Dkt. No. 27:4.)

**\*6** Also like Anderson, Pulver was required to comply with Dollar General SOP, and to follow Dollar General Plan–O–Grams in merchandising her store. (*See id.* at ¶¶ 22, 23.) But also similar to Anderson, Pulver testified that the SOP did not address every situation that could arise in the store on a daily basis, requiring her to exercise discretion in those situations. (*See id.* at ¶ 22.) As to Plan–O–Grams, Pulver testified that because her store did not always comport with the Plan–O–Gram layout, she would exercise discretion in deciding what products to place on approximately ten to twenty percent of the store shelves. (*See id .* at ¶ 23.)

As with all Dollar General Store Managers, Pulver reported to a DM. (*See id.* at ¶ 10.) Similar to Anderson's experience in that regard, Pulver's DM would visit the Hudson store for between one and two hours to review store paperwork and discuss employee performance and ways to improve the store's overall performance. (*See id.*) Pulver recalls only five of these visits occurring during her tenure as Store Manager of the Hudson store, and testified that she rarely spoke to her DM on the telephone and that she could not recall receiving any voice mail messages from him. (*See id.*) Rather, Pulver was responsible for leaving weekly voicemail reports for her DM regarding her store's sales performance. (*See id.*) Like Anderson, Pulver testified that her DM did not interfere with the

performance of her managerial duties. (*See id.* at ¶ 16.)

With respect to compensation, Pulver was hired at a salary of $423.00 per week. (*See id.* at ¶ 6.) Beginning in July 2002, however, and continuing until the end of her employment in July 2003, Pulver's weekly salary was $480.00. (*See id.*) Like Anderson, Pulver testified that she understood when she was hired that this weekly salary was to compensate her for all hours worked since she would not be paid for overtime. (*See id.* at ¶ 7.) Pulver testified to working between sixty and seventy hours per week as Store Manager of the Hudson store. (*See* No. 09–cv–363, Pulver SMF Response, Additional Facts, ¶ 1, Dkt. No. 29:1.) During that time, the next highest paid employee in the Hudson store, an ASM, earned $7.00 per hour and worked an average of thirty to thirty-five hours per week. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 8, Dkt. No. 27:1.) In Pulver's view, she was "worth more" than the other store employees because she had more responsibilities, including hiring, firing, interviewing, scheduling, assigning, disciplining, and training employees in her store. (*See id.* at ¶ 9.) According to Pulver, she was "in charge" of her store. (*See id.* at ¶ 11.)

### D. *Procedural Background*

On March 21 and 29, 2004, Pulver and Anderson consented to join numerous other plaintiffs in this collective FLSA action against Dollar General, alleging that Dollar General improperly classified them as exempt from the FLSA's overtime compensation requirement. (*See* No. 09–cv–363, Ex. B, Pulver Consent, Dkt. No. 27:11; No. 09–cv–360, Ex. B, Anderson Consent, Dkt. No. 38:10; No. 09–cv–363, 2d Am. Compl., Dkt. No. 4; No. 09–cv–360, 2d Am. Compl., Dkt. No. 4.) While the collective action was originally filed in the Northern District of Alabama, Pulver and Anderson's claims, among others, were transferred to this court, where jurisdiction and venue is proper. (*See* No. 09–cv–360, Dkt. No. 1; No 09–cv–363, Dkt. No. 1 .)

**\*7** On May 11, 2009, Magistrate Judge Randolph F. Treece consolidated Anderson and Pulver's cases for discovery, pretrial proceedings, and the filing of common summary judgment briefing. In addition, Judge Treece designated Anderson's case, No. 09–cv–360, as the lead case, directing all filings to be made to that docket. (No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

09–cv–363, Dkt. No. 25.)

Now pending are Dollar General's motions for summary judgment as against each plaintiff and to strike certain evidence offered by plaintiffs in opposition to the summary judgment motions. (*See* No. 09–cv–360, Dkt. Nos. 38, 50; No. 09–cv–363, Dkt. No. 27.)

### III. *Standard of Review*

The standard for the grant of summary judgment is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle,* 499 F.Supp.2d 192, 194–95 (N.D.N.Y.2007).

### IV. *Discussion*

**A.** *Motion to Strike*

Defendants have moved to strike certain evidence offered by plaintiffs in opposition to the current motions. (*See* No. 1:09–cv–360, Dkt. No. 50.) That evidence includes documents relating to a 2004 Dollar General Survey, articles about Dollar General, Dollar General Story Newsletters, and numerous other Dollar General internal documents. Because the court has not relied on this evidence in rendering its decision, Dollar General's motion to strike is denied as moot. And to the extent the motion seeks to preclude this evidence at trial, it is denied as premature.

**B.** *The FLSA Overtime Compensation Requirement*

As noted above, plaintiffs allege that Dollar General deprived them of overtime wages in violation of FLSA's overtime compensation requirement. Dollar General responds that plaintiffs, as Store Managers, were properly classified as "executive" employees and are therefore exempt from the FLSA overtime requirement.

Under the FLSA, an employer must pay overtime to employees working more than forty hours per week. 29 U.S.C. § 207(a)(1). However, individuals "employed in a bona fide executive ... capacity" are exempt from the FLSA's overtime requirements. 29 U.S .C. § 213(a)(1). Congress has not defined what it means to be a "bona fide executive employee," instead delegating that responsibility to the Department of Labor (DOL), which has promulgated a body of clarifying regulations. *See* 29 U.S.C. § 213(a)(7); 29 C.F.R. § 541, *et seq.* Under the

pre–2004 regulations,[FN6] whether an employee qualifies for the executive exemption is a question of law, and is determined based on "different legal tests according to salary level." *Donovan v. Burger King Corp.,* 675 F.2d 516, 518 (2d Cir.1982) (citation omitted). Salaried employees earning more than $250 per week, like plaintiffs here, must satisfy the so-called "short test" to qualify for the exemption. *Id.* (citing 29 C.F.R. § 541.1(f)). To satisfy this test, the employee must be one who regularly directs the work of two or more employees, and whose "primary duty" is management. *Id.*

> FN6. Effective August 23, 2004, the DOL regulations defining the executive exemption were amended. *See* 69 Fed.Reg. 22,122 (Apr. 23, 2004). Because the relevant employment of each plaintiff in this case terminated before the effective date of these amendments, the court agrees with Dollar General—and plaintiffs do not appear to dispute—that the pre–2004 regulations should be applied to plaintiffs' claims. *See, e.g., Clougher v. Home Depot U.S.A., Inc .,* 696 F.Supp.2d 285, 290 n. 6 (E.D.N.Y.2010) (applying pre–2004 regulations to pay periods predating amendment and amended regulations to pay periods postdating amendment); *Baden–Winterwood v. Life Time Fitness, Inc.* 566 F.3d 618, 629 (6th Cir.2009) (same); *Slusser v. Vantage Builders, Inc.,* 576 F.Supp.2d 1207, 1215 n. 4 (D.N.M.2008) ("The revised FLSA regulations adopted ... in August of 2004 do not apply retroactively.").

**\*8** In this case, there is no dispute that Anderson and Pulver regularly directed the work of two or more employees. (*See* No. 09–cv–360, Allen Aff., Ex. 1, Joint Stipulations of Fact ¶ 4, Dkt. No. 41:1; No. 09–cv–360, Pls. Common Response Br., Dkt. No. 44 (focusing solely on issue of primary duty).) Rather, the only issue in dispute is whether Anderson and Pulver's primary duty as Dollar General Store Managers was management.

Whether an employee's primary duty is management under the regulations is determined based on the following five factors:

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

(1) time spent in the performance of managerial duties; (2) relative importance of managerial and non-managerial duties; (3) the frequency with which the employee exercises discretionary powers; (4) the employee's relative freedom from supervision; and (5) the relationship between the employee's salary and the wages paid employees doing similar non-exempt work.

*Donovan, 675 F.2d at 521* (citing 29 C.F.R. § 541.103). Thus, the primary duty inquiry is "necessarily fact-intensive." *Rodriguez v. Farm Stores Grocery, Inc.,* 518 F.3d 1259, 1264 (11th Cir.2008); *see* 29 C.F.R. § 541.103 (2002) ("[The] determination of whether an employee has management as his primary duty must be based on all the facts in a particular case."). And given this "deeply factual ... inquiry ... courts are often reluctant to grant summary judgment based on the executive exemption ." *Indergit v. Rite Aid Corp.,* Nos. 08 Civ. 9361 & 08 Civ. 11364, 2010 WL 1327242, at *7 (S.D.N.Y. Mar. 31, 2010). Further, in examining the primary duty factors, courts must be mindful that "[the executive] exemption must be narrowly construed," and that "[t]he employer has the burden of proving that the employee clearly falls within [its] terms." *Young v. Cooper Cameron Corp.,* 586 F.3d 201, 204 (2d Cir.2009) (citations and internal quotation marks omitted).

**1. Time Spent on Managerial Activities**

As to the first factor, the court must consider the amount of time Anderson and Pulver spent on managerial duties. " 'In the ordinary case[,] it may be taken as a good rule of thumb that ... an employee who spends over 50 percent of [her] time in management would have management as [her] primary duty.' " *Donovan, 675 F.2d. at 520 n. 5* (quoting 29 C.F.R. § 541.03). " 'Time alone, however, is not the sole test.' " *Id.* (quoting 29 C.F.R. § 541.03). Where an employee " 'does not spend over 50 percent of [her] time in managerial duties, [she] might nevertheless have management as [her] primary duty if the other pertinent [factors] support such a conclusion.' " *Id.* (quoting 29 C.F.R. § 541.03). In general, however, how an employee spends her time working is a question of fact for a jury. *Icicle Seafoods, Inc. v.. Worthington,* 475 U.S. 709, 714 (1986).

Here, Dollar General argues that plaintiffs' deposition testimony should "end the legal analysis in its favor"

because it conclusively demonstrates that plaintiffs' spent more than half of their time on managerial activities. The court disagrees. As to Anderson, Dollar General points to the following exchange:

**\*9** Q: .... When you're just performing management type duties, would you say that would be half of the time?

A: At least.

Q: Okay. So over half?

A: Yes

(No. 09–cv–360, Anderson Dep. at 211:7–12, Dkt. No. 38:4.) However, when later asked how much time she spent on non-managerial duties, Anderson responded, "[e]asily half the day," arguably implying that she may have spent more than half the day on those duties. (*Id.* at 242:5–12.) Following this response, the following exchange ensued:

Q: You're not changing your testimony that you spent more time performing managerial duties than you did nonmanagerial duties, are you?
A: No, I don't think so.

(*Id.* at 242:22–25.) Pointing to this latter exchange, Dollar General dismisses Anderson's contention that she spent "half of her day" on managerial duties, arguing that Anderson's "testimony is unequivocal that she spent more time performing managerial duties than non-managerial duties." (No. 09–cv–360, Def.Resp.(Anderson), at 4–5; Dkt. No. 52.)

Having reviewed the deposition transcript, and construing all reasonable inferences in Anderson's favor, the court is not persuaded that Anderson's testimony compels summary judgment. Specifically, given Anderson's arguably inconsistent responses, her less than definitive "clarification" of those responses, and the fact that her testimony was based upon what appear to be rough estimations of the time she spent on certain duties, the court is not satisfied that Anderson's testimony is conclusively unequivocal.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

The same is true with respect to Pulver. As to her testimony, Dollar General points to the following exchange as unequivocal proof that she spent more than half her time on managerial activities:

Q: ... So you spent more than 50 percent of your time on managerial work before you even think about what you did when you were doing the nonmanagerial work and you were still supervising and operating the store, but just out and out managerial work, you spent more than have your time in it didn't you?

A: Sitting down and thinking about it all, yes, maybe at the time I didn't feel like I was doing, you know. But sitting down here and talking and thinking about it, yes.

(No. 09–cv–363, Pulver Dep. at 252:24–25, 253:2–10, Dkt. No. 27:4.) As with Anderson's testimony, however, additional portions of Pulver's testimony weigh against characterizing this exchange as an unequivocal admission. For example, when the "time spent" issue first arose, Pulver testified as follows:

Q: And if we were trying to get a handle on how much time you spent on the non-managerial duties, stocking, cleaning, waiting on customers, running a cash register, cleaning up, those would be less than half of the time?
A: I wanna say no because a lot of paperwork I took home and did on my own time. The scheduling did home, on my own time. I did a lot of stocking and—

Q: I'm not saying you didn't do a lot of stocking.

**\*10** A: But I spent as much time—I want to say as much time doing both. I mean, I was constantly on the floor helping and stocking.

Q: So you would say about 50/50 doing management/nonmanagement?

A: Yes.

(*Id.* at 247:13–25, 248:2–5.) Again, having construed all reasonable inferences in Pulver's favor in light of this arguably inconsistent testimony, the court disagrees with Dollar General that it is entitled to summary judgment on the time spent issue with respect to Pulver. Accordingly, Dollar General's motions for summary judgement as to both Anderson and Pulver are denied insofar as they seek dismissal based on the time spent issue.

**2. Relative Importance of Managerial and Non–Managerial Duties**

This finding, however, does not end the primary duty inquiry. As noted above, "time alone is not the sole test," and the court must proceed to an examination of the second factor—the relative importance of managerial and non-managerial duties. This factor evaluates which of plaintiffs' duties—managerial or non-managerial—were more important to the employer. *See Donovan,* 675 F.2d at 521. In gauging this relative importance, "many courts look to[, among other things,] a manager's training, evaluation, and factors affecting eligibility for bonuses and pay raises." *Mayne–Harrison v. Dolgencorp, Inc.,* No. 1:09–CV–42, 2010 WL 3717604, at *20 (N.D.W.Va. Sept. 17, 2010)* (citing examples). As many courts have recognized, however, resolving this "difficult and intensive factual inquiry" is generally "inappropriate at summary judgment." *Indergit,* 2010 WL 1327242, at *6 (collecting cases).

Here, in arguing that plaintiffs' managerial duties were most important to it, Dollar General points primarily to the Store Manager job description, which lists the variety of essential job functions that are managerial in nature; plaintiffs' compensation structure, which provides for higher weekly earnings and store-performance-based bonuses; and the fact that Store Managers were evaluated on the basis of management-focused criteria.

In response, plaintiffs point to, among other things, the fact that the Store Manager job description explicitly contemplates the frequent performance of manual labor; that plaintiffs' received very little training in preparation for their role as Store Manager; that plaintiffs' weekly pay, when accounting for the number of hours worked, was comparable to other employees; and that Dollar General's restrictive labor budget forced plaintiffs to perform more non-managerial tasks than they otherwise would have. Based primarily on these facts, plaintiffs argue that a reasonable jury could find that their non-managerial duties were more important to Dollar General than their managerial duties.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

Undoubtedly, each of the facts cited by Dollar General offers support for the conclusion that it placed significant value on the plaintiffs' performance of managerial duties. Moreover, the court is not persuaded based on plaintiffs' submissions that the second factor should conclusively weigh in their favor. Nonetheless, the court does agree with plaintiffs that summary judgment on this issue, as in most cases, is not warranted here.

*11 As to training, for example, plaintiffs' testimony calls into question the nature and amount of critical management training plaintiffs actually received. As other courts have recognized, the extent to which an employer trains its managers is relevant in determining the value that employer places on managerial duties. *See, e.g., In re Dollar General Stores FLSA Litigation,* Nos. 5:09–MD–1500–JG, 4:09–CV–57–BR, 4:09–CV–58–BR, 2011 WL 197804, at *10 (E.D.N.C. Jan. 19, 2011) (finding that plaintiff's "value to Dollar General [was] shown by the fact that, unlike the other employees in her store, she went through four weeks of training before she was assigned her own store"). In this case, Anderson testified to receiving no additional training when promoted to Store Manager, and Pulver testified that the brunt of her managerial training occurred over the phone. When viewed in a light most favorable to plaintiffs, these facts cut against a finding in favor of Dollar General.

Similarly, with respect to the Store Manager job description, while Dollar General is correct that it lists numerous managerial functions as "essential," the accuracy of that label is at least somewhat lessened in light of both the limited managerial training plaintiffs appear to have received and the fact that the job description also explicitly contemplates the frequent performance of manual labor.

And most significantly in the court's view is the restrictiveness with which Dollar General appears to allot its labor budget. As noted above, both plaintiffs testified that Dollar General's limited labor budget forced them to spend more time on non-managerial duties than they otherwise would have. (*See* No. 09–cv–360, Anderson Dep. at 237:11–16, Dkt. No. 38:4; No. 09–cv–363, Pulver Dep. at 287:12–16, Dkt. No. 27:4.) As Anderson

explained, the labor budget operated such that she could typically only schedule herself and one additional employee to be in the store at one time, often requiring her to perform non-managerial tasks such as stocking and cleaning. (No. 09–cv–360, Anderson Dep. at 236–37, 238–40, Dkt. No. 38:4.) Pulver testified to operating under similar constraints, explaining that "[w]e all complained about not getting enough hours, every store manager did." (No. 09–cv–363, Pulver Dep. at 161, Dkt. No. 27:4.) Pulver further testified that she "wasn't getting the help she needed" with, among other things, "[h]iring certain employees for key positions," which "put more pressure on [her] to open and close stores everyday, rearrange [her] schedule to open and leave and then come back and leave." (*Id.* at 160–61.) Given this testimony, the court is unable to definitively conclude, especially in light of other record evidence, that no reasonable jury could find that Dollar General more highly valued plaintiffs' non-managerial duties. *See, e.g., Pierce v. Dolgencorp, Inc.,* Nos. 3:09cv079 & 4:09cv097, 2011 WL 398366, at *9 (M.D.Pa. Feb. 3, 2011) (denying summary judgment and holding that a reasonable jury could plausibly conclude that plaintiff's managerial duties were less highly valued where employer limited employee's ability to perform managerial tasks by failing to allot more labor hours); *Plaunt v. Dolgencorp, Inc.,* Nos. 3:09cv079 & 1:09cv084, 2010 WL 5158620, at *8 (M.D.Pa. Dec. 14, 2010) (same).

*12 On balance, then, having considered the parties' competing arguments and reviewed the record evidence in a light most favorable to plaintiffs, the court is not convinced that Dollar General has conclusively demonstrated an entitlement to summary judgement with respect to the second factor.

### 3. Relationship Between Salary and Other Employee Wages[FN7]

> FN7. Ordinarily, the court would next turn to an examination of the third and fourth factors—the frequency with which discretion was exercised and freedom from supervision. In this case, however, because the court discerns questions of fact with respect to the fifth factor—the relationship between plaintiffs' salary and other employees' wages—the court need not do so, for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

even if the third and fourth factors were found to decidedly weigh in Dollar General's favor, Dollar General's failure to conclusively establish the fifth, in light of the court's findings above, weighs heavily against summary judgment.

The fifth factor in the primary duty analysis compares an employee's salary to the wages of non-exempt employees performing similar work. In this case, the parties agree that the relevant comparison is between plaintiffs and their respective ASMs, each of whom, at all relevant times, earned $7.00 per hour.

Dollar General argues that this factor weighs conclusively in its favor because plaintiffs earned significantly more than their ASMs. In drawing that conclusion, Dollar General compares plaintiffs' weekly salaries with the weekly earning potential of their respective ASMs. With respect to Anderson, for example, Dollar General compares her $425.00 weekly salary to her ASM's potential weekly earnings of $280.00, and concludes that "Anderson's weekly salary was at least 151 % of the weekly earnings of her next highest paid employee." (No. 1:09–cv–360, Def. Mem. of Law (Anderson) at 14, Dkt. No. 38:2.) Dollar General also highlights the fact that "Anderson was eligible for up to $10,000 per year in bonuses based upon her store's performance, where her ASM was eligible only for up to $3,000 in bonuses." (Id.)

As to Pulver, Dollar General relies on the same calculation, comparing Pulver's weekly salary—which ranged from $423.00 to $480.00—to her ASM's potential weekly earnings of $280.00, and finding Pulver's salary to be 151% to 171% of those earnings. (No. 1:09–cv–363, Def. Mem. of Law (Pulver) at 13, Dkt. No. 27:2.)

Plaintiffs counter that their salaries were not significantly higher than their ASMs' potential wages when considering the amount of hours they worked. As to Anderson, for instance, she testified to working an average of fifty hours per week as a Store Manager. When dividing her $425.00 weekly salary, she contends, her effective hourly rate would have been $8.50 an hour, only $1.50 more per hour than her ASM. (See No. 1:09–cv–360, Anderson Mem. of Law at 11, Dkt. No. 46.)

Converting Pulver's weekly salary to an hourly rate produces similar results. As noted above, Pulver earned $425.00 per week in the beginning of her employment, and later earned $480.00 per week. Thus, when considering Pulver's testimony that she worked an average of sixty to sixty-five hours a week, her effective hourly rate was between $6.51 and $7.08 initially, and between $7.38 and $8 .00 once her salary increased. (See No. 1:09–cv–363, Pulver Mem. of Law at 11, Dkt. No. 29.) Based on these figures, Pulver argues, the gap in earnings between her and her ASM is not so significant as to compel summary judgment on this issue. (Id. at 11–12.)

As the parties' submissions reflect, there is some divergence of opinion with respect to which of these methods of calculation and comparison is the "correct" one. Compare, e.g., Moore v. Tractor Supply Co., 352 F.Supp.2d 1268, 1279 (S.D.Fla.2004) (declining to reduce salary to hourly rate), with Johnson v. Big Lots Stores, Inc., 604 F.Supp.2d 903, 918 (E.D.La.2009) (finding hourly rate analysis both relevant and appropriate to proper executive exemption determination). To the limited extent that courts in this Circuit have addressed the issue, however, they have not foreclosed use of the method espoused by plaintiffs, suggesting that the hours worked by an employee can be taken into account. See Donovan, 675 F.2d at 522 (finding that "[a]ssistant [m]anagers earning $250 or more were paid substantially higher wages even taking their longer hours into account" (emphasis added)); Clougher v. Home Depot U.S.A., Inc., 696 F.Supp.2d 285, 293 (E . D.N.Y.2010) (2010) ("[T]here is nothing in the record to render [plaintiff's] counter-argument implausible; namely, that his hourly pay rate, where properly calculated, is substantially less than comparable hourly-wage supervisors.... Given the potential import of an hourly-wage analysis, this Court is compelled to reject [defendant's] all too pat concern for the burdens of engaging in such 'mathematical gymnastics.' " (citations omitted)).

*13 This court likewise declines to reject plaintiffs' hourly rate conversion. In the court's view, converting plaintiffs' weekly salary into an approximate hourly wage is an appropriate way of finding a common basis with which to compare the wages paid to others. As one court

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

reasoned, "[t]o ignore the fact that [a plaintiff] worked more than forty hours per week would largely frustrate the purpose of this inquiry: to determine whether the employer sought to subvert the FLSA by attaching an overtime exemption to an employee who otherwise performs the same non-exempt tasks as hourly employees." *Plaunt,* 2010 WL 5158620, at *13 ("Without some standard unit, there can be no useful comparison in this already-amorphous inquiry."). The persuasiveness of this reasoning is enhanced, in the court's view, when considering the overarching principle that "[e]xemptions from the FLSA are to be narrowly construed against the employer, and [it is] the employer [that] has the burden of establishing an exemption." *Pignataro v. Port Auth. of N.Y. & N.J.,* 593 F.3d 265, 268 (3d Cir.2010); *Young,* 586 F.3d at 204.

Thus, in viewing the wage and salary evidence in a light most favorable to plaintiffs—i.e., in accordance with the hourly-rate conversion—the court finds that the question of whether the difference in plaintiffs' salary was so significant as to justify their exemption is one more properly left to a jury. *See Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1271 (11th Cir.2008) (finding that "[g]iven the relatively small difference between the store managers' and assistant managers' hourly rates[—two or three dollars—] it was within the jury's province to conclude that this factor either did not weigh in [defendant's] favor or at least did not outweigh the other factors in Plaintiffs' favor").

And finally, with respect to Anderson, while having considered that she was, in addition to her salary, eligible for a larger bonus than was her ASM, the court is not convinced that that fact compels a contrary result. While a jury could find that this eligibility differential, in light of Anderson's higher salary, renders her compensation significant enough to justify the exemption, it could similarly find that her compensation, including the bonus eligibility, fails to meet that threshold. *See Clougher,* 696 F.Supp.2d at 293 ("[D]isparate compensation, even where it includes performance bonuses, stock options, and other tokens of executive employment, has never been held strictly dispositive." (citing, inter alia, *Johnson,* 604 F.Supp.2d at 904 (finding fact that bonuses paid to exempt workers is not strictly dispositve)).) Thus, Anderson's

bonus eligibility, while relevant, does not, in the court's view, conclusively tip the scales in favor of summary judgment.

Accordingly, having failed to demonstrate that the fifth factor weighs definitively in its favor, and in light of the court's findings with respect to the first and second factors, Dollar General's motions for summary judgment as to the primary duty issue are denied.

**C.** *Liquidated Damages*

**\*14** Finally, Dollar General claims it is entitled to summary judgment on plaintiffs' claims for liquidated damages because it acted in good faith in classifying plaintiffs as exempt employees. (*See* No. 09–cv–360, Def. Common Br., at 26, Dkt. No. 40.) At this juncture, the court declines to rule on this issue and denies Dollar General's motion with leave to renew at a later stage of the litigation.

**V.** *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Dollar General's motion to strike certain evidence (No. 09–cv–360, Dkt. No. 50) is **DENIED;** and it is further

**ORDERED** that Dollar General's motions for summary judgment as against Janet Anderson (No. 09–cv–360, Dkt. No. 38) and Betty Pulver (No. 09–cv–363, Dkt. No. 27) are **DENIED;** and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Anderson v. Dolgencorp of New York, Inc.
Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681etseq. ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,*
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising
duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. FN2 The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

*4 Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the respondeat superior principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *SeeReese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *SeeReese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

> FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

> FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

> FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jesse L. STEWART, Jr., Plaintiff,
v.
Gary HOWARD, D. Monell, N. Marsh, D.
Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D.
Russell, Defendants.
No. 9:09–CV–0069 (GLS/GHL).

April 26, 2010.
Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael
J. Livolsi, Esq., of Counsel, East Syracuse, NY, for
Defendants.

**REPORT–RECOMMENDATION**

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action,
commenced pursuant to 42 U.S.C. § 1983, has been
referred to me for Report and Recommendation by the
Honorable Gary L. Sharpe, United States District Judge,
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).
Plaintiff Jesse L. Stewart alleges that Defendants, all
employees of the Tioga County Jail, violated his
constitutional rights by limiting his ability to send legal
mail, depriving him of his mattress and bedding during
daytime hours, subjecting him to excessive force, denying
him medical care after the alleged use of excessive force,
and conducting biased disciplinary hearings. Currently
pending before the Court is Defendants' motion for
summary judgment pursuant to Federal Rule of Civil
Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the
motion. (Dkt. No. 32.) For the reasons that follow, I
recommend that Defendants' motion be granted.

**I. FACTUAL AND PROCEDURAL SUMMARY**

This action involves Plaintiff's experiences at Tioga

County Jail, where he was incarcerated from August 19,
2008, to January 13, 2009. (Dkt. No. 30–4 at 14:2–11.)
The complaint consists almost entirely of copies of
grievances and letters that Plaintiff submitted to other
individuals and organizations. The "facts" section of the
civil complaint form merely directs the reader to "see
attached." As such, the precise contours of Plaintiff's
claims are difficult to discern. The documents attached to
the complaint show that:

On September 22, 2008, Plaintiff requested a
grievance form so that he could complain about the
facility's legal mail procedures. (Dkt. No. 1 at 41.) A
grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance
form so he could complain about being denied access
to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with
[Plaintiff] but he refuses to sign off. He states he needs
these letters to go out to these courts because he's fighting
extradition." *Id.*

On October 30, 2008, Defendant Officer Earl
Hollenbeck issued an Inmate Rule Infraction Notice to
Plaintiff accusing him of sending mail using another
inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008,
Plaintiff alleged that, pending disciplinary action against
him, staff at the Tioga County Jail deprived him of his
mattress, sheets, and blanket when temperatures were as
low as fifteen degrees at night and forced him to sit
directly on his steel bed for periods up to seventeen hours.
(Dkt. No. 1 at 8.) In support of Defendants' summary
judgment motion, Defendant Lt. David Monell declares
that when inmates are accused of violating a disciplinary
rule, they are placed in administrative segregation pending
a hearing. During that time, the inmate's bedding is
removed during the day. If this was not done, "inmates
may intentionally violate rules in order to be assigned to
administrative segregation so they could sleep in the cell
all day instead of having to adhere to the normal inmate
routine." (Dkt. No. 30–11 at 6 ¶ 12.) The parties agree that
inmates' mattresses and bedding are returned at night.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

(Dkt. No. 1 at 10; Dkt. No. 30–11 at 6 ¶¶ 13–15.)

**\*2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8–9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14–15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30–11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so.

Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9–10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

**\*3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46–47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

**\*4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing <u>FN1</u> and requesting that disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23–24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed

Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

> <u>FN1.</u> Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16–17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

**\*5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards—once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that

Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29–30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*6** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim

for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id,* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

**\*7** Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30–12 at 10–11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." [FN3] Id. at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. Id. at 4 ¶ A.

> FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30–4 at 9–17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." Id. at 15:14–15. Plaintiff then ended the deposition. Id. at 15:20–22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to

dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30–12 at 2–3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. Jones v. Bock, 549 U.S. 199, 218 (2007).

**\*8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30–10 at 8–11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. Id. at ¶ 1.2(A)(1–2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. Id. at ¶ 1.2(A) (3–4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. Id. at ¶ 1.2(A)(5–8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. Id. at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. Id. at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30–11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

> FN4. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did

not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8–10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23–24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

**C. Eighth Amendment Conditions of Confinement**

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9–10.) Defendants move for summary judgment of this claim. (Dkt. No. 30–12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

**D. Due Process**

1. *Bedding*

  **\*10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30–12 at 5–6.) Defendants are correct.

  An individual claiming that he was deprived of an interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S.

564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

  Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

  In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000).

  An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

  Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06–Cv–0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

    FN5. The Court will provide Plaintiff with a

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8–10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

**\*11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36–3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986)

(citing *Bounds v. Smith,* 430 U.S. 817, 821–23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies *"could* cause a great effect" and *"could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

**\*12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30–12 at 11–12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [FN10]

FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ——U.S. ——, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* —— F.Supp.2d ——, No. 08–CV–116580, 2009 U.S. Dist. LEXIS 116580, at *32–39, 2009 WL 4824669, at*10–11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will

assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be **GRANTED;** and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06–Cv–0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989));

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard
Not Reported in F.Supp.2d, 2010 WL 3907227
(N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jesse L. STEWART, Jr., Plaintiff,
v.
Gary HOWARD; D. Monell; N. Marsh; D.
Spangenburg; D. Swarts; E. Hollenbeck; J. Edwards;
and D. Russell, Defendants.
No. 9:09–CV–69 (GLS/GHL).

Sept. 30, 2010.
Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael
J. Livolsi, Esq., of Counsel, East Syracuse, NY, for the
Defendants.

### MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, District Judge.

#### I. Introduction

*1 Plaintiff Jesse L. Stewart, an inmate at Forest State
Correctional Institution, Forest County, Pennsylvania,
brings this action under 42 U.S.C. § 1983, alleging that
defendants Tioga County Jail employees violated his
Eighth and Fourteenth Amendment rights during his
incarceration at Tioga County Jail. (See Compl., Dkt. No.
1.) Defendants moved for summary judgment and for
dismissal based on, among other things, Stewart's refusal
to cooperate at his deposition. (Dkt. No. 30.) On April 26,
2010, Magistrate Judge George H. Lowe issued a Report
and Recommendation Order (R & R) recommending that
defendants' motion for dismissal as a discovery sanction
be denied but that defendants' motion for summary
judgment be granted. (Dkt. No. 38.) Pending are Stewart's
objections to the R & R. (Dkt. No. 39.) For the reasons
that follow, the court adopts the R & R in its entirety.

#### II. Standard of Review

Before entering final judgment, this court routinely
reviews all report-recommendations in cases it has
referred to a magistrate judge. If a party has objected to
specific elements of the magistrate judge's findings and
recommendations, this court reviews those findings and
recommendations de novo. See Almonte v. N.Y. State Div.
of Parole, No. 04–cv–484, 2006 WL 149049, at *6–7
(N.D.N.Y. Jan.18, 2006). In those cases where no party
has filed an objection, or only a vague or general objection
has been filed, this court reviews the findings and
recommendations of a magistrate judge for clear error. See
id.

Summary judgment shall be granted "if the pleadings,
depositions, answers to interrogatories, and admissions on
file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106
S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing FED. R. CIV.
P. 56(c)); see also Globecon Group, LLC v. Hartford Fire
Ins. Co., 434 F.3d 165, 170 (2d Cir.2006). In considering
a motion for summary judgment, the court must "view the
evidence in the light most favorable to the non-moving
party and draw all reasonable inferences in its favor ...."
Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir.1995) (citation
omitted). The initial burden is on the moving party to
inform the court of the basis for its motion, and identify
those portions of the pleadings, affidavits, and discovery
and disclosure materials on file that it believes
"demonstrate the absence of a genuine issue of material
fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106
S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also SEC v. Kern,
425 F.3d 143, 147 (2d Cir.2005). "A 'genuine' dispute
over a material fact only arises if the evidence would
allow a reasonable jury to return a verdict for the
nonmoving party." Dister v. Cont'l Group, Inc., 859 F.2d
1108, 1114 (2d Cir.1988) (citation omitted). And while
the court remains obliged to read a pro se movant's
supporting arguments liberally and "interpret them to raise the
strongest arguments that they suggest," Burgos v. Hopkins,
14 F.3d 787, 790 (2d Cir.1994), "[c]onclusory allegations,
conjecture, and speculation ... are insufficient to create a
genuine issue of fact," Kerzer v. Kingly Mfg., 156 F.3d
396, 400 (2d Cir.1998). Moreover, pro se status "does not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

exempt a party from compliance with relevant rules of procedural and substantive law" and courts cannot read into pro se submissions inconsistent claims or claims not suggested by those submissions. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (citations and internal quotation marks omitted).

### III. *Discussion*

**\*2** Construed liberally, Stewart's objections specifically challenge Judge Lowe's conclusions that: (1) Stewart failed to exhaust his administrative remedies regarding his excessive force and failure to provide medical care claims; (2) Stewart's claims regarding the amount of toilet paper, conditions of showering, and removal of bedding during the day failed to make out a viable Eighth Amendment claim; (3) Stewart had no protected liberty interest entitling him to additional process prior to the imposition of disciplinary sanctions; and (4) Stewart failed to raise any triable issue of fact as to his claim for denial of access to the courts. Consequently, the court will review those conclusions de novo.

### A. *Failure to Exhaust Administrative Remedies*

Stewart objects to Judge Lowe's conclusion that his Eighth Amendment excessive force and denial of medical care claims are barred by his failure to exhaust his administrative remedies under the Prisoner Litigation Reform Act of 1995 (PLRA). Read liberally, Stewart's argument is threefold. First, Stewart argues that the grievance process at Tioga County Jail was such that any appeal he filed would be futile and accordingly that administrative remedies were not "available" to him under the meaning of 42 U.S.C. § 1997(e). (*See* Pl. Objections at 2, Dkt. No. 39.) This argument is without merit. Even if the court were to accept the allegation that following the grievance procedures would ultimately have lead to an unfair denial of Stewart's claims at the institutional level, perceived futility of the process "does not render the grievance system 'unavailable.' " *Yeldon v. Ekpe,* 159 Fed. Appx. 314, 316 (2d Cir.2005) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Second, Stewart argues that he was not required to use the prison system to exhaust his remedies because the prison grievance system cannot award monetary damages. (*See* Pl. Objections at 3, Dkt. No. 39.) However, "[e]ven

when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citing *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). Accordingly, this argument also fails.

Finally, Stewart claims that he was threatened and did not file grievances at the institutional level for fear of being retaliated against. (*See* Pl. Objections at 2, Dkt. No. 39; *see also* Compl. at 10, Dkt. No. 1; Pl. Resp. at 1, Dkt. No. 32.) The Second Circuit has held that threats by prison officials may estop those officials from raising the affirmative defense of failure to exhaust administrative remedies. *See, e.g., Macias v. Zenk,* 495 F.3d 37, 44–45 (2d Cir.2007). The estoppel argument can take two forms: either that the actions of a prison official made all administrative remedies unavailable, or that those actions made only some remedies unavailable. *See Hemphill,* 380 F.3d at 687. Stewart can only be arguing the latter. His objections state that he did complain of the use of excessive force and the failure to provide medical care in his letters to the Sheriff, Under Sheriff, and Commissioner. (*See* Pl. Objections at 2, Dkt. No. 39.) However, a review of those letters reveals that they are entirely bereft of any mention of the excessive force or failure to provide medical treatment claims, excepting two mentions—without any detail or request for action—of a civil claim for excessive force Stewart was pursuing against defendant Marsh. (*See* Compl. at 16–30, Dkt. No. 1.) As a consequence, even if the court were to presume Stewart's remedies at the prison level were unavailable, there is no question of fact as to whether Stewart failed to exhaust all his available remedies. Stewart could have raised those issues outside the local grievance process but failed to do so. Thus, defendants are entitled to judgment as a matter of law on those claims.

### B. *Eighth Amendment Conditions of Confinement Claims*

**\*3** Stewart further argues that, contrary to Judge Lowe's conclusions, his conditions of confinement "shock the mind" and that he was subject to "barbaric," "draconian," and "extreme treatment" sufficient to make out cruel and unusual punishment under the Eighth Amendment. (Pl. Objections at 2–3, Dkt. No. 39.) Stewart

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

alleged in his complaint that for ten days he was denied bedding between the hours of 6:30 am and 11:00 pm, denied his personal property, allowed to shower only while in restraints, and provided only two sheets of toilet paper per defecation. (*See* Compl. at 8–9, Dkt. No. 1.) Judge Lowe was correct to find that these deprivations are not sufficiently serious to support an Eighth Amendment claim. (*See* R & R at 17–18, Dkt. No. 38.) The Supreme Court has held that

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Stewart's complaint and response fail to allege either the presence of an excessive risk to his health or safety or that any prison official was aware of such a risk. Accordingly, Judge Lowe's finding is adopted and Stewart's conditions of confinement claims are dismissed .[FN1]

> **FN1.** Stewart now claims via his objections that he was denied blankets at night (in contradiction of his complaint), that he had unspecified "medical life threatening ailments" which could have caused him to die in the cold without blankets, and that there was a risk he would slip and fall while wearing restraints in the shower. (*See* Pl. Objections at 4, Dkt. No. 39.) The court declines to consider these new claims at this late stage. *See Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1999).

**C.** *Due Process*

Stewart's objections reassert the claim that his due process rights were violated due to a biased disciplinary hearing and generally flawed grievance system at Tioga County Jail. (*See* Pl. Objections at 2, Dkt. No. 39.) As the R & R observed, to establish a procedural due process claim, an inmate must show that he possessed a state granted interest in remaining free from the alleged

deprivation and that the deprivation imposed " 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " (*See* R & R at 19, Dkt. No. 38 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).) Here, the conditions of Stewart's heightened confinement are not disputed by the parties and there is no evidence or allegation that the conditions of confinement were atypical in relation to other administrative confinements imposed in the ordinary course of prison administration. Thus, summary judgment is appropriate. *See Davis v. Barrett,* 576 F.3d 129, 134 (2d Cir.2009). In the absence of unusually harsh conditions, "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection." *Id.* at 133 (citation omitted). Given that Stewart's confinement was substantially shorter than 101 days, the court agrees with Judge Lowe's conclusion that Stewart possessed no protected liberty interest sufficient to support a procedural due process claim and adopts the recommendation that Stewart's due process claims be dismissed.

**D.** *Access to the Courts*

**\*4** Lastly, Stewart argues that Judge Lowe erred in finding that Stewart failed to raise any triable issue of fact as to an injury suffered by his restricted use of the mail system. (*See* Pl. Objections at 4, Dkt. No. 39.) Stewart claims that his limited use of the mail prevented him from being heard in support of a habeas corpus petition, which resulted in an unfavorable outcome. (*See id.; see also* Pl. Resp. at 1, Dkt. No. 32.) Other than those two places, no allegation of any actual injury stemming from the mail restrictions has been made in Stewart's submissions. Judge Lowe was correct in observing that Stewart's response is unsworn and it cannot be treated as an affidavit for summary judgment purposes. (*See* R & R at 21, Dkt. No. 38.) Accordingly, the response's contents cannot constitute "evidence" sufficient to create a triable issue of fact. (*See* Pl. Resp. at 1, Dkt. No. 32.) The court is mindful of Stewart's pro se status and observes that even if his response could be construed as an affidavit, the statement therein is too conclusory to create a triable issue of fact regardless of his non-compliance with 28 U.S.C. § 1746. Stewart references no specific facts regarding the case he allegedly lost as a consequence of the denial of sufficient postage. Mere assertions unsupported by any specifics,

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

even when contained in an affidavit, are insufficient to create the material dispute necessary to defeat a motion for summary judgment. *See Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir.2008). Therefore, the court adopts Judge Lowe's recommendation that Stewart's denial of access to the courts claim be dismissed.[FN2]

> [FN2.] The court observes in passing that even if it were willing to consider new evidence in Stewart's sworn objections, Stewart's statement therein regarding his lost legal case is no more helpful in identifying what case he lost or providing substantiation to the claim that he lost the case as a consequence of limited postage. (*See* Pl. Objections at 4, Dkt. No. 39.)

**E. Remaining Recommendations**

Because Stewart has not objected to the remaining recommendations, the court has reviewed those recommendations for clear error and finds none. Accordingly, the remainder of the R & R is adopted.

**IV. Conclusion**

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge George H. Lowe's April 26, 2010 Report and Recommendation Order (Dkt. No. 38) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion to dismiss based on Stewart's refusal to cooperate with his deposition (Dkt. No. 30) is **DENIED;** and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 30) is **GRANTED** and Stewart's claims are **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Stewart v. Howard
Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jesse L. STEWART, Jr., Plaintiff,
v.
Gary HOWARD; D. Monell; N. Marsh; D.
Spangenburg; D. Swarts; E. Hollenbeck; J. Edwards;
and D. Russell, Defendants.
No. 9:09–CV–69 (GLS/GHL).

Sept. 30, 2010.
Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for the Defendants.

### MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, District Judge.

#### I. Introduction

*1 Plaintiff Jesse L. Stewart, an inmate at Forest State Correctional Institution, Forest County, Pennsylvania, brings this action under 42 U.S.C. § 1983, alleging that defendants Tioga County Jail employees violated his Eighth and Fourteenth Amendment rights during his incarceration at Tioga County Jail. (See Compl., Dkt. No. 1.) Defendants moved for summary judgment and for dismissal based on, among other things, Stewart's refusal to cooperate at his deposition. (Dkt. No. 30.) On April 26, 2010, Magistrate Judge George H. Lowe issued a Report and Recommendation Order (R & R) recommending that defendants' motion for dismissal as a discovery sanction be denied but that defendants' motion for summary judgment be granted. (Dkt. No. 38.) Pending are Stewart's objections to the R & R. (Dkt. No. 39.) For the reasons that follow, the court adopts the R & R in its entirety.

#### II. Standard of Review

Before entering final judgment, this court routinely reviews all report-recommendations in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo. See Almonte v. N.Y. State Div. of Parole, No. 04–cv–484, 2006 WL 149049, at *6–7 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of a magistrate judge for clear error. See id.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing FED. R. CIV. P. 56(c)); see also Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir.2006). In considering a motion for summary judgment, the court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor ...." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir.1995) (citation omitted). The initial burden is on the moving party to inform the court of the basis for its motion, and identify those portions of the pleadings, affidavits, and discovery and disclosure materials on file that it believes "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also SEC v. Kern, 425 F.3d 143, 147 (2d Cir.2005). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1114 (2d Cir.1988) (citation omitted). And while the court remains obliged to read a pro se movant's supporting papers liberally and "interpret them to raise the strongest arguments that they suggest," Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994), "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact," Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998). Moreover, pro se status "does not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

exempt a party from compliance with relevant rules of procedural and substantive law" and courts cannot read into pro se submissions inconsistent claims or claims not suggested by those submissions. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (citations and internal quotation marks omitted).

### III. *Discussion*

**\*2** Construed liberally, Stewart's objections specifically challenge Judge Lowe's conclusions that: (1) Stewart failed to exhaust his administrative remedies regarding his excessive force and failure to provide medical care claims; (2) Stewart's claims regarding the amount of toilet paper, conditions of showering, and removal of bedding during the day failed to make out a viable Eighth Amendment claim; (3) Stewart had no protected liberty interest entitling him to additional process prior to the imposition of disciplinary sanctions; and (4) Stewart failed to raise any triable issue of fact as to his claim for denial of access to the courts. Consequently, the court will review those conclusions de novo.

### A. *Failure to Exhaust Administrative Remedies*

Stewart objects to Judge Lowe's conclusion that his Eighth Amendment excessive force and denial of medical care claims are barred by his failure to exhaust his administrative remedies under the Prisoner Litigation Reform Act of 1995 (PLRA). Read liberally, Stewart's argument is threefold. First, Stewart argues that the grievance process at Tioga County Jail was such that any appeal he filed would be futile and accordingly that administrative remedies were not "available" to him under the meaning of 42 U.S.C. § 1997(e). (*See* Pl. Objections at 2, Dkt. No. 39.) This argument is without merit. Even if the court were to accept the allegation that following the grievance procedures would ultimately have lead to an unfair denial of Stewart's claims at the institutional level, perceived futility of the process "does not render the grievance system 'unavailable.' " *Yeldon v. Ekpe,* 159 Fed. Appx. 314, 316 (2d Cir.2005) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Second, Stewart argues that he was not required to use the prison system to exhaust his remedies because the prison grievance system cannot award monetary damages. (*See* Pl. Objections at 3, Dkt. No. 39.) However, "[e]ven

when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citing *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). Accordingly, this argument also fails.

Finally, Stewart claims that he was threatened and did not file grievances at the institutional level for fear of being retaliated against. (*See* Pl. Objections at 2, Dkt. No. 39; *see also* Compl. at 10, Dkt. No. 1; Pl. Resp. at 1, Dkt. No. 32.) The Second Circuit has held that threats by prison officials may estop those officials from raising the affirmative defense of failure to exhaust administrative remedies. *See, e.g., Macias v. Zenk,* 495 F.3d 37, 44–45 (2d Cir.2007). The estoppel argument can take two forms: either that the actions of a prison official made all administrative remedies unavailable, or that those actions made only some remedies unavailable. *See Hemphill,* 380 F.3d at 687. Stewart can only be arguing the latter. His objections state that he did complain of the use of excessive force and the failure to provide medical care in his letters to the Sheriff, Under Sheriff, and Commissioner. (*See* Pl. Objections at 2, Dkt. No. 39.) However, a review of those letters reveals that they are entirely bereft of any mention of the excessive force or failure to provide medical treatment claims, excepting two mentions—without any detail or request for action—of a civil claim for excessive force Stewart was pursuing against defendant Marsh. (*See* Compl. at 16–30, Dkt. No. 1.) As a consequence, even if the court were to presume Stewart's remedies at the prison level were unavailable, there is no question of fact as to whether Stewart failed to exhaust all his available remedies. Stewart could have raised those issues outside the local grievance process but failed to do so. Thus, defendants are entitled to judgment as a matter of law on those claims.

### B. *Eighth Amendment Conditions of Confinement Claims*

**\*3** Stewart further argues that, contrary to Judge Lowe's conclusions, his conditions of confinement "shock the mind" and that he was subject to "barbaric," "draconian," and "extreme treatment" sufficient to make out cruel and unusual punishment under the Eighth Amendment. (Pl. Objections at 2–3, Dkt. No. 39.) Stewart

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

alleged in his complaint that for ten days he was denied bedding between the hours of 6:30 am and 11:00 pm, denied his personal property, allowed to shower only while in restraints, and provided only two sheets of toilet paper per defecation. (*See* Compl. at 8–9, Dkt. No. 1.) Judge Lowe was correct to find that these deprivations are not sufficiently serious to support an Eighth Amendment claim. (*See* R & R at 17–18, Dkt. No. 38.) The Supreme Court has held that

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Stewart's complaint and response fail to allege either the presence of an excessive risk to his health or safety or that any prison official was aware of such a risk. Accordingly, Judge Lowe's finding is adopted and Stewart's conditions of confinement claims are dismissed.[FN1]

> **FN1.** Stewart now claims via his objections that he was denied blankets at night (in contradiction of his complaint), that he had unspecified "medical life threatening ailments" which could have caused him to die in the cold without blankets, and that there was a risk he would slip and fall while wearing restraints in the shower. (*See* Pl. Objections at 4, Dkt. No. 39.) The court declines to consider these new claims at this late stage. *See Hynes v. Squillace*, 143 F.3d 653, 656 (2d Cir.1999).

**C. Due Process**

Stewart's objections reassert the claim that his due process rights were violated due to a biased disciplinary hearing and generally flawed grievance system at Tioga County Jail. (*See* Pl. Objections at 2, Dkt. No. 39.) As the R & R observed, to establish a procedural due process claim, an inmate must show that he possessed a state granted interest in remaining free from the alleged

deprivation and that the deprivation imposed " 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " (*See* R & R at 19, Dkt. No. 38 (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).) Here, the conditions of Stewart's heightened confinement are not disputed by the parties and there is no evidence or allegation that the conditions of confinement were atypical in relation to other administrative confinements imposed in the ordinary course of prison administration. Thus, summary judgment is appropriate. *See Davis v. Barrett*, 576 F.3d 129, 134 (2d Cir.2009). In the absence of unusually harsh conditions, "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection." *Id.* at 133 (citation omitted). Given that Stewart's confinement was substantially shorter than 101 days, the court agrees with Judge Lowe's conclusion that Stewart possessed no protected liberty interest sufficient to support a procedural due process claim and adopts the recommendation that Stewart's due process claims be dismissed.

**D. Access to the Courts**

**\*4** Lastly, Stewart argues that Judge Lowe erred in finding that Stewart failed to raise any triable issue of fact as to an injury suffered by his restricted use of the mail system. (*See* Pl. Objections at 4, Dkt. No. 39.) Stewart claims that his limited use of the mail prevented him from being heard in support of a habeas corpus petition, which resulted in an unfavorable outcome. (*See id.; see also* Pl. Resp. at 1, Dkt. No. 32.) Other than those two places, no allegation of any actual injury stemming from the mail restrictions has been made in Stewart's submissions. Judge Lowe was correct in observing that Stewart's response is unsworn and it cannot be treated as an affidavit for summary judgment purposes. (*See* R & R at 21, Dkt. No. 38.) Accordingly, the response's contents cannot constitute "evidence" sufficient to create a triable issue of fact. (*See* Pl. Resp. at 1, Dkt. No. 32.) The court is mindful of Stewart's pro se status and observes that even if his response could be construed as an affidavit, the statement therein is too conclusory to create a triable issue of fact regardless of his non-compliance with 28 U.S.C. § 1746. Stewart references no specific facts regarding the case he allegedly lost as a consequence of the denial of sufficient postage. Mere assertions unsupported by any specifics,

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

even when contained in an affidavit, are insufficient to create the material dispute necessary to defeat a motion for summary judgment. *See Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir.2008). Therefore, the court adopts Judge Lowe's recommendation that Stewart's denial of access to the courts claim be dismissed.[FN2]

> [FN2.] The court observes in passing that even if it were willing to consider new evidence in Stewart's sworn objections, Stewart's statement therein regarding his lost legal case is no more helpful in identifying what case he lost or providing substantiation to the claim that he lost the case as a consequence of limited postage. (*See* Pl. Objections at 4, Dkt. No. 39.)

**E. *Remaining Recommendations***

Because Stewart has not objected to the remaining recommendations, the court has reviewed those recommendations for clear error and finds none. Accordingly, the remainder of the R & R is adopted.

**IV. *Conclusion***

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge George H. Lowe's April 26, 2010 Report and Recommendation Order (Dkt. No. 38) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion to dismiss based on Stewart's refusal to cooperate with his deposition (Dkt. No. 30) is **DENIED;** and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 30) is **GRANTED** and Stewart's claims are **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Stewart v. Howard
Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and individual capacity, Dr. Marc Janis, in his official and individual capacity, New York State Department Of Correctional Services, Dr. Lester Wright, in his official and individual capacity, and Dr. J. Pereli, in his official and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary**Civil Rights 78** 🗝 **1358**

**78** Civil Rights

    **78III** Federal Remedies in General

        **78k1353** Liability of Public Officials

            **78k1358** k. Criminal law enforcement; prisons. Most Cited Cases

**Prisons 310** 🗝 **203**

**310** Prisons

    **310II** Prisoners and Inmates

        **310II(D)** Health and Medical Care

            **310k203** k. Reproductive issues. Most Cited Cases

**Sentencing and Punishment 350H** 🗝 **1546**

**350H** Sentencing and Punishment

    **350HVII** Cruel and Unusual Punishment in General

        **350HVII(H)** Conditions of Confinement

            **350Hk1546** k. Medical care and treatment. Most Cited Cases

    A correctional services doctor was not deliberately indifferent to a prisoner's serious medical needs under the Eighth Amendment in connection with the alleged denial of testosterone treatments. The prisoner brought a § 1983 action which alleged that he was denied the treatments which he needed after he developed hypogonadism after an epididymectomy. The doctor not liable for the alleged harm because he was not involved with any denials of the prisoner's treatment and did not create a policy that contributed to the prisoner's alleged harm. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

### *OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

   *1 Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case [FN1], violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

   FN1. The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

## II. BACKGROUND[FN2]

   FN2. For more detailed background, see *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2008

WL 3152963 (S.D.N.Y. Aug. 5, 2008) (*"Bellamy I"*). Some of the facts recounted here are drawn from the prior opinion.

### A. Facts

### 1. Parties

   Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York.[FN3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws.[FN4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS.[FN5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS.[FN6]

   FN3. *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

   FN4. *See id.* ¶ 2.

   FN5. *See id.* ¶ 3.

   FN6. *See id.*

### 2. Bellamy's Surgery

   In August 2004, while in DOCS custody at Sing Sing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy.[FN7] Bellamy was HIV positive at the time of his surgery.[FN8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol.[FN9] As a result of these conditions, Bellamy was prescribed various medications, including a testosterone patch called "Androderm."[FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

> FN7. See Bellamy I, 2008 WL 3152963, at *1. An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. See Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

> FN8. See 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

> FN9. See Bellamy I, 2008 WL 3152963, at *2. These conditions had many side effects, including sexual maladies and dramatic weight loss. See id. While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. See 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

> FN10. See, e.g., Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.

> FN11. See 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. See Moorjani Aff. ¶¶ 4-5.

> FN12. See Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). See also Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

**3. Bellamy's Letters to Wright**

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility.[FN14] Bellamy's third letter to Wright concerned several matters.[FN15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

> **FN13.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants ("Dawkins Decl.").

> **FN14.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

> **FN15.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

> **FN16.** *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses.[FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate.[FN20] The concerns are then investigated and addressed by the regional staff.[FN21]

> **FN17.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

> **FN18.** *See id.*

> **FN19.** *See id.* ¶ 13.

> **FN20.** *See id.* ¶ 14.

> **FN21.** *See id.*

**\*2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

> **FN22.** *See id.* ¶ 15.

> **FN23.** *See id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN24. *See id.*

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**[FN27]

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.[FN28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff." [FN29] Bellamy charges the DOCS because he was in its custody when his claims arose.[FN30] Bellamy

specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution." [FN31] A similar claim is lodged against the DOCS.[FN32] Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws.[FN33] Finally, Bellamy seeks compensatory and punitive damages.[FN34]

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002)* ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

**III. LEGAL STANDARD**

**A. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FN35 An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " FN36 A fact is material when it " 'might affect the outcome of the suit under the governing law.' " FN37 "It is the movant's burden to show that no genuine factual dispute exists." FN38

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248).

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. FN39 "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

party's case, and on which that party will bear the burden of proof at trial.' " [FN40] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [FN41] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [FN42] However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [FN43]

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

*3 In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. [FN44] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " [FN45] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." [FN46]

FN44. See *Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [FN47] and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." [FN48] However, a pro se plaintiff must still meet the usual requirements of summary judgment . [FN49] Thus, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or] her attempt to oppose defendants' motion [for summary judgment] ineffectual." [FN50]

> FN47. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

> FN48. *Burgos,* 14 F.3d at 790.

> FN49. *See Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

> FN50. *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

## B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions. [FN51] Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to

court at all." [FN52] Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." [FN53] Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules in order to suffice. [FN54] The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN55]

> FN51. *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); Booth v. Churner, 532 U.S. 732, 739 (2001).

> FN52. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

> FN53. *Id.*

> FN54. *See Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

> FN55. *Porter,* 534 U.S. at 532.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

> when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [FN56]

> FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." [FN57] "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " [FN58]

> FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

**C. Eleventh Amendment Immunity**

**\*4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." [FN59] "A state's Eleventh Amendment protection from suit extends to its agencies and departments." [FN60] "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." [FN61] To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." [FN62] State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment.[FN63]

> FN59. U.S. Const. amend. XI.

> FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

> FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

**D. Section 1983**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." FN64 In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. FN65 "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." FN66 Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." FN67

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " FN68 Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." FN69 In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. FN70 However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." FN71 The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." FN72 Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." FN73 For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." FN74

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). *See also Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

**\*5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." [FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' " [FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. *See Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

*8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " FN80 "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." FN81 "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." FN82 "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." FN83

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

**F. Preliminary and Permanent Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." FN84 "A preliminary injunction is an extraordinary remedy never awarded as of right." FN85 "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." FN86 The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. FN87

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). *Accord Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN86. *Mitchell v. New York State Dep't of Corr. Servs.,* No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009) (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

FN87. *See Winter,* 129 S.Ct. at 381.

## IV. DISCUSSION

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

### A. Exhaustion of Administrative Remedies

*6 This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." [FN88] Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at *5

(citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

### B. Eleventh Amendment Immunity

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

### C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

evidence that Wright was responsible for making any decisions regarding his testosterone medications.[FN89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability.[FN90]

> FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

> FN90. *See Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain-indeed Bellamy conceded that Wright was not involved in the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

**D. Preliminary and Permanent Injunction**

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is denied.

**\*7** *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis.[FN91]

> FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs.[FN92] For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment.[FN93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

> FN92. While the DOCS itself is immune from section 1983 liability, the following analysis

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

surrounds the DOCS and its employees generally.

FN93. Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

FN94. *See* Am. Compl., Prayer for Relief ¶ 18.

FN95. *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims"). *See also Kshel Realty Corp. v. City of New York,* No. 01 Civ.

9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**H**

United States District Court,

S.D. New York.

Matthew D'OLIMPIO and Michael Kaplan, Plaintiffs,

v.

Louis CRISAFI, in his individual capacity, Brendan
Vallely, in his individual capacity, Thomas
D'Amicantonio, in his individual capacity, James Giglio,
in his individual capacity, Michael Moffett, in his
individual capacity, Paul Nadel, in his individual
capacity, Jennifer Treacy, in her individual capacity,
Kenneth Post, in his individual capacity, and Timothy
Dewey, in his individual capacity, Defendants.

Louis Crisafi, Counterclaim-Plaintiff,

v.

Michael Kaplan, Counterclaim-Defendant.

Nos. 09 Civ. 7283(JSR), 09 Civ. 9952(JSR).

June 15, 2010.

**Background:** Arrestee and former narcotics enforcement
investigator brought action against another investigator
and other narcotics enforcement officials, alleging
malicious prosecution, false arrest, unlawful detention, and
other constitutional violations against arrestee, and First
Amendment retaliation against investigator. Defendant
investigator counterclaimed, alleging defamation by

plaintiff investigator. Defendants moved to dismiss for
failure to state a claim.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

(1) allegations were sufficient to state a claim of
supervisory liability against officials;

(2) law enforcement officers lacked even arguable
probable cause to make arrest;

(3) investigator's statements were not protected by First
Amendment; and

(4) plaintiff investigator was not liable for defamation.

Motions denied in part and granted in part.

West Headnotes

**[1] Civil Rights 78 ☞ 1358**

78 Civil Rights

   78III Federal Remedies in General

      78k1353 Liability of Public Officials

         78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases

     Arrestee was not required to show discriminatory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

purpose on the part of law enforcement officers in order to establish the personal involvement needed to support the officers' liability on his § 1983 claim alleging that his search, arrest, and prosecution violated the Fourth Amendment. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 🗝️    1395(6)**

78 Civil Rights

  78III Federal Remedies in General

    78k1392 Pleading

    78k1395 Particular Causes of Action

      78k1395(4) Criminal Law Enforcement; Police and Prosecutors

      78k1395(6) k. Arrest, search, and detention. Most Cited Cases

Allegations against law enforcement officials were sufficient to state a claim under § 1983 that officials failed to supervise narcotics enforcement investigators; complaint incorporated by reference an investigatory report that described various acts of misconduct by investigator that took place prior to arrestee's arrest, and concluded that there was a lack of appropriate supervision by officials, and arrestee alleged that another investigator complained to official in writing regarding investigator's misconduct prior to arrestee's arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[3] Arrest 35 🗝️    63.4(2)**

35 Arrest

35II On Criminal Charges

  35k63 Officers and Assistants, Arrest Without Warrant

    35k63.4 Probable or Reasonable Cause

      35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S.C.A. Const.Amend. 4.

**[4] Civil Rights 78 🗝️    1376(6)**

78 Civil Rights

  78III Federal Remedies in General

    78k1372 Privilege or Immunity; Good Faith and Probable Cause

      78k1376 Government Agencies and Officers

      78k1376(6) k. Sheriffs, police, and other peace officers. Most Cited Cases

In the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78 🗝️    1358**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

           78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

    Arrestee's allegations were sufficient to state a § 1983 supervisory liability claim against law enforcement officials, arising out of officials' creation of policy allowing narcotics enforcement investigators to initiate criminal charges based on a phone conversation or faxed affidavit, where arrestee alleged that his arrest for possession of a narcotic and criminal impersonation to obtain prescriptions was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of a prescription within a week, which prompted a narcotics enforcement official to call arrestee's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of arrestee's doctor. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

[6] Arrest 35 ⟜ 63.4(8)

35 Arrest

    35II On Criminal Charges

        35k63 Officers and Assistants, Arrest Without Warrant

           35k63.4 Probable or Reasonable Cause

                35k63.4(7) Information from Others

                    35k63.4(8) k. Reliability of informer. Most Cited Cases

    Law enforcement officers lacked even arguable probable cause to arrest arrestee for possession of a narcotic and impersonation of a physician based solely on unauthenticated report by physician's staff denying knowledge of arrestee's prescription. U.S.C.A. Const.Amend. 4.

[7] Constitutional Law 92 ⟜ 1941

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

           92k1941 k. Discipline or reprimand. Most Cited Cases

    A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee spoke as a citizen on a matter of public concern; otherwise, the employee's speech is outside the scope of the First Amendment. U.S.C.A. Const.Amend. 1.

[8] Constitutional Law 92 ⟜ 1955

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

           92k1955 k. Police and other public safety officials. Most Cited Cases

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**Municipal Corporations 268 ☞ 185(1)**

268 Municipal Corporations

   268V Officers, Agents, and Employees

      268V(B) Municipal Departments and Officers Thereof

         268k179 Police

            268k185 Suspension and Removal of Policemen

               268k185(1) k. Grounds for removal or suspension. Most Cited Cases

    Law enforcement officer's complaints to supervisor about fellow officer's behavior, his workplace incident reports, and his complaint to the inspector general, was speech falling within officer's official duties, and thus was not protected under the First Amendment, as required to support employee's retaliation claim; statements were made privately though channels available through officer's employment and were made in a manner that would not be available to a non-public employee citizen, and subject of statements was that other officer was not performing his job properly. U.S.C.A. Const.Amend. 1.

**[9] Libel and Slander 237 ☞ 28**

237 Libel and Slander

   237I Words and Acts Actionable, and Liability Therefor

      237k26 Repetition

         237k28 k. By others in general. Most Cited Cases

    It was simply implausible that narcotics investigator in any legally relevant sense caused the republication of his statements in an investigatory report or newspaper article regarding actions of a fellow investigator, as required to state a claim of defamation under New York law.

**[10] Libel and Slander 237 ☞ 28**

237 Libel and Slander

   237I Words and Acts Actionable, and Liability Therefor

      237k26 Repetition

         237k28 k. By others in general. Most Cited Cases

    Under New York law, a plaintiff may not recover damages from the original author for slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication.

*342 James Brian Lebow, Sr., New York, NY, for Plaintiffs.

Christine Alexandria Rodriguez, Christine A. Rodriguez, Law Office, Ivan B. Rubin, Peter Sangjin Hyun, New York State Office of the Attorney General, New York, NY, for Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

On August 18, 2009, Plaintiff Matthew D'Olimpio brought this action (docket-numbered 09 Civ. 7283) against defendants Louis Crisafi, Brendan Vallely, Thomas D'Amicantonio, James Giglio, Michael Moffett, and Paul Nadel for malicious prosecution, false arrest, unlawful detention, and various other violations of the Constitution and 42 U.S.C. §§ 1983 and 1988. An amended complaint filed on October 29, 2009 joined Michael Kaplan as a plaintiff and added a claim against defendants Nadel, Jennifer Treacy, Kenneth Post, and Timothy Dewey for unconstitutionally retaliating against Kaplan based on his reports of misconduct committed by defendant Crisafi, a fellow investigator employed by the New York State Department of Health's Bureau of Narcotics Enforcement, Metropolitan Area Regional Office ("BNE-MARO"), in violation of the First and Fourteenth Amendments and § 1983.

On December 18, 2009, defendants Giglio, Moffett, and Nadel moved to dismiss all of D'Olimpio's claims against them, and defendants Crisafi, Vallely, and D'Amicantonio moved to dismiss D'Olimpio's malicious prosecution claim. That same day, defendants Nadel, Treacy, Post, and Dewey moved to dismiss Kaplan's claims against them. Meanwhile, on December 3, 2009, Crisafi had filed what was styled as a complaint against Kaplan (docket-numbered 09 Civ. 9952) alleging that Kaplan defamed him through publication of the reports of Crisafi's misconduct discussed in Kaplan's complaint. On the parties' consent, the Court converted Crisafi's complaint into a compulsory counterclaim in the action docket-numbered 09 Civ. 7283 and consolidated the two cases. *See* Transcript, 1/14/10, *Crisafi v. Kaplan,* No. 09 **\*343** Civ. 9952. On January 22, 2010, Kaplan moved to dismiss that counterclaim.

By Order dated March 1, 2010 (the "March 1 Order"), the Court granted the motion of Nadel, Treacy, Post, and Dewey to dismiss Kaplan's retaliation claim; granted Kaplan's motion to dismiss Crisafi's defamation counterclaim; and denied all other motions to dismiss.[FN1] The Order also promised that a Memorandum would issue in due course stating the reasons for these rulings. With apologies to counsel for the extended delay, the Court here provides that Memorandum.

> FN1. Although the Order did not explicitly so state, all the dismissals were with prejudice (which, as it happens, is also the default position when an order does not state whether a dismissal is or is not with prejudice).

The Court turns first to the motions of defendants Crisafi, Vallely, and D'Amicantonio to dismiss D'Olimpio's malicious prosecution claim, as set forth in the First Amended Complaint ("FAC") filed on October 29, 2009.[FN2] The relevant allegations are as follows:

> FN2. The first five causes of action in the FAC are D'Olimpio's claims. The sixth cause of action is Kaplan's claim.

Sometime before November 16, 2007, D'Olimpio, a resident of Brooklyn, was prescribed Vicodin by his doctor. FAC ¶ 17. He called that prescription into his pharmacy and obtained the Vicodin. *Id.* ¶ 18. D'Olimpio's pharmacy contacted the BNE-MARO after it had not received a hard copy of the prescription from D'Olimpio's doctor within seven days. *Id.* ¶ 19. A MARO official called D'Olimpio's doctor's office and spoke to an unknown individual there, who either stated by phone that he was not aware of D'Olimpio's Vicodin prescription or provided a faxed affidavit purportedly signed by the doctor to that effect. *Id.* ¶ 20. Based on these occurrences, and without any further investigation, MARO investigator Crisafi began planning Crisafi's arrest. *Id.* ¶ 21.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

On or about November 16, 2007, D'Olimpio was exiting his doctor's office in Brooklyn and walking toward his car when Crisafi and defendants Vallely and D'Amicantonio, also MARO investigators, showed D'Olimpio their badges and asked to speak with him. *Id.* ¶¶ 4, 27-28. They asked D'Olimpio his name, where he was coming from, what he was doing at the doctor's office, and whether the car was his. *Id.* ¶ 29. D'Olimpio replied it was his wife's car. *Id.* ¶ 30. Crisafi asked D'Olimpio if they could search him for weapons; D'Olimpio consented to be frisked, but not to a full search. *Id.* ¶¶ 31-32. Crisafi then frisked D'Olimpio, reached into his pockets, and took out his car keys. *Id.* ¶ 33. Crisafi asked D'Olimpio whether he would consent to a search of the car; D'Olimpio refused, but Crisafi nonetheless carried out the search. *Id.* ¶¶ 34-36. During the search, Crisafi found a bag containing a bottle marked for Klonopin but containing both Vicodin and Klonopin pills, all of which were lawfully prescribed to Crisafi and which he carried in one bottle for convenience. *Id.* ¶¶ 37-38. Upon finding the bottle and discovering that there were two types of pills inside, Crisafi handcuffed D'Olimpio and moved him into the police car, without making any effort to find out whether the drugs were legally prescribed. *Id.* ¶¶ 39-40.

While D'Olimpio was being driven to the police precinct and again when he was being escorted to a bathroom prior to questioning, D'Olimpio requested an attorney, but these requests were denied. *Id.* ¶¶ 41-44. Before questioning began, D'Olimpio asked Crisafi to call an ambulance so that he could take the Klonopin that he needed; Crisafi told D'Olimpio to call his wife and ask her to come to the precinct with his medication. *Id.* ¶¶ 46-47. When **\*344** D'Olimpio's wife arrived, D'Olimpio was brought into a different room, and his wife was given his possessions. *Id.* ¶ 48. Crisafi then offered D'Olimpio a blue pill, which he took, but D'Olimpio now believes that pill was not a Klonopin pill, as he experienced side effects of confusion and drowsiness after taking it, which he had never felt previously when taking Klonopin. *Id.* ¶ 50. Crisafi began to interrogate D'Olimpio, and at one point

threatened to rescind his father's physician license. *Id.* ¶ 51. D'Olimpio at that point again requested an attorney, and Crisafi again denied his request. *Id.* ¶¶ 52-53.

During the interrogation, Crisafi asked D'Olimpio to confess to charges of criminal possession of a controlled substance for possessing the Vicodin and to charges of criminal impersonation for allegedly calling pharmacies and using false information to obtain prescriptions. D'Olimpio, under the influence of the pill, signed a one-page confession presented to him by Crisafi. *Id.* ¶ 54. At Crisafi's request, Vallely signed a form falsely indicating that he had seen Crisafi inform D'Olimpio of his *Miranda* rights. *Id.* ¶ 55. D'Olimpio's forged signature was also added to this "*Miranda* sheet." *Id.* ¶ 56. Crisafi, perhaps with the assistance of Vallely or D'Amicantonio, also wrote a four-page confession and forged D'Olimpio's signature and initials on it. *Id.* ¶ 57. Furthermore, Crisafi, possibly with the assistance of Vallely and D'Amicantonio, drafted an affidavit falsely attesting that D'Olimpio illegally possessed Vicodin and that he impersonated a doctor to obtain his prescriptions. *Id.* ¶ 58.

D'Olimpio was then taken to the Manhattan Detention Center, where he was held for 24 hours prior to being arraigned. *Id.* ¶¶ 59-60. Based on the four-page confession and the affidavit, he was arraigned on the criminal possession and impersonation charges and then released on his own recognizance. *Id.* ¶¶ 61-62. According to the Complaint, D'Olimpio appeared in court about seven times before the charges against him were finally dropped on September 4, 2008. *Id.* ¶ 76.

On the basis of these allegations, D'Olimpio's third cause of action claims that Crisafi, Vallely, and D'Amicantonio maliciously prosecuted D'Olimpio by initiating the criminal charges.[FN3] These defendants moved to dismiss this malicious prosecution claim, primarily on the basis that the charges against D'Olimpio remained pending against him as of the time of their motion, as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

demonstrated by a Court Action Sheet of the Criminal Court, New York County. Decl. of Ivan Rubin, 12/22/09, Ex. 1. Because the favorable termination of the prosecution is a necessary element of a malicious prosecution claim under § 1983, *Green v. Mattingly*, 585 F.3d 97, 103 (2d Cir.2009), the pendency of criminal charges would be fatal to this cause of action.

> FN3. In the first, fourth, and fifth causes of action in the FAC, D'Olimpio respectively alleges that Crisafi, Vallely, and D'Amicantonio violated various constitutional rights, falsely arrested him, and unlawfully detained him. No motions to dismiss were filed with respect to these claims.

In his opposition to the motions to dismiss, D'Olimpio asserted that the Assistant District Attorney prosecuting D'Olimpio's criminal case had committed to move orally to dismiss that case at the next court hearing, which was scheduled for February 2, 2010. Based on that representation, this Court granted leave for D'Olimpio to file a Second Amended Complaint ("SAC") following that hearing. The Second Amended Complaint, filed on February 18, 2010, did indeed include the representation that the criminal charges were dismissed on February 2, 2010. SAC **345 ¶ 110. Since D'Olimpio had now sufficiently alleged the favorable termination of the criminal charges against him, the March 1 Order therefore denied the motions to dismiss D'Olimpio's malicious prosecution claim.[FN4]

> FN4. Defendants also asserted that the malicious prosecution claim should be dismissed because D'Olimpio's allegations failed to demonstrate the element of malice-*i.e.,* that there was "some deliberate act punctuated with awareness of 'conscious falsity' " with respect to the institution of criminal proceedings. *Bradley v. Vill. of Greenwood Lake*, 376 F.Supp.2d 528,

534-35 (S.D.N.Y.2005). But D'Olimpio's allegations regarding the false affidavits and confessions were clearly more than sufficient to plead malice.

Defendants Giglio, Moffett, and Nadel moved to dismiss D'Olimpio's second cause of action, which charged them with various constitutional violations based on their supervisory authority over Crisafi and their involvement with an alleged policy leading to D'Olimpio's false arrest. In this regard, the FAC contains the following allegations with respect to these defendants: At the time of the events alleged, James Giglio was the director of the BNE, and worked in the BNE's office in Troy, New York. *Id.* ¶ 5. Michael Moffett was the BNE's Section Chief with responsibility over BNE investigators, and also worked in the Troy office. *Id.* ¶ 6. Paul Nadel was the BNE's Program Director for the MARO, and worked in the same Manhattan office as Crisafi, Vallely, and D'Amicantonio. *Id.* ¶ 7. All three of these defendants had supervisory authority over Crisafi, Vallely, D'Amicantonio, and Kaplan. *Id.* ¶¶ 5-7.

The FAC further alleges that at the time of Crisafi's arrest, MARO followed the following protocol in order to determine whether a narcotics prescription was legitimate: First, when a patient called in a prescription to a pharmacy, the pharmacy would expect to receive a hard copy of the prescription from the patient's doctor within a week. Second, pharmacies were instructed to contact the MARO if they failed to receive a hard copy by the end of the seven-day period. Third, when the MARO was contacted by a pharmacy because the pharmacy did not receive a hard copy, a MARO officer would call the doctor's office and would either speak with the doctor to inquire whether the prescription was legitimate or would ask the doctor to fax an affidavit stating that the prescription was legitimate. *Id.* ¶ 11. With respect to this last step, MARO had a practice of confirming complaints from doctors by telephone and fax without taking any other steps to verify the doctors' identities. *Id.* ¶ 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

The FAC also includes the following allegations regarding the failure of Giglio, Moffett, and Nadel to supervise Crisafi: On March 22, 2007, the *New York Times* published an article detailing the abuse of parking placards by government officials. This article included a photograph of a car belonging to Crisafi. *Id.* ¶ 13. Shortly after the publication of that article, the New York State Inspector General's Office began an investigation of Crisafi, which unearthed evidence of other misconduct. *Id.* ¶ 14. Sometime before November 16, 2007, plaintiff Kaplan, a MARO investigator, sent Nadel a written complaint informing him that Crisafi was violating suspects' Fifth Amendment rights. *Id.* ¶ 15. Nadel took no action in response to this complaint. *Id.* ¶ 16. Kaplan followed up with a series of other complaints, including a report to the Inspector General, which are discussed more fully below in the context of Kaplan's retaliation claim. The Inspector General's investigation culminated in a report issued on December 8, 2008, written by Inspector General Joseph Fisch (the "Fisch Report"), which found that Crisafi committed numerous abuses, including many of those alleged by Kaplan, some of **\*346** which were assisted by Vallely and D'Amicantonio. The Fisch Report also found that Giglio and Moffett failed to supervise Crisafi and the MARO office, and noted the fact that Nadel, who was responsible for approving law enforcement operations, was a licensed pharmacist with no previous law enforcement experience. *Id.* ¶¶ 78-79.

Based on the above allegations, Crisafi in his second cause of action asserted § 1983 claims against Giglio, Moffett, and Nadel arising from (1) their creation of a policy allowing MARO personnel to initiate criminal charges based on a phone conversation or faxed affidavit without confirmation of the doctor's identity or that the alleged signature on the affidavit was authentic (the "Policy"); (2) their failure to supervise Crisafi and the MARO; (3) their allowing Nadel, a pharmacist with no prior law enforcement experience, to be the MARO Program Director; and (4) their deliberate indifference to D'Olimpio's rights. *Id.* ¶¶ 122-25.

Defendants attack these claims on several grounds. First, they assert that these claims are based on a broad theory of "supervisory liability" that has been discredited by the Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for showing that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a § 1983 claim. A plaintiff could plead personal involvement by showing any of the following:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Defendants argue that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* therefore rendering D'Olimpio's reliance on some of the *Colon* categories unwarranted.

By way of background, the plaintiff in *Iqbal* brought a " *Bivens* " action against several high-ranking federal officials, including the Attorney General and the Director of the Federal Bureau of Investigation, based on allegations that following the September 11 attacks, the FBI "arrested and detained thousands of Arab and Muslim men" substantially on the basis of their race, religion, or national origin, and that as a result plaintiff was unlawfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

subjected to harsh confinement conditions substantially on these discriminatory bases. [129 S.Ct. at 1951.](#) The Supreme Court, however, held, *inter alia,* that the complaint failed to state a claim for intentional discrimination with respect to the Attorney General and FBI Director, and, as part of that discussion, observed that neither *[Bivens](#)* itself (*i.e., [Bivens v. Six Unknown Fed. Narcotics Agents,](#) 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)*) nor [§ 1983](#) imposes supervisory liability simply on the basis of *respondeat superior;* rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *[Id. at 1948; see also id. at 1949](#)* ("[T]he term 'supervisory liability' is a misnomer.... [E]ach Government official ... is only liable for his or her own misconduct."). The Court went on to note that the required showing of personal involvement "will vary with the **\*347** constitutional provision at issue"; as the plaintiff's claim in *[Iqbal](#)* was for "invidious discrimination" in violation of the First Amendment and Equal Protection Clause, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *[Id. at 1948.](#)* Accordingly, the Court rejected the plaintiff's theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *[Id. at 1949.](#)*

[1] The defendants here note that certain courts in this District have read these passages of *[Iqbal](#)* to mean that "[o]nly the first and part of the third *[Colon](#)* categories pass *[Iqbal's](#)* muster ... [t]he other *[Colon](#)* categories impose the exact types of supervisory liability that *[Iqbal](#)* eliminated." *[Bellamy v. Mount Vernon Hosp.,](#) 2009 WL 1835939, at \*6 (S.D.N.Y. June 26, 2009); see also [Newton v. City of N.Y.,](#) 640 F.Supp.2d 426, 448 (S.D.N.Y.2009)* ("[P]assive failure to train claims have not survived the Supreme Court's recent decision in *[Ashcroft v. Iqbal.](#)*"); *[Joseph v. Fischer,](#) 2009 WL 3321011, at \*15 (S.D.N.Y. Oct. 8, 2009)* ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim Iqbal eliminated."). This Court respectfully disagrees. As *[Iqbal](#)* noted, the degree of personal involvement varies depending on the

constitutional provision at issue; whereas invidious discrimination claims require a showing of discriminatory purpose, there is no analogous requirement applicable to D'Olimpio's allegations regarding his search, arrest, and prosecution. *See, e.g., [Whren v. United States,](#) 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)* ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). *[Colon's](#)* bases for liability are not founded on a theory of *respondeat superior,* but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. [58 F.3d at 873](#) (internal quotation marks omitted). Thus, the five *[Colon](#)* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *See, e.g., [Sash v. United States,](#) 674 F.Supp.2d 531, 544 (S.D.N.Y.2009)* ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *[Colon v. Coughlin](#)* may still apply." (citation omitted)).

[2] Apart from this argument based on *[Iqbal,](#)* Giglio and Moffett assert that D'Olimpio's claims against them should be dismissed insofar as they allege a failure to supervise the MARO investigators. They maintain that D'Olimpio's allegations in this regard are too conclusory to state a claim. The Court disagrees. The FAC incorporates by reference the Fisch Report, which summarizes an investigation beginning in March 2007, describes various acts of misconduct by Crisafi that took place prior to D'Olimpio's arrest, contains a section headed "Lack of Supervision of Crisafi and MARO," and indeed concludes that there was a "lack of appropriate supervision by [Crisafi's] supervisors at MARO and at

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

BNE's headquarters in Troy," where Giglio and Moffett were in charge. Fisch Report, 12/8/08, at 4, 16-17, *available at http:// www. ig. state. ny. us/ *348 pd fs/Investigationöf% 20Employee% 20Misconduct% 20at% 20the% 20DOH% 20Bureau% 20of% 20Narcotics% 20Enforcement.pdf* (cited in FAC ¶ 78). These findings by the Inspector General strongly suggest that defendants Giglio and Moffett "fail[ed] to act on information indicating unconstitutional acts were occurring," or were "gross[ly] negligen[t] in failing to supervise ... subordinates who commit ... wrongful acts," or were otherwise deliberately indifferent to suspects' rights, and also demonstrate "an affirmative causal link between the supervisor's inaction and [plaintiff's] injury." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). For the foregoing reasons, the March 1 Order held that the claims against Giglio and Moffett in this respect cannot be dismissed.

Nadel also argued that the claims against him for his failure to supervise Crisafi must be dismissed because there were no specific allegations of Nadel's personal involvement. The FAC does allege, however, that Kaplan complained to Nadel in writing of Crisafi's misconduct prior to D'Olimpio's arrest. FAC ¶ 15. The Fisch Report, although it does not dwell on Nadel's actions, cites Nadel's lack of prior law enforcement experience and describes complaints by MARO investigators that the lack of a Program Director with law enforcement experience allowed Crisafi "to attain an inappropriate degree of power within the office." Fisch Report at 1, 16. Because the Court, in ruling on a motion to dismiss, must "take all facts and draw all inferences in the light most favorable" to the plaintiff, *Gross v. Rell,* 585 F.3d 72, 75 n. 1 (2d Cir.2009), and because, as noted, the FAC incorporates by reference the allegations of the Fisch Report, the Fisch Report's conclusion that there was a general failure to supervise Crisafi must be taken for these purposes to apply to Nadel, Crisafi's immediate supervisor.[FN5] Thus, the March 1 Order denied the motion to dismiss the claim alleging Nadel's failure to supervise.

FN5. Defendants' reply memorandum asserted that contrary to what was pleaded in the FAC, Crisafi was a Senior Investigator at the time of D'Olimpio's arrest and thus did not report to Nadel at that time. In support of this, it cited to the Fisch Report, which mentions that Crisafi was temporarily promoted between 2006 and March 2008. Fisch Report at 16. The Report does not, however, state that Crisafi ceased reporting to Nadel during this period. The FAC alleges that Nadel, as MARO Program Director, had supervisory authority over all MARO investigators. FAC ¶ 7. In light of the allegations in the FAC, and taking all inferences in favor of D'Olimpio, the Court cannot conclude that Nadel lacked supervisory authority over Crisafi during this period. In any event, it is undisputed that Nadel supervised Vallely and D'Amicantonio, who are also alleged to have violated D'Olimpio's constitutional rights.

With respect to those aspects of plaintiff D'Olimpio's second cause of action that relate to the alleged "Policy," that Policy allegedly permitted BNE investigators to rely on unverified telephone communications with, or faxed affidavits from, doctors' offices to satisfy the requirement of probable cause to arrest suspects or initiate criminal charges. While defendants appear to concede that Giglio, Moffett, and Nadel were sufficiently involved with the formation and operation of this Policy to satisfy the personal involvement requirement of § 1983, they argue that the alleged Policy is not unconstitutional, or at the very least, that the doctrine of qualified immunity should bar further proceedings with respect to these allegations.

[3][4] "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is *349 committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). The probable cause determination is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

based on the "totality of the circumstances," and does not readily lend itself to being reduced to a "neat set of legal rules." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (internal quotation marks omitted). Furthermore, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Id.* (internal quotation mark omitted). The Supreme Court has held that tips from informants can provide probable cause to arrest, but only if either the informant or the information in his/her tips has been shown to be reliable or has been sufficiently corroborated. *See Illinois v. Gates,* 462 U.S. 213, 242, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven in making a warrantless arrest[,] an officer 'may rely upon information received through an informant, rather than upon his direct observations, *so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.*' " (emphasis added)); *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous call to police reporting that person was carrying a gun lacked indicia of reliability sufficient to satisfy "reasonable suspicion" standard with respect to a police officer's stop-and-frisk search, even though that standard requires a lesser showing than probable cause to arrest); *see also United States v. Elmore,* 482 F.3d 172, 179 (2d Cir.2007) ("Even a tip from a completely anonymous informant-though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable-can form the basis of reasonable suspicion or probable cause *if it is sufficiently corroborated.*" (emphasis added) (citation omitted)); *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) ("Information about criminal activity provided by a single complainant can establish probable cause *when that information is sufficiently reliable and corroborated.*" (emphasis added)).

[5] Defendants argue that the Policy provides BNE officers with probable cause (either on the merits or sufficient to entitle them to qualified immunity) because the information provided by the doctors' offices is sufficiently reliable to support a reasonable belief that a crime has been committed. For this proposition, the defendants rely primarily on two out-of-circuit cases,

*United States v. Fooladi,* 703 F.2d 180 (5th Cir.1983), and *Edwards v. Cabrera,* 58 F.3d 290 (7th Cir.1995). While these cases do support the proposition that it may be error to discount information provided by disinterested informants absent reason to doubt these informants' veracity, even when their names are not known to the law enforcement officer, these cases do not stand for the proposition that such information alone suffices to establish probable cause. Rather, in *Fooladi,* the probable cause determination was not based solely on information provided by a representative of a glass manufacturer, which the Fifth Circuit held that the trial court had erroneously disregarded. Instead, the arrest was based not only on the employee's tip that the manufacturer had shipped glassware to a purported business address that was in fact the arrestee's personal address, but also on, among other things, the law enforcement agent's personal observation that the arrestee's residence emanated an odor characteristic of methamphetamine manufacturing and that the arrestee left the premises "holding his gloved hands away from his body as if a chemical were on them." 703 F.2d at 181-84. Similarly, in *Edwards,* the Seventh Circuit found that probable cause existed not just because of a tip from a bus **350** driver, relayed through a dispatcher, that the driver thought he saw several men participate in a drug transaction in a bus station, but also based on the police officer's own personal observations of several men, including the arrestee and his brother, who matched the driver's description standing together outside the bus station; the officer's personal observation that the arrestee's brother was so nervous that he appeared to have urinated on himself; and the officer's subsequent consent search of the brother's garment bag, which yielded a plastic bag appearing to contain marijuana. 58 F.3d at 292.

These cases are thus consistent with the law in this Circuit, as articulated in *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). The plaintiff in *Caldarola,* a New York corrections officer challenged his arrest on charges that he was unlawfully collecting job injury benefits even though he was no longer a New York resident and thus was not qualified to receive such benefits. The arresting officer determined there was probable cause to believe the plaintiff had moved from New York to Connecticut based

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

on an investigative file containing reports from two private investigation firms that had been hired by the officer's supervisors. The reports themselves contained, among other things, summaries of investigators' personal interviews with the plaintiff's New York neighbors, surveillance tapes showing the plaintiff emerging from a home in Connecticut and dropping his children off at school, a deed and mortgage for a Connecticut home in the plaintiff's name indicating that it was his primary residence, and work attendance records indicating that the plaintiff had a Connecticut telephone number. The Second Circuit held that it was reasonable for the arresting officer to conclude that these private investigative firms hired by his supervisors were reliable and that the investigators' reports provided information corroborating their conclusions. *Id.* at 163-68. Thus, accepting *arguendo* defendants' assertion that *Caldarola* stands for the proposition that information gathered by private investigators can support probable cause even in the absence of personal knowledge by the arresting officer, the decision certainly does not suggest that an unadorned, unverified phone call or fax can, by itself, without further meaningful corroboration, satisfy probable cause or support qualified immunity.

[6] Returning to the allegations in the FAC, D'Olimpio has asserted that, consistent with the Policy, his arrest was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of the prescription within a week, which prompted a MARO official to call D'Olimpio's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of the doctor. None of the above-cited cases suggests that this information originating from an unidentifiable person in a doctor's office can even come close to satisfying probable cause to arrest, absent corroboration or other indicia of reliability. Unlike *Caldarola,* here there is no underlying data providing support for the informant's conclusion. There is no indication that the identity of the informant here could ever be determined. Cf. *J.L.,* 529 U.S. at 270, 120 S.Ct. 1375 ("Unlike a tip from a known informant whose

reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " (citation omitted)). There is no suggestion that the MARO investigators had any reason to rely on this particular doctor's office; to the contrary, there are numerous **351** reasons why a doctor or her staff might inadvertently provide inaccurate information, especially given that the relevant information is not affirmatively provided by a tipper, but rather can be elicited by the investigator from whoever happens to pick up the phone in the doctor's office. Moreover, if the doctor herself were involved in wrongdoing with respect to the prescription of narcotics, she would have an incentive to affirmatively mislead the investigators. In sum, while a report from a doctor or her staff denying knowledge of the prescription might be a reasonable basis for further investigation, it is patently deficient as the sole ground for an arrest.

For the foregoing reasons, under the facts alleged and the clearly established law cited herein, defendants lacked even arguable probable cause to arrest D'Olimpio. Because the circumstances of this arrest were consistent with the Policy (as alleged), and because defendants do not dispute that Giglio, Moffett, and Nadel had personal involvement with the establishment and enforcement of this Policy, the March 1 Order declined to dismiss the second cause of action with respect to these allegations.

The Court turns next to those portions of the FAC that assert claims by plaintiff Kaplan, all of which the defendants moved to dismiss. Kaplan's claim of retaliation for expressing his First Amendment rights (the sixth cause of action in the FAC) is based on the following allegations: Kaplan (as noted) is a MARO investigator. FAC ¶ 3. During at least some of the times covered by the FAC, Crisafi was Kaplan's supervisor. *Id.* ¶ 64. As described above, Kaplan complained to Nadel about Crisafi prior to November 16, 2007, but Nadel took no action. *Id.* ¶¶ 15-16. On or about November 17, 2007, Kaplan again went to Nadel and raised concerns about

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Crisafi: in particular, he stated that Crisafi took prescription narcotics while on duty; that Crisafi would experience facial tics and "zone out"; that Crisafi accidentally discharged his weapon while on duty; that Crisafi lied about his previous job experience; that Crisafi had investigators perform "ill-conceived" and dangerous arrests and searches; that Crisafi was violating suspects' *Miranda* rights; that Crisafi, without authorization, put sirens and lights on his car; and that Crisafi was working outside jobs during work hours. *Id.* ¶ 63. Despite the fact that Kaplan told Nadel that he was afraid of Crisafi and Nadel assured Kaplan that the conversation would be kept confidential, Nadel reported this conversation to Crisafi. *Id.* ¶¶ 63-64. Thereafter, on or about November 20, 2007, Crisafi threatened Kaplan by walking up behind him and saying, "Bang bang, you're dead." *Id.* ¶ 65. At around that same time, Kaplan filed a Workplace Incident Report with the Department of Health's Bureau of Employee Relations detailing these threats and reporting Crisafi's other misconduct, of which he had previously complained to Nadel. *Id.* ¶ 66. In response, Crisafi sabotaged Kaplan's work product on several occasions and began to spread rumors about him, including rumors that Kaplan appeared tired and slept while at the office. *Id.* ¶¶ 67-68. Kaplan then called the Inspector General to report these concerns about Crisafi, and the Inspector General then widened his ongoing investigation of Crisafi to address these issues. *Id.* ¶¶ 69-70. Because, however, the Inspector General's investigation led to interviews with all the MARO inspectors except for Kaplan, Crisafi and Nadel were able to infer that Kaplan was the whistleblower. *Id.* ¶ 71.

Kaplan, after spraining his ankle while on duty, went on workers' compensation leave on or about February 27, 2008. *Id.* ¶ 72. A bullet was shot at Kaplan's house on April 17, 2008, and on April 25, 2008, his house was vandalized. *Id.* ¶¶ 73-74. **\*352** On August 12, 2008, after Kaplan was notified that Employee Relations never received his first Workplace Incident Report, Kaplan resubmitted it. *Id.* ¶ 75.

After publication of the Fisch Report, Giglio resigned as the director of the BNE. *Id.* ¶ 81. In December 2008, defendant Jennifer Treacy was appointed Deputy Director of the New York State Department of Health, with supervisory authority over the BNE and the MARO. *Id.* ¶ 82. The Inspector General attempted to persuade Kaplan to return to work, as Crisafi was on leave and would face discipline for his conduct. *Id.* ¶ 83. Kaplan agreed to return to work and received a physician's evaluation that he was fit to return. *Id.* ¶¶ 84-86. Nonetheless, Kaplan was required to undergo three additional physical examinations; after reviewing these, the relevant administrator concluded that Kaplan was fit to return, provided the he be closely monitored, specifically for falling asleep at work. *Id.* ¶¶ 87-90. He was scheduled to return to work on April 10, 2009. *Id.* ¶ 91. The FAC alleges that Treacy, who was romantically involved with Giglio, was upset about Giglio's resignation and blamed Kaplan for causing it; therefore, she ordered the acting director of the BNE not to allow Kaplan to return. *Id.* ¶¶ 92-93. On April 9, 2009, Kaplan was told not to return because of a lack of staff, and on April 23, the Department of Health sent him a letter informing him that he was terminated for failing to complete a study to confirm he did not have a sleep disorder. *Id.* ¶¶ 94-95. Kaplan filed a grievance and, after a hearing, was allowed to return to work. *Id.* ¶ 96.

In May 2009, defendant Kenneth Post was appointed as director of the BNE, and defendant Timothy Dewey was appointed as BNE Section Chief. *Id.* ¶¶ 97-98. In June 2009, Kaplan returned to work, and was informed that he would only be given a temporary assignment and would not perform fieldwork. *Id.* ¶ 99. After his reinstatement, Kaplan was denied access to a state car and was not given a badge, gun, or firearms training; he was confined to desk duties and menial document review. *Id.* ¶¶ 100-101. On July 14, 2009, Kaplan met with Dewey to complain about his treatment. *Id.* ¶ 102. D'Olimpio filed his original complaint in the instant action on August 18, 2009. In September 2009, Stephanie Jubic of Employee Relations confiscated the computers of Crisafi, Vallely, D'Amicantonio, and Kaplan-Kaplan believes Jubic downloaded his emails to find grounds to terminate him. *Id.* ¶ 105. On October 8, 2009, Kaplan was placed on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

administrative leave and told not to contact anyone at the BNE. *Id.* ¶ 108. On October 16, Jubic mailed Kaplan a letter stating that he would be interrogated on October 27 and would possibly face discipline. *Id.* ¶ 109. Also on October 16, Kaplan had a grievance hearing to discuss being denied his proper job responsibilities. At this hearing, Post stated that as BNE director, it was in his discretion to decide what duties Kaplan should have. *Id.* ¶ 110.

Based on these facts, Kaplan alleges in that defendants Treacy, Post, Dewey, and Nadel retaliated against him with respect to speech that was protected by the First Amendment. These defendants have moved to dismiss Kaplan's claim on several grounds, including that Kaplan's speech was made pursuant to his official duties and hence is not protected by the First Amendment.

[7] A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee "spoke as a citizen on a matter of public concern"; otherwise, the employee's speech is outside the scope of the First Amendment. *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (internal quotation *353 mark omitted). In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Though not without reluctance, the Court concludes that this "official duties" exception, as recently elaborated on by the Second Circuit in *Weintraub v. Board of Education,* 593 F.3d 196 (2d Cir.2010), is fatal to Kaplan's retaliation claim.

*Weintraub* made clear that for purposes of determining whether a public employee's speech is protected, a public employee's "official duties" are to be

construed broadly. The plaintiff in *Weintraub* was a public school teacher, and the allegedly protected speech consisted of a grievance he filed with his union challenging a school administrator's decision not to discipline a disruptive student. Quoting *Garcetti,* the Court of Appeals stated that the inquiry into whether a public employee speaks pursuant his official duties is "a practical one," and that the employee's duties should not be interpreted narrowly. 593 F.3d at 202 (internal quotation marks omitted). Thus, *Weintraub* held:

[U]nder the First Amendment, speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer. In particular, we conclude that Weintraub's grievance was "pursuant to" his official duties because it was "part-and-parcel of his concerns" about his ability to "properly execute his duties," as a public school teacher-namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.... Weintraub's speech challenging the school administration's decision to not discipline a student in his class was a "means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching.

*Id.* at 203 (citations omitted). The court went on to note that its conclusion was supported "by the fact that [Weintraub's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." *Id.* Whereas actions like writing a letter to a newspaper or informally discussing politics with co-workers are equally available to government employees and ordinary citizens, "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens." *Id.* at 203-04.

[8] Here, the speech that Kaplan claims is protected falls within Kaplan's official duties as defined by

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*Weintraub.* In the FAC, Kaplan alleges that the retaliation he allegedly suffered was in response to the following statements: (1) his complaints to Nadel about Crisafi's behavior; (2) his Workplace Incident Reports; and (3) his complaint to the Inspector General. With the possible exception of the latter, each of these statements, as Kaplan concedes, was "made privately though channels available through his employment, and was "made in a manner that would not be available to a non-public employee citizen." Kaplan Supp. Mem., 2/5/10, at 5. Moreover, the common theme of all these statements was that Crisafi was violating suspects' rights and was not performing his job properly, and by implication that Crisafi was interfering with Kaplan's ability to perform his own duties. It is clear that Kaplan's duties as a MARO officer included ensuring that investigations and arrests of narcotics abuses are lawfully conducted. *See, e.g.,* Fisch Report at 2-3 (describing policies and training manuals **354** applicable to BNE investigators). All of Kaplan's relevant speech was therefore, either directly or indirectly, " 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' " as a BNE investigator. *Weintraub,* 593 F.3d at 203. Just as the speech in *Weintraub* was in furtherance of the teacher's duty to maintain classroom discipline, Kaplan's speech here, which related to ensuring the "safety of citizens" and the "constitutional rights of suspects," Kaplan Supp. Mem. at 5, was made in furtherance of his law enforcement duties as an investigator endowed with the power to arrest. *Cf. Carter v. Inc. Vill. of Ocean Beach,* 693 F.Supp.2d 203, 211 (E.D.N.Y.2010) ( "All of plaintiffs' complaints to their superiors ... related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern [that various acts] affected their ability to perform their job assignments safely and that they were told not to issue summonses to certain individuals and businesses.... Plaintiffs' speech in challenging ... defendants' alleged cover-ups of officer misconduct ... was undertaken in the course of performing one of their core employment responsibilities of enforcing the law and, thus, was speech made pursuant to their official duties."). Accordingly, Kaplan's allegations cannot support a First Amendment retaliation claim.

In addition, the speech contained in Kaplan's Workplace Incident Reports and his complaint to the Inspector General were unprotected by the First Amendment because these statements were required by law. *See* N.Y. Labor Law § 27-b(6)(a) ("Any employee ... who believes that a serious violation of a workplace violence protection program exists or that an imminent danger exists shall bring such matter to the attention of a supervisor in the form of a written notice."); N.Y. Exec. Law § 55(1) ("Every state officer or employee in a covered agency shall report promptly to the state inspector general any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment .... The knowing failure of any officer or employee to so report shall be cause for removal from office or employment or other appropriate penalty.").[FN6] Speech made pursuant to a public employee's legal obligations is not made "as a citizen."[FN7]

FN6. It is these statutory obligations, as well as *Weintraub's* broad definition of speech made in the course of official duties, that distinguish Kaplan's speech from that of the plaintiff in *Freitag v. Ayers,* 468 F.3d 528 (9th Cir.2006). The plaintiff in *Freitag,* a California correctional officer, claimed she was retaliated against after reporting to the California Inspector General that she and other prison guards were being sexually harassed. Although the Ninth Circuit held that the plaintiff "acted as a citizen" in complaining to the Inspector General and in writing letters to a state senator regarding this harassment, the court's holding was based on the fact that "[i]t was certainly not part of [plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly." *Id. at 545.* Under New York law, however, such complaints *are* within the official duties of BNE investigators.

FN7. Because Kaplan's speech was made

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

pursuant to his official duties and thus is not constitutionally protected, the Court need not reach other required elements of a First Amendment retaliation claim, including whether his speech addressed matters of "public concern," *see Sousa, 578 F.3d at 170*, and whether the complaint sufficiently alleges a causal connection between the protected speech and the retaliatory acts, *see Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir.2001)*.

For the foregoing reasons, the March 1 Order denied the sixth cause of action in the FAC, and, as the Court now clarifies, the dismissal was with prejudice because it rests on a legal ground that cannot be **\*355** cured by repleading. *Cf. Oliver Schs., Inc. v. Foley, 930 F.2d 248, 252-53 (2d Cir.1991)*. The Court notes, however, that the dismissal of Kaplan's First Amendment claim brought pursuant to § 1983 does not alter Kaplan's opportunity under applicable New York law to seek protection from the retaliatory acts he alleges. *See N.Y. Labor Law § 27-b*(6)(e) (prohibiting retaliation based on an employee's filing of a report of workplace violence); *N.Y. Exec. Law. § 55*(1) (providing that employees who report "improper governmental action" to the Inspector General "shall not be subject to dismissal, discipline or other adverse personnel action").

[9] The Court comes finally to Crisafi's counterclaim for defamation, which insinuates that the aforementioned Workplace Incident Reports filed by Kaplan, Kaplan's complaint to the Inspector General, and even Kaplan's allegations in the FAC are defamatory. Crisafi subsequently conceded, however, that the only potentially actionable statements not protected by privilege or barred by the statute of limitations are those that were allegedly republished on December 8, 2008 by the Inspector General and the *New York Times*. Crisafi Mem. Opp. Kaplan's Mot. to Dismiss, 2/5/10, at 4-5. In this respect, the counterclaim, which was filed on December 3, 2009, alleges the following: Kaplan filed Workplace Incident Reports on or about November 20, 2007 and August 12,

2008 reporting various misconduct by Crisafi, and made a complaint to the Inspector General to the same effect on or about November 20, 2007. Crisafi Compl. ¶¶ 15, 17, 20, Exs. C-E. Crisafi alleges, based on information and belief, that Kaplan's report to the Inspector General "prompted an investigation" focused on Crisafi and relating to Kaplan's complaints. *Id.* ¶ 19. Also upon information and belief, Crisafi alleges that a copy of the Fisch Report was provided to Kaplan in advance of its public release. *Id.* ¶ 35. This report was also provided to the *New York Times*, which described this report in an article published on December 8, 2008. *Id.* ¶ 36 & Ex. F. Upon information and belief, Crisafi alleges that Kaplan gave the Fisch Report to the *New York Times*. *Id.* ¶ 37. The Fisch Report was published on the *New York Times's* and Inspector General's websites, where it remains accessible. *Id.* ¶¶ 39-40. Crisafi alleges that the contents of the *New York Times* article and the Fisch Report reflect false and defamatory statements made by Kaplan, and have caused Crisafi to be vilified and his reputation to suffer. *Id.* ¶¶ 16, 18, 21, 23-33, 41-43. Accordingly, Crisafi asserted two causes of action alleging that Kaplan defamed him. Kaplan then moved to dismiss these counterclaims on the basis that Kaplan is not responsible for the republication of his allegedly defamatory statements by the *New York Times* or the Inspector General.

[10] Under New York law, a plaintiff "may not recover damages from the original author for ... slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 59 (2d Cir.2002)*. Crisafi argues that a more lenient standard applies, permitting liability based on Kaplan's mere knowledge or reasonable expectation that his allegedly defamatory statements would be republished. *See, e.g., Campo v. Paar, 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963)*. The Court need not resolve which standard applies: Crisafi's counterclaim is deficient under either test because it fails to "state a claim to relief that is plausible on its face." *Iqbal, 129 S.Ct. at 1949* (internal quotation marks omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Even accepting as true Crisafi's non-conclusory factual allegations, including **356** those made only on information and belief, it is simply implausible that Kaplan in any legally relevant sense caused the republication of his statements in the Fisch Report or *New York Times* article. Crisafi alleges that Kaplan's complaint prompted the Inspector General investigation, but this allegation is contradicted by the Fisch Report itself, which indicates that the investigation began after the *New York Times* published an article in March 22, 2007 describing abuses of government-issued parking placards. Fisch Report at 3-4. In any event, even if Kaplan's complaint served to expand the scope the investigation, and included allegations consistent with what the Fisch Report eventually concluded, the Report clearly did more than merely parrot Kaplan's charges. The Report, in a section headed "Methodology," states that the investigation was based on, among other things, interviews with Crisafi himself, other BNE employees, Giglio, and Moffett, as well as other police officers and district attorneys who had interacted with Crisafi. *Id.* at 4. Indeed, the Inspector General is required by statute to "investigate," not merely repeat, allegations of malfeasance. N.Y. Exec. Law § 53. And even if, as alleged, Kaplan acted to bring the Report to the attention of the *New York Times,* the *New York Times* article, which consists entirely of a summary of the Fisch Report, reflects Kaplan's allegations only to the extent that such charges were ratified by the Report itself. *See* Crisafi Compl., Ex. F.

For these reasons, the Court concluded that there is no basis for holding Kaplan liable for the republication of his allegedly defamatory statements, even if he intended that his allegations be republished in this manner and gave the *New York Times* a copy of the Fisch Report. "The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication." *Van-Go Transp. Co. v. N.Y. City Bd. of Educ.,* 971 F.Supp. 90, 102 (E.D.N.Y.1997) (internal quotation marks omitted). Here,

the duty of the Inspector General to investigate complaints prior to publishing a written report, the fact that the Fisch Report was based on numerous sources beyond Kaplan's allegations, and the fact that the *New York Times* article merely summarized the Fisch Report together sever any causal link that might exist between Kaplan's actions and the December 8, 2008 republications. Thus, the March 1 Order dismissed Crisafi's counterclaim with prejudice.[FN8]

FN8. This result is not inconsistent with *Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963), which declared that "[a]nyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication." This broad pronouncement was made in the context of a narrower holding that the defendant, Jack Paar, could be held responsible for the *New York Post's* publication of his statement, made by him to a reporter during an interview, that the plaintiff "lacked certain qualities which would fit him to be a performer desirable to [Paar's] program." *Id.* at 365, 239 N.Y.S.2d 494. The causal link between Kaplan's statements and the findings of the Fisch Report, which were subsequently summarized by the *New York Times,* is obviously much more attenuated than the relationship in *Campo* between Paar's statement to the newspaper reporter during an interview and the reporter's publication of that statement.

For the foregoing reasons, the Court hereby confirms its decisions to dismiss the sixth cause of action (*i.e.,* all of Kaplan's claims) and to dismiss both of Crisafi's counterclaims, all with prejudice, and to otherwise deny the motions to dismiss. The Clerk of the Court is directed to close **357** the entries numbered 33, 34, 35, 42, and 47 on the docket of case number 09 Civ. 7283 and to close case number 09 Civ. 9952.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

S.D.N.Y.,2010.

D'Olimpio v. Crisafi

718 F.Supp.2d 340

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)

(Cite as: 2011 WL 1086001 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Nelson RODRIGUEZ, Plaintiff,
v.
Donald SELSKY, Defendant.
Civil Action No. 9:07–CV–0432 (LEK/DEP).

Jan. 25, 2011.
Nelson Rodriguez, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for the Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Nelson Rodriguez, a New York state prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. In his complaint, as amended, Rodriguez alleges that prison officials at the facility in which he was confined at the relevant times issued him two fabricated misbehavior reports ("MBRs") falsely accusing him of violating prison rules and denied him procedural due process during the course of the ensuing disciplinary hearing.[FN1] Plaintiff attributes those actions to retaliation for his having filed a civil action against a corrections employee who was not named as a defendant in his complaint.

> FN1. As originally constituted, plaintiff's complaint recited other purportedly unlawful conduct, alleging that he was subjected to ongoing harassment, retaliation, and interference with his access to the courts. As a result of a series of court interventions the claims in this action, which was commenced elsewhere but later transferred to this district, have been significantly narrowed.

The sole remaining claim in this action is asserted against defendant Donald Selsky, the former Director of Special Housing and Inmate Disciplinary Programs for the New York State Department of Correctional Services ("DOCS"), alleging deprivation of procedural due process arising out of plaintiff's disciplinary hearing and defendant Selsky's review of the resulting determination.

Currently pending before the court is defendant's motion for summary judgment dismissing plaintiff's amended complaint. In his motion, defendant argues that 1) he was not sufficiently involved in the constitutional deprivation alleged to support a finding of liability; 2) plaintiff was afforded procedural due process in connection with the disciplinary proceedings at issue, and 3) in any event he is entitled to qualified immunity from suit. For the reasons set forth below, I recommend a finding that plaintiff was not deprived of procedural due process, and that his complaint therefore be dismissed.

I. *BACKGROUND*[FN2]

> FN2. In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate entrusted to the custody of the DOCS; at the times relevant to his due process claim plaintiff was housed at the Shawangunk Correctional Facility ("Shawangunk"), located in Wallkill, New York. Amended Complaint (Dkt. No. 7) ¶ 3; Selsky Decl. (Dkt. No. 62–3) ¶ 15.

As a result of an incident involving another inmate occurring on December 30, 2003, plaintiff was issued two MBRs. Amended Complaint (Dkt. No. 7) ¶¶ 12–15. Selsky Decl. (Dkt. No. 62–3) ¶ 16. The first, issued on December 30, 2003 and authored by Corrections Officer Goosby, charged Rodriguez with fighting and refusal to obey a direct order. Selsky Decl. (Dkt. No. 62–3) ¶ 17 and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)

(Cite as: 2011 WL 1086001 (N.D.N.Y.))

Exh. A (Dkt. No. 62–4). The second, issued on January 2, 2004 by Corrections Lieutenant Wright, addressed the same incident and accused Rodriguez of fighting, engaging in violent conduct, and participating in a demonstration detrimental to the order of the facility. Selsky Decl. (Dkt. No. 62–3) ¶ 18 and Exh. A (Dkt. No. 62–4).

The parties differ as to when the two MBRs were served upon Rodriguez. Plaintiff and defendant appear to be in agreement that the second MBR was served upon him on January 2, 2004. Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A (Dkt. No. 62–4); Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 68) ¶ 16. While defendant asserts that both MBRs were served on January 2, 2004, *see* Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A (Dkt. No. 62–4), plaintiff denies that he received the December 30, 2003 MBR until the commencement of his disciplinary hearing.[FN3] Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 68) ¶ 16.

> FN3. As will be seen I have assumed, as I must at this juncture, that plaintiff's version of the facts is correct. *See* pp. 21–32, *post.*

*2 The two MBRs were consolidated, over plaintiff's objection, and a Tier III disciplinary hearing was conducted, beginning on January 7, 2004, to address the charges set forth within them.[FN4,FN5] Amended Complaint (Dkt. No. 7) ¶ 15; Selsky Decl. (Dkt. No. 62–3) ¶ 21 and Exhs. A (Dkt. No. 62–4) and B (Dkt. Nos. 62–5 and 62–6). In advance of the hearing plaintiff was given the opportunity to express his preferences for an assistant, and based upon his selection Corrections Counselor Roddy was assigned to assist him. Selsky Decl. (Dkt.62–3) ¶ 20 and Exh. A (Dkt. No. 62–4).

> FN4. The DOCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3. Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the Special Housing Unit ("SHU"). Tier III hearings concern the most

serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

> FN5. Plaintiff's disciplinary hearing was originally scheduled to start on January 5, 2004, in order to meet the requirements of a state regulation mandating that a disciplinary hearing commence within seven days of a prisoner's confinement in a facility's SHU, 7 N.Y.C.R.R. § 251–5.1(a) (1983). Selsky Decl., Exh. B (Dkt. No. 62–5) pp. 18–19. While plaintiff assigns significance to the failure of prison officials to meeting the seven-day requirement, the record reveals that an extension was granted because plaintiff's assistant was unable to meet with him prior to January 5, 2004. *Id.* In any event, the violation of state regulations is not cognizable under 42 U.S.C. § 1983. *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject to constitutional standards, which require only that the hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips,* No. 9:04–CV–1160, 2007 WL 168238, at *6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable).

Following its commencement on January 7, 2004, the hearing officer twice adjourned the hearing, initially to January 8, 2004, and again from January 8, 2004 to January 13, 2004, to allow the plaintiff an opportunity to prepare his defense. Selsky Decl. (Dkt. No. 62–3) and Exh. B (Dkt. No. 62–5) pp. 4–20, 20–58. During the course of the hearing plaintiff was permitted to call at least eleven witnesses to testify on his behalf, and also to introduce documentary evidence in his defense Selsky Decl. (Dkt. No. 62–3) ¶ 44 and Exh. A (Dkt. No. 62–4);

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)

(Cite as: 2011 WL 1086001 (N.D.N.Y.))

Exh. B (Dkt. No. 62–5) at pp. 60–86, 94–115, 136–83, 185–209, and Exh. B (Part 2) (Dkt. No. 62–6) at pp. 2–12, 30–43, 59–71, 72–78, 76–83, 105–111, 111–117, 117–21,122–26, 128–39. Two inmate witnesses listed by the plaintiff declined to testify, and executed refusal forms stating that they did not wish to be involved in the matter. Selsky Decl. (Dkt. No. 62–3) ¶ 42 and Exh. A (Dkt. No. 62–4). The hearing officer rejected plaintiff's request that he be permitted to adduce testimony from two other witnesses, his wife and his attorney, concluding that the testimony would not be relevant to the issues involved in the hearing. Selsky Decl., Exh. B (Part 2) (Dkt. No. 62–6) pp. 98–99.

At the conclusion of hearing, plaintiff was found guilty of fighting (one count), refusing to obey a direct order, engaging in violent conduct, and participating in a demonstration, but was acquitted on the second count of fighting. Selsky Decl. (Dkt. No. 62–3) ¶ 22 and Exh. A (Dkt. No. 62–4). Based upon his findings, which were both noted in writing and stated orally at the hearing, the hearing officer imposed a penalty that included twenty-four months of disciplinary SHU confinement and a corresponding loss of package, commissary and telephone privileges. Selsky Decl. (Dkt. No. 62–3) ¶ 23; see also Exh. A (Dkt. No. 62–4) and Exh. B (Part 2) (Dkt. No. 62–6) pp. 156–58.

On February 11, 2004, plaintiff appealed the disciplinary determination to defendant Selsky's office. See Amended Complaint (Dkt. No. 7) ¶ 21; Selsky Decl. (Dkt. No. 62–3) ¶ 26 and Exh. C (Dkt. No. 62–7). Plaintiff also submitted a supplemental appeal on or about March 12, 2004. Selsky Decl. (Dkt. No. 62–3) ¶¶ 26–27, Exhs. C (Dkt. No. 62–7) and D (Dkt. No. 62–8). Defendant Selsky issued a determination on behalf of the DOCS Commissioner on April 8, 2004, modifying the results of the hearing by dismissing the charge of engaging in a demonstration and reducing the penalty imposed to twelve months of SHU confinement with a corresponding loss of privileges.[FN6] Selsky Decl. (Dkt. No. 62–3) ¶ 28 and Exh. E (Dkt. No. 62–9). That determination was based upon defendant Selsky's finding that the nature of the incidents giving rise to the MBRs did not warrant the full extent of the penalty imposed and that the charge of engaging in a demonstration was not substantiated. Id. at ¶ 28 and Exh.

E (Dkt. No. 62–9). Based upon his review, however, Selsky concluded that plaintiff received all of the procedural due process mandated under the Fourteenth Amendment and that there was evidence in the record substantiating the charges for which Rodriguez was found guilty. Id. at ¶ 29.

> FN6. Plaintiff's SHU term of disciplinary confinement and corresponding loss of privileges was further reduced to eighth months and nine days, ending on September 9, 2004, as a result of a discretionary time cut on or about July 14, 2004, occurring while plaintiff was housed at the Southport Correctional Facility. Selsky Decl. (Dkt. No. 62–3) ¶ 53.

II. *PROCEDURAL HISTORY*

**\*3** This action was commenced on April 11, 2007 in the Southern District of New York, but was subsequently transferred to this district by order issued by Chief District Judge Kimba M. Wood on April 11, 2007.[FN7] Dkt. Nos. 1, 3. Plaintiff's original complaint challenged not only the MBRs issued and the disciplinary action that ensued, but also chronicled continued harassment and acts of retaliation that he experienced following his transfer into the Attica Correctional Facility, naming as defendants several DOCS employees including Donald Selsky. *See* Complaint (Dkt. No. 1).

> FN7. While plaintiff's complaint was not filed in the Southern District until April 11, 2007, the transfer order issued by Chief Judge Wood noted that the complaint was received in that district on February 26, 2007. *See* Dkt. No. 3, n. 1.

Upon transfer of the case to this district and the court's initial review of plaintiff's complaint and accompanying request for leave to proceed *in forma pauperis* ("IFP"), by order dated May 17, 2007, Senior District Judge Lawrence E. Kahn granted plaintiff IFP status but directed that he file an amended complaint, noting several deficiencies in the original pleading including, *inter alia,* the apparent untimeliness of certain of his claims. Dkt. No. 5. In accordance with the court's directive, plaintiff filed an amended complaint on June 26, 2007. Dkt. No. 7. Upon review of that pleading District

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)

(Cite as: 2011 WL 1086001 (N.D.N.Y.))

Judge Kahn issued an order on July 19, 2007 accepting the amended complaint for filing, but dismissing plaintiff's claims against the majority of the defendants as time-barred and further directing dismissal of plaintiff's claims against a newly-added defendant, Corrections Sergeant Corcran, without prejudice to plaintiff's right to file a separate action against that defendant in the Western District of New York.[FN8] As a result, Donald Selsky was left as the sole remaining defendant in the action.

> FN8. District Judge Kahn explained that "[s]ince the alleged wrongdoing by Defendant Corcran occurred in the Western District of New York, and Plaintiff's claims against Defendant Corcran are very recent, and thus not in jeopardy of being time-barred at this time, the Court will dismiss Defendant Corcran from the action, without prejudice to Plaintiff filing his claims against Defendant Corcran in the Western District of New York." Decision and Order (Dkt. No. 8) at p. 3.

After filing an answer generally denying plaintiff's allegations against him and asserting various affirmative defenses, see Dkt. No. 10, defendant Selsky moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings, urging dismissal of plaintiff's amended complaint on the ground that it failed to allege the requisite degree of his personal involvement in any wrongdoing to support a finding of liability. Dkt. No. 47. The motion resulted in my issuance of a report on February 25, 2010 recommending that the motion be denied. Dkt. No. 54. That recommendation was adopted by District Judge Lawrence E. Kahn by order issued on September 13, 2010. Dkt. No. 67.

On June 18, 2010, defendant again moved, this time for summary judgment dismissing plaintiff's complaint. Dkt. No. 62. In his motion defendant reiterates his claim of lack of personal involvement, and additionally asserts that in any event plaintiff's due process claim lacks merit since the plaintiff was afforded all of the procedural safeguards required under the Fourteenth Amendment, and further that he is entitled to qualified immunity from suit. Id. Plaintiff has since responded in opposition to defendant's motion, Dkt. No. 68, and defendant has

submitted a reply memorandum addressing plaintiff's arguments and further supporting his motion. Dkt. No. 74.

**\*4** Defendant's motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). See also Fed.R.Civ.P. 72(b).

III. DISCUSSION

A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. Anderson, 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; Security Ins., 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 250, 106 S.Ct. at 2511. Though pro se plaintiffs are entitled to special latitude when defending

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)

(Cite as: 2011 WL 1086001 (N.D.N.Y.))

against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Personal Involvement*

**\*5** In his motion defendant Selsky renews an argument previously made and rejected—that his limited involvement in reviewing the disciplinary determination in question based upon plaintiff's appeal of that decision is insufficient to support a finding of liability for any procedural due process violation which may have occurred in the context of that hearing. In response, plaintiff counters that the record reveals facts from which a reasonable factfinder could conclude that the defendant personally participated in the due process violation, including by conducting an inadequate review of the disciplinary hearing record.

It seems clear, particularly in light of the Supreme Court's relatively recent decision in *Ashcroft v. Iqbal,* ––– U.S. ––– 129 S.Ct. 1937, 1948–49 (2009), that to be held accountable for a constitutional deprivation under section 1983 a defendant must have had personal involvement in the conduct giving rise to the deprivation. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977),

*cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978); *Scott v. Fischer,* 616 F.3d 100, 110 (2d Cir.2010) ("In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.") (quoting *McKinnon* ). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

As was noted in my prior report and recommendation, the question of whether defendant Selsky's review of an allegedly infirm disciplinary hearing provides grounds for establishing his personal involvement is one that has divided the courts. Some courts have found the mere allegation that Selsky has reviewed and affirmed a hearing determination that was the product of a due process deprivation is insufficient to establish liability for the underlying violation. *See, e.g., Abdur–Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) ("The only allegation concerning Selsky in the case at bar is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU.... That is not enough to establish Selsky's personal involvement."); *Ramsey v. Goord,* No. 05–CV–47A, 2005 WL 2000144, at \*6 (W.D.N.Y. Aug. 13, 2005) ("[t]he fact that Commissioner Goord and SHU Director Selsky, as officials in the DOCS 'chain of command,' affirmed defendant Ryerson's determination on appeal is not enough to establish personal involvement of their part."); [FN9] *see also Odom v. Calero,* No. 06 Civ. 15527, 2008 WL 2735868, at \*7 (S.D.N.Y. Jul. 10, 2008) (concluding that a due process violation is complete upon the hearing officer rendering a decision, even when the liberty interest deprivation persists, and therefore is not "ongoing" when an appeal is taken to Donald Selsky).

FN9. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*6** On the other hand, other courts have found that the act of reviewing and affirming a determination on appeal can provide a sufficient basis to find the necessary personal involvement of a supervisory employee like

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)

(Cite as: 2011 WL 1086001 (N.D.N.Y.))

defendant Selksy. *See, e.g., Bennett v. Fischer,* No. 9:09–CV–1236, 2010 WL 5525368 (N.D.N.Y. Aug 17, 2010) (Peebles, M.J.) (finding questions of fact regarding Commissioner Fischer's personal involvement in disciplinary precluding summary judgment), *Report and Recommendation Adopted,* 2011 WL 13826 (N.D.N.Y. Jan. 4, 2011) (Scullin, S. J.); *Baez v. Harris,* No. 9:01–CV–807, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (fact that defendant Selsky responds personally to all disciplinary appeals by inmates found sufficient to withstand summary judgment motion based on lack of personal involvement); *Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) ("The Complaint alleges that '[t]he Commissioner and/or his designee entertained plaintiff[']s appeal and also affirmed.' ... [T]he allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation. Assuming that this allegation is true, as this court must on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) ..., Cepeda has pleaded personal involvement by Commissioner Coughlin sufficiently to withstand this motion.") (citations omitted); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (finding that plaintiff's complaint had sufficiently alleged personal involvement of Superintendent and Commissioner to withstand motion to dismiss because plaintiff alleged that both defendants had actual or constructive notice of the defect in the underlying hearing); *Ciaprazi v. Goord,* No. 9:02–CV–0915, Report–Recommendation, 2005 WL 3531464, at *16 (N.D.N.Y. Mar. 14, 2004) (Peebles, M.J.) (recommending that Selsky's motion for summary judgment for lack of personal involvement be denied because Selsky's review of plaintiff's disciplinary hearing appeal "sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations."), *adopted,* 2005 WL 3531464, at *1–2 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.).

In support of his argument regarding personal involvement defendant cites *Tafari v. McCarthy,* 714 F.Supp.2d 317 (N.D.N.Y. My 24, 2010), in which another magistrate judge of this court, in a report and recommendation adopted by the assigned district judge, wrote that "[t]he affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation." *Tafari,* 714 F.Supp.2d at 383. (citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002)). I respectfully disagree with my esteemed colleague and maintain that the cases holding that Selsky's affirmance, or that of someone in his corresponding position, of a constitutionally defective disciplinary determination at a time when the inmate is still serving his or her disciplinary sentence, and the violation can therefore be abated, falls within the *Colon* factors articulated in the Second Circuit for informing the supervisory liability analysis. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). In any event, this case is distinguishable from *Tafari* since here plaintiff has alleged that through his own conduct in inadequately reviewing the underlying determination defendant Selsky committed a due process violation, *see* Amended Complaint (Dkt. No. 7) ¶ 21, thereby satisfying the Supreme Court's admonition that a defendant can only be held liable for his or own conduct for purposes of a civil rights violation. *Iqbal,* 129 S.Ct. at 1948.

**\*7** As I noted in my prior report, I believe that those cases concluding that a plaintiff's allegation that defendant Selsky reviewed and upheld an allegedly constitutionally-suspect disciplinary determination is enough to show his personal involvement in the alleged violation appear to be both better reasoned and more consonant with the Second Circuit's position regarding personal involvement. *See Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) (criticizing a district court's denial of leave to amend to add Donald Selsky as a defendant in a due process setting and appearing to assume that Selsky's role in reviewing and affirming a disciplinary determination is sufficient to establish his personal involvement). While it may be true that the due process violations cited by Rodriguez occurred and were no longer ongoing when his appeal was taken to defendant Selsky, because it appears that the sentence imposed was still being served at the time of his review, the liberty interest deprivation allegedly effectuated without due process was therefore ongoing, and defendant Selsky was in a position to remedy the violation, at least in part, at a time when his intervention would still have been meaningful.

C. *Merits of Plaintiff's Due Process Claim*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)

(Cite as: 2011 WL 1086001 (N.D.N.Y.))

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. See Tellier v. Fields, 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); Hynes, 143 F.3d at 658; Bedoya v. Coughlin, 91 F.3d 349, 351–52 (2d Cir.1996). Defendant concedes that plaintiff's eight months of SHU disciplinary confinement "at least arguably" impacted a protected liberty interest, see Defendant's Memorandum (Dkt. No. 62–14) at p. 3, and I agree. See Colon v. Howard, 215 F.3d 227, 231 (2d Cir.2000) (finding that disciplinary confinement for a period of 305 days is "a sufficient departure from the ordinary incidents of prison life to require procedurally due process protections."). Plaintiff's claim, then, boils down to whether he was provided the procedural safeguards guaranteed under the Fourteenth Amendment prior to that deprivation.[FN10]

> FN10. It should be noted that in this case plaintiff goes beyond merely alleging defendant Selsky's failure to rectify a past due process violation. In his complaint plaintiff also alleges that defendant Selsky participated in or furthered the violation by failing to conduct an appropriate review. Amended Complaint (Dkt. No. 7) ¶ 21.

The procedural rights to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in Wolff v. McDonnell, 418 U.S. 539, 564–67, 94 S.Ct. 2963, 2978–80 (1974).[FN11] Under Wolff, the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. Wolff, 418 U.S. at 564–67, 94 S.Ct. at 2978–80; see also Eng v. Coughlin, 858 F .2d 889, 897–98 (2d Cir.1988). In addition, to pass muster under the Fourteenth Amendment the hearing officer's disciplinary determination must garner the

support of at least "some evidence". Superintendent v. Hill, 472 U.S. 445, 105 S.Ct. 2768 (1985).

> FN11. Many of the points raised in support of plaintiff's due process claim surround the alleged failure of prison officials to meet the requirements prescribed by regulation for disciplinary hearings. It is well established, however, that a violation of a state regulation is not actionable under section 1983. Cusamano, 604 F.Supp.2d at 482.

1. Notice of Charges

*8 The record now before the court, when interpreted in a light most favorable to the plaintiff, suggests that while the second of the two MBRs addressed at plaintiff's disciplinary hearing was served on Rodriguez on January 2, 2004, the earlier report was not received by him until the date on which the hearing was to begin.[FN12] Under Wolff, an accused inmate is entitled to meaningful advance written notice of the charges against him; in this circuit, a minimum of twenty-four hours of advance notice is generally considered to be required. Sira v. Morten, 380 F.3d 57, 70 (2d Cir.2004). The purpose of the notice requirement is to place the inmate on notice of the charges faced in order to permit the preparation of an adequate defense. Id. (citing Taylor v. Rodriguez, 238 F.3d 188, 192–93 (2d Cir.2001); see also Martin v. Mitchell, No. 92–CV–716, 1995 WL 760651, at *2 (N.D.N.Y. Nov. 24, 1995) (McAvoy, J.) (citing Wolff, 418 U.S. at 564, 94 S.Ct. at 2978) (holding that the purpose of the twenty-four hour notice rule is to provide inmates with sufficient time to prepare a defense, "not to hold hearing officers to a rigid and useless requirement that they only may call an inmate into a hearing room once they are positive that the inmate received a copy of the misbehavior report at least twenty-four hours earlier").

> FN12. As was previously noted, defendant disputes plaintiff's claim in this regard and asserts instead that both misbehavior reports were served on the plaintiff on January 2, 2004 by Corrections Officer Ferguson on January 2, 2004. Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)

(Cite as: 2011 WL 1086001 (N.D.N.Y.))

In this instance, any failure on the part of prison officials to provide plaintiff with notice of the charges lodged against him prior to the scheduled hearing was harmless in light of the hearing officer's agreement to adjourn the hearing, initially from January 7, 2004 to January 8, 2004, and then again to January 13, 2004, in order to allow the Rodriguez to prepare his defense. The record clearly reflects that, during those intervening periods, he was afforded the opportunity to prepare a defense to both charges before any testimony was taken. *See* Plaintiff's Memorandum (Dkt. No. 68–1) at p. 5 (admitting that plaintiff was served with the first misbehavior report at the hearing prior to any testimony having been taken).

The notice requirements of *Wolff* were therefore satisfied in this case, and no reasonable factfinder could conclude otherwise.

2. *Assistance in Preparation of a Defense*

Under *Wolff* and its progeny, a prisoner is entitled to an "employee assistant" to aid in the preparation for a disciplinary hearing when the inmate is illiterate, confined to the SHU, or unable to grasp the complexity of the issues involved. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993); *see also Eng,* 858 F.2d at 897. The Supreme Court has made it clear, however, that the assistance due prisoners is limited and is not equivalent of the right of a criminally accused legal counsel. *Wolff,* 418 U.S. at 570, 94 S.Ct. at 2981. An assistant is only required to act as the inmate's *"surrogate*—to do what the inmate would have done were he able." *Silva,* 992 F.2d at 22 ("The assistant is not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel.")

**\*9** Because Rodriguez had been relegated to SHU confinement by the time of the disciplinary hearing he was entitled to and was in fact assigned an employee assistant, Ms. Roddy, to help him prepare for the hearing. Rodriguez asserts that the assistant, however, refused to provide him with requested documents and threatened to "write him up" if he requested further assistance. Plaintiff's Memorandum (Dkt. No. 68–1) at pp. 14–17. Specifically, plaintiff claims that he was refused access to documents that would have helped prove his innocence, including a

list of officers involved in the incidents involved, letters written by another inmate, video footage of a different inmate being led to the SHU, all misbehavior reports concerning other inmates' involvement in the incidents, and all pertinent "To/From" memoranda produced by staff or inmates with knowledge of the relevant events. *Id.* at p. 15.

A careful review of the assistant forms and attachments in the record shows that the assigned assistant fulfilled her duty as plaintiff's surrogate. Plaintiff provided several lists of documents requested to prepare his defense. Selsky Decl., Exh. A (Dkt. No. 62–4) pp. 46–49, 54–61. Ms. Roddy indicated on the assistant form that she pursued all of plaintiff's requests and provided him with at least twenty pages of documents. *Id.* at pp. 17–18. On the handwritten lists, Ms. Roddy noted which documents were provided to plaintiff and gave brief explanations as to why some of the requested documents could not be produced. It was noted, for example, that plaintiff was denied access to the handwritten notes of another inmate, several requested "To/From" forms simply did not exist, and that the video footage would be available for viewing at the hearing if deemed pertinent to the pending charges. *Id.* at pp. 46–49.

> FN13. It is noted that plaintiff did not request that Ms. Roddy interview any inmates or other persons as potential witnesses and refused to sign the assistant form. Selsky Decl., Exh. A (Dkt. No. 62–4) p. 17.

There is no indication that any documents were withheld from plaintiff without justification or as a result of Ms. Roddy's ineffective assistance. Ms. Roddy's role as plaintiff's assistant was limited to acting as his surrogate; if he was not permitted to receive certain documents, Ms. Roddy likewise could not access them. Even assuming plaintiff's claim that Ms. Roddy was rude and hostile toward him is accurate, such conduct in and of itself does not violate his federal due process rights. *See Gates v. Selsky,* No. 02 CV 496, 2005 WL 2136914, at \* 7 (W.D.N.Y. Sept. 02, 2005) (noting that the duty owed by an employee assistant is the provision of requested services in good faith and in the best interest of the inmate and to perform as instructed by the inmate). In short, there

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)

(Cite as: 2011 WL 1086001 (N.D.N.Y.))

is no evidence now before the court from which a reasonable factfinder could conclude that plaintiff was denied effective assistance in preparing his defense to the pending disciplinary charges.

3. *Opportunity to Present Evidence*

The due process clause of the Fourteenth Amendment plainly guarantees the right of an accused inmate to present a defense to disciplinary charges. *Wolff,* 418 U.S. at 555–56, 94 S.Ct. at 2974. That right, however, is not unfettered and does not apply to the same extent as the constitutional guarantee to a criminally accused defendant of the right to present a meaningful defense. *Hernandez v. Selsky,* 572 F.Supp.2d 446, 454 (S.D.N.Y.2008) (citing *Wolff* ). Instead, in order to keep a disciplinary hearing to within reasonable limits, a hearing officer "must have the necessary discretion ... to refuse to all witnesses that may create a risk of reprisal or undermine authority" *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2980.

**\*10** An inmate's request to have specific witnesses called to testify may be refused if the hearing officer reasonably finds that such witnesses' testimony would be duplicative, non-probative, or would interfere with correctional goals. See *Russell v. Selsky,* 35 F.3d 55, 58 (2d Cir.1994). "[A] hearing officer does not violate due process by excluding irrelevant or unnecessary testimony." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999).

In support of his claim that he was denied the opportunity to present a meaningful defense plaintiff first points to the hearing officer's refusal to allow him to call his mother and attorney as witnesses. According to the plaintiff, both would have substantiated his claim of retaliatory motives on the part of correctional officials. Plaintiff's Memorandum (Dkt. No. 68–1) at p. 8; *see also* Selsky Decl., Exh. B (Dkt. No. 62–6) pp. 98–99. Neither witness, however, was present in the prison during any of the events giving rise to plaintiff's claims. The only testimony those individuals could have offered would not only have been hearsay, but would have come directly from Rodriguez himself, who was present to testify. Accordingly, the hearing officer properly determined that such testimony would have been irrelevant or unnecessarily redundant.

Plaintiff also challenges the hearing officer's failure to submit written questions to two fellow inmates who refused to testify at the hearing. Despite plaintiff's claim to the contrary, a hearing officer is under no affirmative duty to compel a response from an inmate who refuses to testify at a disciplinary hearing. If a witness has indicated that he or she will not testify if called, it would be futile and unnecessary to pursue his or her testimony further. *Silva,* 992 F.2d at 22; *see also Johnson v. Doling,* No. 9:05–CV–376, 2007 WL 3046701, at \*7 (N.D.N.Y. Oct. 17, 2007) (McAvoy, J. and Treece, M.J.) (the failure to summon the testimony of a witness who refuses to testify does not violate due process); *Dumpson v. Rourke,* No. CIVA96CV621, 1997 WL 610652, at \*5 (N.D.N.Y. Sept. 26, 1997) (Pooler, J. and DiBianco, M.J.) (a hearing officer's failure to investigate why an inmate refused to testify does not constitute a due process violation).

Here, inmates Colon and Berrios flatly refused to testify at plaintiff's disciplinary hearing, signing the appropriate refusal forms on January 14, 2004. Selsky Decl., Exh. A (Dkt. No. 62–4) pp. 110–11. Colon explained his refusal by noting that he had not witnessed the incident, and Berrios likewise claimed to have no relevant information because he was sleeping in his cell at the relevant times. *Id.* Requesting further information from these inmates would have been futile and unnecessary since they claimed not to have actually witnessed the events that led to Rodriguez's charges. It was therefore not a violation of plaintiff's due process rights for the hearing officer to refuse to inquire further into their involvement.

4. *Impartial Hearing Officer*

**\*11** Among the due process dictates arising under the Fourteenth Amendment is the requirement that a hearing officer assigned to address a disciplinary charge against an inmate be unbiased. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see also Davidson v. Capuano,* No. 78 Civ. 5724, 1988 WL 68189, at \*8 (S.D.N .Y. June 16, 1988) (citing *McCann v. Coughlin,* 698 F.2d 112, 122 n. 10 (2d Cir.1983)). While the reality is that most hearing officers serving in that capacity are prison officials, and a prison hearing officer's impartiality generally does not have to mirror that of judicial officers, nonetheless the result of a disciplinary hearing should not be "arbitrary and adversely

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)

(Cite as: 2011 WL 1086001 (N.D.N.Y.))

predetermined." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Here again, the inquiry focuses on whether plaintiff was afforded basic due process. *See Wright v. Conway,* 584 F.Supp.2d 604, 609 (W.D.N.Y.2009). Within that context, an impartial hearing officer is one who "does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990).

It should be noted that a plaintiff's disagreement with a hearing officer's rulings alone does not give rise to a finding of bias. *See Johnson,* 2007 WL 3046701, at *10 (hostile exchanges between plaintiff and the hearing officer throughout the proceeding and adverse rulings did not constitute bias where plaintiff was otherwise provided the opportunity to testify, call witnesses, and raise objections). Similarly, the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias. *See Vega v. Artus,* 610 F.Supp.2d 185, 200 (N.D.N.Y.2009) (failing to find bias where the hearing officer conducted both the disciplinary proceeding and the investigation into the inmate's grievance against the involved corrections officer).

Because prison officials serving as adjudicators enjoy a rebuttable presumption that they are unbiased, *Allen,* 100 F.3d at 259, plaintiff's conclusory allegations of bias in this case are insufficient to overcome this presumption. Plaintiff claims that Hearing Officer Ewanciw was biased because he sought assistance from Lt. Wright, who authored one of the two MBRs in issue. Plaintiff's Memorandum (Dkt. No. 68–1) at pp. 18–20. However, Rodriguez fails to explain how this evidences bias against him, reflects a predetermination on the hearing officer's part, or impacted the outcome of the proceeding. The record reflects that the hearing officer disclosed to the plaintiff that he had consulted with Lt. Wright, the "disciplinary lieutenant," for the purpose of ascertaining whether plaintiff was permitted to receive copies of redacted investigation documents. Selsky Decl., Exh. B (Dkt. No. 62–5) p. 130.

During the hearing plaintiff suggested that the hearing officer and Lt. Wright are friends outside of work. Selsky Decl., Exh. B (Dkt. No. 62–5) pp. 131–32. While the allegation denied by Hearing Officer Ewanciew, even if true this fact does not show that he was predisposed to rule against plaintiff.

**\*12** In sum, plaintiff has failed to adduce evidence from which a reasonable factfinder could conclude that the hearing officer assigned to preside over plaintiff's disciplinary hearing was biased, or had prejudged plaintiff's guilt prior to considering the evidence presented at the hearing.

5. *Determination Supported by "Some Evidence"*

In addition to repeated verbal explanations of his rulings throughout the hearing and his ultimate findings, Hearing Officer Ewanciw provided plaintiff with a written explanation of the evidence relied upon in reaching his conclusion. Selsky Decl., Exh. A (Dkt. No. 62–4) pp. 3–4. In his written explanation, Hearing Ewanciw acknowledged that he relied in part on information from confidential witnesses. Selsky Decl., Exh. A (Dkt. No. 62–4) p. 4. The question next presented is whether these findings were supported by at least some credible evidence.

The "some evidence" standard is extremely tolerant and is satisfied if "there is any evidence in the record that supports" the disciplinary ruling. *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000). Nonetheless to pass constitute muster, the supporting evidence must be reliable. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001). The Second Circuit has made clear that "the reliability of evidence is always properly assessed by reference to the totality of the circumstances and that an informant's record for reliability cannot, by itself, establish the reliability of bald conclusions or third-party hearsay." *Sira,* 380 F.3d at 82; *see also Dawkins v. Gonyea,* 646 F.Supp.2d 594, 614 (S.D.N.Y.2009) (*"Sira* clearly established that an independent assessment is necessary to satisfy the 'some evidence' standard when a disciplinary decision is based solely on confidential information.").

The hearing transcript reflects that the hearing officer did not make an independent inquiry into the reliability of the confidential inmate witnesses himself, but instead relied on Lt. Wright's independent finding of reliability. Selsky Decl., Exh. B (Dkt. No. 62–5) p. 128. Had the disciplinary decision been based solely on such confidential information, an issue of material fact might

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)

(Cite as: 2011 WL 1086001 (N.D.N.Y.))

have been presented as to whether the "some evidence" standard was met. With defendant Selsky's reversal of plaintiff's conviction on the demonstration charge contained within the January 2, 2004 MBR, the remaining charges for which he was found guilty included fighting, refusing a direct order, and violent conduct. To support his finding of guilt on those counts Hearing Officer Ewanciw relied on a correctional officer's assertion that he witnessed plaintiff raise his fists, throw punches, and fail to stop fighting when instructed to do so—an account that was corroborated by another officer's investigation—as well as the results of an investigation into the incident and evidence found in plaintiff's cell tying him to the relevant events. There was therefore sufficient reliable evidence on which to base a disciplinary decision related to the charges, independent of the confidential witness statements, and no reasonable factfinder could conclude otherwise.

IV. *SUMMARY AND RECOMMENDATION*

**\*13** Plaintiff has failed to establish the existence of a genuine issue of material fact regarding his procedural due process claim. Rodriguez received sufficient notice of the charges against him as well as adequate assistance in preparing a defense, and had ample opportunity to appear, call witnesses, and present evidence in his defense. In addition, the record fails to disclose any basis for concluding that Hearing Officer Ewanciw was biased, and the record before the court proves that he provided plaintiff with a written explanation of the reasons for his decision, which was supported by at least some reliable evidence. I therefore recommend dismissal of plaintiff's due process claim against defendant Selsky on the merits, and in light of this recommendation find it unnecessary to address defendant's claim of qualified immunity. It is therefore respectfully

RECOMMENDED, that defendant's motion for summary judgment (Dkt. No. 62) be GRANTED, and that the complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL

PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)*.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2011.

Rodriguez v. Selsky
Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2011 WL 830639 (N.D.N.Y.)

(Cite as: 2011 WL 830639 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Nelson RODRIGUEZ, Plaintiff,
v.
Donald SELSKY, Defendant.
No. 9:07–CV–0432 (LEK/DEP).

March 3, 2011.
Nelson Rodriguez, Attica, NY, pro se.

Aaron M. Baldwin, New York State Attorney General, Albany, NY, for Defendant.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report–Recommendation filed on January 25, 2011, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report–Rec. (Dkt. No. 78). Therein, Magistrate Judge Peebles recommends granting Defendant Donald Selsky's Motion for summary judgment (Dkt. No. 62) and dismissing Plaintiff's Amended Complaint (Dkt. No. 7) in its entirety. Dkt. No. 78. After receiving an extension of time to respond to the Magistrate Judge's Report–Recommendation, Plaintiff Nelson Rodriguez filed his objections ("Objections") on February 28, 2011. Dkt. No. 80.

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). Where, however, an objecting " 'party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error.' " Farid v. Bouey, 554 F.Supp.2d 301, 307 (N.D.N.Y.2008) (quoting McAllan v. Von Essen, 517 F.Supp.2d 672, 679 (S.D.N.Y.2007) (citations and quotations omitted)); see also Brown v. Peters, No. 95–CV–1641, 1997 WL 599355, at \*2–3 (N.D.N.Y. Sept. 22, 1997). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. This Court has considered Plaintiff's Objections (Dkt. No. 80) and has undertaken a de novo review of the record and has determined that the Report–Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report–Recommendation (Dkt. No. 78) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendant Selsky's Motion for judgment (Dkt. No. 62) is **GRANTED,** and it is further

**ORDERED,** that Plaintiff's Amended Complaint (Dkt. No. 7) is **DISMISSED in its entirety;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Rodriguez v. Selsky
Not Reported in F.Supp.2d, 2011 WL 830639 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.FN4 Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a (1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.FN5 Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. FN6 The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

### (4)

### Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

*4 A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. See April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. See March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. See generally Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. See County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

*5 Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by *42 U.S.C. § 1997e(a)* unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by *Section 1997e(a)* of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

*10 Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8; Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

*11 Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold*, 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer*, 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn*, 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold*, 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic*, 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn*, 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

*DECISION and ORDER*

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

**I. FACTS**[FN1]

> **FN1.** The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> **FN2.** Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
LaCream NEWMAN, Plaintiff,
v.
George B. DUNCAN, Superintendent of Great Meadow
Correctional Facility; David Carpenter, Deputy
Superintendent; Patrick Vanguilder, Deputy
Superintendent of Security; William Mazzuca,
Superintendent of Fishkill Correctional Facility; R.
Ercole, Deputy Superintendent of Security; J. Conklin,
Corrections Sergeant; and John Doe, Corrections
Officer, Defendants.
**No. 04-CV-395 (TJM/DRH).**

Sept. 26, 2007.

LaCream Newman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Charles J. Quackenbush, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District
Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred to the Hon. David R. Homer, United
States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the

Report-Recommendation and Order dated September 6,
2007 have been filed. Furthermore, after examining the
record, this Court has determined that the
Report-Recommendation and Order is not subject to attack
for plain error or manifest injustice. Accordingly, the
Court adopts the Report-Recommendation and Order for
the reasons stated therein.

It is therefore,

**ORDERED** that

(1) Defendants' motion for summary judgment (Docket
No. 36) is **GRANTED** as to defendants Duncan,
Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and
as to all of Newman's causes of action;

(2) The complaint is **DISMISSED** without prejudice as to
defendant John Doe; and

(3) This action is **TERMINATED** in its entirety as to all
defendants and all claims.

**IT IS SO ORDERED**

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> [FN1.] This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).
DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se LaCream Newman ("Newman"), an inmate
in the custody of the New York State Department of
Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,
seven DOCS employees, violated his constitutional rights
under the Eighth and Fourteenth Amendments. [FN2] *See*
Compl. (Docket No. 1). Presently pending is defendants'

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 36. Newman opposes the motion. Docket No. 41. For the following reasons, it is recommended that defendants' motion be granted.

> FN2. Newman's Fourteenth Amendment claims were previously dismissed. *See* Docket No. 28.

## I. Background

The facts are presented in the light most favorable to Newman as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

On October 23, 2002, Newman was being transferred from Great Meadow Correctional Facility ("Great Meadow") to Fishkill Correctional Facility's ("Fishkill") Special Housing Unit ("SHU").FN3 *See* Pelc. Aff. (Docket No. 36), Ex. B. Before arriving at Fishkill, Newman was temporarily housed at Downstate Correctional Facility ("Downstate"). *Id.* While being housed at Downstate, an inmate attempted to sexually assault Newman. *See* Compl. at ¶ 7. On October 24, 2002, Newman was transferred from Downstate to Fishkill. *See* Pelc. Aff., Ex. B. Upon arrival at Fishkill, Newman was assigned to a double occupancy cell. *See* Compl. at ¶ 10. On October 29, 2002, an inmate again attempted to sexually assault Newman. *See* Compl. at ¶ 12; *see also* Harris Aff. (Docket No. 36) at Ex. A. On November 15, 2002, Newman was transferred to Clinton Correctional Facility ("Clinton"). *See* Pelc. Aff., Ex. B. This action followed.

> FN3. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-or double-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2004). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

## II. Discussion

Newman asserts six causes of action, each alleging that defendants' failure to house Newman in a single occupancy cell constituted cruel and unusual punishment under the Eighth Amendment. Defendants seek judgment on all claims.

### A. Standard

**\*2** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.; see also Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U .S. at 247-48.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

## B. Exhaustion

Defendants contend that Newman has failed to demonstrate any reasonable excuse for failing to exhaust his administrative remedies as to his Eighth Amendment claim. *See* Defs. Mem. of Law (Docket No. 36) at 6-11. Newman contends that he failed to exhaust his administrative remedies after the attempted sexual assaults because (1) he was threatened by John Doe; (2) he was in transit between DOCS facilities; and (3) he was dealing with the mental and emotional effects of the attempted assaults. *See* Pl. Reply Mem. of Law (Docket No. 41) at 1-3.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), subjects suits concerning prison conditions brought under federal law to certain prerequisites. Specifically, the PLRA dictates that a prisoner confined to any jail, prison, or correctional facility must exhaust all available administrative remedies prior to bringing any suit concerning prison life, " 'whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)); *see also Jones v. Bock,* 127 S.Ct. 910, 918-19 (2007) ( "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.") (citation omitted)); *Woodford v. Ngo,* 126 S.Ct. 2378, 2382-83 (2006). Administrative remedies include all appellate remedies provided within the system, not just those that meet federal standards. *Woodford,* 126 S.Ct. at 2382-83. However, the Second Circuit has recognized three exceptions to the PLRA's exhaustion requirement:[FN4]

> FN4. It is unclear whether *Woodford* has overruled the Second Circuit's exceptions to the exhaustion requirement. *See Miller v. Covey,* No. Civ. 05-649 (LEK/GJD), 2007 WL 925054, at *3-4 (N.D.N.Y. Mar. 29, 2007). However, it is not necessary to determine what effect *Woodford* has on the Second Circuit's exceptions to the exhaustion requirement because Newman's contentions cannot prevail even under pre-*Woodford* case law. *See Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006)

**\*3** when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)

"The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524-25)). " '[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.' " *Id.* (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)). Inmates must provide sufficient information to "allow prison officials to take appropriate responsive measures." *Id.*

DOCS has established a grievance procedure which includes a three-stage review and appeal process. *See* N.Y. Correct. Law § 139 (McKinney 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1-.16 (2003);[FN5] *Hemphill,* 380 F.3d at 682-83. When an inmate files a grievance, it is investigated and reviewed by an Inmate Grievance Resolution Committee ("IGRC"). If the grievance cannot be resolved informally, a hearing is held. The IGRC decision may be appealed to the Superintendent of the facility. Finally, an inmate may appeal the Superintendent's decision to the Central Office Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. tit.7, § 701.7(c).

> FN5. The Court is aware that the sections governing the Inmate Grievance Program procedures in the Official Compilation of Codes, Rules & Regulations of the State of New York were re-numbered in June 2006. *See Bell v. Beebe,* No. Civ. 06-544 (NAM/GLD), 2007 WL 1879767, at *3 n. 4 (N.D.N.Y. June 29, 2007). However, in the interests of clarity, the Court will cite the section numbers of the provisions

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

that were in effect at the time Newman filed his complaint.

Here, it is undisputed that Newman's first attempt to file a grievance regarding the alleged sexual assaults did not occur until September 21, 2003, nearly one year after the alleged assaults. *See* Pl. Reply Statement of Material Facts (Docket No. 41) at Ex. 2; *see also* Newman Dep. (Ullman Decl. at Ex. 1, Docket No. 36) at 85-87. In his complaint, Newman contends that he failed to file a timely complaint due to "fear." *See* Pl. Reply Statement of Material Facts at Ex. 2. However, the Inmate Grievance Program ("IGP") supervisor at Clinton rejected Newman's attempt to file his complaint as a grievance because Newman failed to "expand on what/who caused the 'fear.' " *Id.* The IGP supervisor also noted that Newman had been housed at Clinton for the previous nine months and, thus, had "ample opportunity to file [his] complaint before [September 2003]." *Id.* Newman attempted to file an appeal of the IGP supervisor's decision to the Superintendent, but the supervisor advised Newman "[t]here is no provision to appeal the IGP Supervisors decision (to not accept a grievance) to the Superintendent. You may file a separate grievance on the determination by submitting it to the IGRC office." *Id.*

**\*4** On or about October 15, 2003, Newman filed a grievance requesting that the October 10, 2003 decision of the IGP supervisor be reversed. *See* Ullman Decl. (Docket No. 36) at Exs. 5 & 6. Newman alleged that the following "mitigating circumstances" prevented him from filing a timely grievance regarding the October 2002 sexual assaults: "1. I was in transit within the 14 days of the incident; to a number of correctional facilities; in addition to MHU within NYS DOCS; 2. I was confronted with fear (threats); which was made by CO's at Fishkill SHU 200 which I wasn't to make mention of the situation and that he could cause me to be placed in the same situation again and no on[e] would help me." *Id.* The IGRC denied Newman's grievance, finding that "[Newman] has been in [Clinton] since Dec. 2002 which gave him adequate time to file complaint which would have been accepted if filed then. Grievant did not provide mitigating circumstances to warrant the acceptance of complaint." Ullman Decl., Ex. 5 at 4. The Superintendent and CORC both denied Newman's appeals, finding that Newman had failed to present mitigating circumstances to excuse his delay in submitting the complaint. *See* Ullman Decl, Exs. 7 & 8.

In claiming that his non-exhaustion should be excused, Newman makes three arguments. First, he contends that a corrections officer at Fishkill (John Doe) threatened him, warning that if Newman reported the October 29, 2002 sexual assault then he would be placed back in the "same predicament" he was in before. *See* Newman Dep. at 83. However, Newman was transferred to Clinton in November 2002 and, thus, could have immediately filed a grievance now that he was separated from the officer who threatened him. *See* Pelc Decl. (Docket No. 36) at Ex. B. Further, Newman testified that he felt "safe" while at Clinton, demonstrating that any fear he may have had surrounding the filing of a grievance was left behind at Fishkill. *See* Newman Dep. at 66. Moreover, Newman ultimately did file a grievance while at Clinton. *See* Ullman Decl., Exs. 5 & 6. Thus, Newman's first argument for failure to properly exhaust is not persuasive.

Second, Newman contends that his frequent transfers between DOCS facilities within fourteen days of the sexual assaults prevented him from timely filing a grievance. However, this argument is not persuasive because DOCS regulations state that "[e]ach correctional facility housing a reception/classification/transit inmate population shall insure all inmates access to the IGP." N.Y. Comp.Codes R. & Regs. tit.7, § 701.14. Further, Newman arrived at Clinton on November 15, 2003 and was not moved to another DOCS facility until November 19, 2003, thus affording him nearly a year where he was not "in transit." *See* Pelc. Decl. at Ex. B.

Third, Newman contends that this Court should apply the "special circumstances" exception under *Hemphill* because he was dealing with the mental and emotional effects of the sexual assaults, thus preventing his filing of a grievance. *See* Newman Dep. at 83-84; Pl. Reply Mem. of Law at 2-3; *see also* Hemphill, 380 F.3d at 686. However, the special circumstances exception under *Hemphill* concerned an inmate's justifiable confusion regarding the proper DOCS procedure for filing an expedited grievance, not an inmate's mental or emotional condition. *See* Hemphill, 380 F.3d at 689-91. Thus, absent any documented mental illness that prevented Newman from filing a grievance, his third argument excusing his failure to timely exhaust his administrative remedies is not persuasive.[FN6]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

FN6. Moreover, shortly after the second assault, Newman wrote a letter to his counselor requesting that he be able to correspond with another inmate. *See* Newman Dep. at 42-43. Thus, in light of his ability to correspond with his counselor shortly after the incident, Newman's contention that he was too emotionally distraught to file a grievance is without merit.

**\*5** Therefore, it is recommended that defendants' motion on this ground be granted.

### C. Eighth Amendment[FN7]

FN7. In his complaint, Newman contends that defendants' conduct constituted cruel and unusual punishment in violation of the Eighth Amendment because their failure to comply with DOCS regulations "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23. Therefore, Newman's cause of action is best addressed under the Eighth Amendment's failure to protect standard.

Newman contends that defendants knew or should know that he was a homosexual and that his placement in a double occupancy cell "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23.

Prison officials have a duty to protect inmates from violence by other inmates. *See Farmer v. Brennan,* 511 U.S. 825, 833 (1994). When asserting a failure to protect claim, an inmate must establish that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendants acted with deliberate indifference to the inmate's safety. *Id.* at 834. Deliberate indifference is established when the official knew of and disregarded an excessive risk to inmate health or safety. *Id.* at 837. However, "the issue is not whether [a plaintiff] identified

his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [him]." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 621 (2d Cir.1991).

Here, Newman contends that on two separate occasions, fellow inmates "attempted to rape/physical[ly] assault" him. *See* Compl. at ¶¶ 7, 11, 15, 17, 19, 21, 23. However, it is undisputed that Newman did not suffer any actual injury [FN8] from these attempted assaults. *See* Defs. Statement of Material Facts (Docket No. 36) at ¶¶ 71-76; Pl. Reply Statement of Facts at ¶¶ 71-76; *see also* Newman Dep. at 31-32, 35-37, 41-42, 68-74, 95-96; Harris Aff. at Ex. A. The law is clear that an inmate must demonstrate an "actual injury" when alleging a constitutional violation. *See Brown v. Saj,* No. Civ. 06-6272(DGL), 2007 WL 1063011, at *2 (W.D.N.Y. Apr. 5, 2007) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). These two isolated incidents, coupled with Newman's failure to allege any injury resulting from the attempted sexual assaults, fail to demonstrate a constitutional violation under the Eighth Amendment. *See Boddie v. Schnieder,* 105 F.3d 857, 861-62 (2d Cir.1997) (holding that isolated incidents of sexual assault, without any injury, fail to state an Eighth Amendment claim); *see also Brown,* 2007 WL 1063011, at *2 (dismissing inmate's failure to protect claim for failure to demonstrate an actual injury).

FN8. To the extent that Newman contends that the attempted assaults caused him any mental or emotional injury, this claim must fail because "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) (2003); *see also Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002) (holding that § 1997e(e) "applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury").

Therefore, in the alternative, it is recommended that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

defendants' motion on this ground be granted.

### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Newman's allegations as true, he has not shown that defendants violated his constitutional rights.

**\*6** Therefore, in the alternative, defendants' motion for summary judgment on this ground should be granted.

### E. Failure to Serve Defendant John Doe

Newman's complaint asserts a claim against John Doe, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because defendant John Doe has not been identified by Newman or timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

### III. Conclusion[FN9]

FN9. Defendants also contend that Newman failed to demonstrate that they were personally involved in the alleged constitutional violations. *See* Defs. Mem. of Law at 11-14. However, it is recommended herein that defendants' motion

should be granted as to all of Newman's claims on other grounds. Thus, this argument need not be addressed.

For the reasons stated above, it is hereby

**RECOMMENDED** that:

    1. Defendants' motion for summary judgment (Docket No. 36) be **GRANTED** as to defendants Duncan, Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and as to all of Newman's causes of action;

    2. The complaint be **DISMISSED** without prejudice as to defendant John Doe; and

    3. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.
Newman v. Duncan
Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ⚷ 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
        78k1395 Particular Causes of Action
            78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff, FN1 a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,FN2 and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

> FN3. The amended complaint reads as follows:
>
> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

> FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prison officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

*4 In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**\*5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY,
Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, NY, By: S. Kenneth Jones,
Assistant Attorney General, for Defendants, of counsel.

OPINION

SWEET, J.

*1 Defendants Charles Greiner ("Greiner"), past
Superintendent of Sing Sing Correctional Facility ("Sing
Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams
("Williams"), and Dr. Lofton ("Lofton"), all of the Sing
Sing Medical Department, (collectively, the
"Defendants"), have moved to dismiss the amended
complaint of *pro se* inmate Roger Sulton ("Sulton"),
pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure
to exhaust administrative remedies. For the reasons set
forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,
2000, asserting a claim against the Defendants under
Section 1983 for alleged violation of his constitutional
rights under the Eighth Amendment for acting with
deliberate indifference to his serious medical needs.
Sulton filed an amended complaint on May 3, 2000, to
identify additional defendants to his suit. Additionally,
Sulton alleges negligent malpractice by the Sing Sing
medical staff. Sulton seeks monetary damages. The instant
motion was filed on August 9, 2000, and was marked fully
submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion
to dismiss for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b)(6). However, both the
Defendants and Sulton have submitted materials outside
the pleadings. Where a District Court is provided with
materials outside the pleadings in the context of a 12(b)(6)
motion to dismiss, it has two options: the court may
exclude the additional materials and decide the motion on
the complaint alone or convert the motion to one for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v.
Coughlin,* 922 F.2d 152, 154 (2d Cir.1991); *Fonte v.
Board of Managers of Continental Towers Condominium,*
848 F.2d 24, 25 (2d Cir.1988). The Court has determined
to treat the instant motion as a motion for summary
judgment. Therefore, the following facts are gleaned from
the parties' submissions, with all inferences drawn in favor
of the non-movant as required on a motion for summary
judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing
Sing at the time of the incidents in question. Greiner was
Superintendent of Sing Sing at that time. Halko was and is
a doctor on medical staff at Sing Sing. Williams and
Lofton are alleged to be affiliated with the Sing Sing
Medical Department.

According to Sulton, on October 8, 1998, he slipped on a
flight of wet stairs, where there was no "wet floor" sign
posted, and injured his left knee. The next day his knee
was swollen and the pain "was real bad." That same day

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**\*2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson,* 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender,* No. 99 Civ. 0969. 2000 WL 303280, at \*2-\*3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to

find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see Snider v. Melindez,* 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette,* 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at \*2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at \*4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit,* 2000 WL 303280, at \*3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2003 WL 22143709 (N.D.N.Y.)

(Cite as: 2003 WL 22143709 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Angel HERNANDEZ, Plaintiff,
v.
John NASH, Warden; Michael Sepanek, Captain; and
Kenneth Sharlow, Corrections Officer, FCI Ray Brook,
Defendants.
No. Civ.9:00CV1564FJSGLS.

Sept. 10, 2003.
Angel Hernandez, FCI Ray Brook, Ray Brook, New York,
Plaintiff, pro se.

Hon. Glenn T. Suddaby, United States Attorney, James T.
Foley U.S. Courthouse, Albany, NY, for the Defendants,
James C. Woods, AUSA, of counsel.

*REPORT AND RECOMMENDATION*

SHARPE, Magistrate J.

**\*1** Plaintiff, *pro se,* Angel Hernandez, a federal prison
inmate currently at the Federal Correctional Institute
("FCI") in Ray Brook, New York, commenced this civil
rights action to challenge an alleged failure on the part of
prison officials to protect him from physical injury.
Hernandez's claim stems from an altercation which
occurred on August 21, 2000, and involved his cell mate,
and as a result, he suffered physical injury which required
medical attention. In his complaint, Hernandez asserts
violations of his civil rights under the Fifth, Sixth and
Eighth Amendments, and seeks damages in the amount of
$1,000,000.

Currently pending before the court is a motion by the
defendants seeking dismissal of Hernandez's complaint for
failure to state a claim upon which relief may be granted
or, in the alternative, summary judgment dismissing his
complaint in all respects. In support of their motion, the
defendants assert a variety of grounds including, *inter alia,*
Hernandez's failure to exhaust available administrative

remedies. He has not responded to the defendants' motion
which was filed more than nine months ago.

Because it is clear from Hernandez's complaint that he
has failed to avail himself of the internal administrative
remedies required to be exhausted prior to commencement
of suit, this court recommends dismissal of his complaint
on this basis, without prejudice, and finds it unnecessary
to recommend conversion of the defendants' motion to one
for summary judgment and/or to address the various other
grounds raised by the defendants in support of their
motion.

**I.** *BACKGROUND*

The facts set forth in Hernandez's complaint, in
support of his claims in this action, are concisely stated
and exceedingly straightforward.[FN1] Hernandez alleges that
on or about August 21, 2000, while assigned to the Special
Housing Unit ("SHU"), he was confronted by his cell mate
who requested that the two engage in sexual acts. Compl.
P. 4 (*Dkt. No. 1* ). Hernandez asserts that in response to
that overture, he attempted to summons the assistance of
a correctional officer which resulted in Sharlow coming to
his cell door. *Id.* After Hernandez explained the situation
and requested that he be moved, Sharlow allegedly
responded that he did not have the keys necessary to open
his cell door, and told him to "do what [you] have to do".
*Id.* Based upon a conversation between Hernandez and an
unnamed lieutenant, he attributed the fact that Sharlow did
not have a key to open his cell door to a directive issued
by defendants Sepanek and Nash, that officers not carry
keys within the SHU Tier late at night. *Id.* As a result of
the incident, Hernandez alleges that he was assaulted by
his cell mate which resulted in an eye injury and required
medical attention, including stitches.

> FN1. In their motion, the defendants have
> submitted considerable detail concerning
> Hernandez's criminal conviction and the basis for
> his confinement at FCI Ray Brook as well as
> regarding the incident at issue in this case.
> However, since this court finds that conversion
> of the motion to one for summary judgment is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22143709 (N.D.N.Y.)

(Cite as: 2003 WL 22143709 (N.D.N.Y.))

unnecessary, it is inappropriate to include the facts related in those documents. Instead, this court will limit it's focus to the facts set forth in Hernandez's complaint.

II. *PROCEDURAL HISTORY*

Hernandez commenced this action on October 12, 2000, and has paid the required $150.00 filing fee (*Dkt. No. 1* ). In his complaint, he asserts violations of his civil rights under the Fifth, Sixth and Eighth Amendments, asserting in his first cause of action that Sharlow violated those rights by exhibiting deliberate indifference to his safety and encouraging violence through his comments in response to Hernandez's request for assistance. [FN2] Compl. P. 5 (*Dkt. No. 1* ). In his second cause of action, Hernandez alleges participation by Sepanek and Nash in the constitutional infringement as a result of their implementation of "improper policies and adequate supervision of officers". *Id.* Hernandez seeks recovery of $1,000,000 as a result of the defendants' actions. Following commencement of suit and the ensuing inaction on the part of Hernandez in pursuing the matter, Chief District Judge Frederick J. Scullin, Jr., issued an order on March 18, 2002, directing that Hernandez show cause why the suit should not be dismissed based upon his failure to arrange for proper service of the summons and complaint upon the three named defendants (*Dkt. No. 7* ). In response, Hernandez filed an affidavit dated April 16, 2002, expressing his belief that he had done what was necessary to effectuate service and that service had, in fact, been effectuated in the case (*Dkt. No. 8* ).

FN2. Although Hernandez's complaint purports to be filed under 42 U.S.C. § 1983, this court will read the complaint as raising claims under *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), which recognized the existence of a cognizable claim in certain instances for alleged constitutional violations committed by federal agents. In order to state a *Bivens* claim, a plaintiff must allege a constitutional deprivation by defendants acting under color of federal law. *Soichet v. Toracinta,* 93Civ.8858, 1995 WL 489434, at *3 (S.D.N.Y. Aug. 16, 1995)(citing *Barbera v. Smith,* 654 F.Supp. 386, 390 (S . D.N.Y.1987)). Generally,

case law under 42 U.S.C. § 1983 applies to *Bivens* cases. *Chin v. Bowen,* 833 F.2d 21, 24 (2d Cir.1987)(quoting *Ellis v. Blum,* 643 F.2d 68, 84 (2d Cir.1981)).

**\*2** On May 13, 2002, this court found the existence of good cause for Hernandez's failure to effectuate service of process in a timely manner, and directed the assistance of the United States Marshal to accomplish that objective (*Dkt. No. 9* ). Thereafter, service was accomplished with regard to each of the three named defendants who executed service waivers (*Dkt. No. 14* ).

In response to Hernandez's complaint, the defendants have moved seeking, in the alternative, either dismissal for failure to state a claim upon which relief may be granted, or summary judgment dismissing his complaint in its entirety (*Dkt.Nos.19-21* ). In their motion, the defendants assert various grounds, including: 1) Hernandez's failure to exhaust available internal administrative remedies, as required under 42 U.S.C. § 1997e(a); 2) lack of personal involvement; and, 3) on the merits, based upon Hernandez's failure to allege and prove deliberate indifference by defendants to his safety. There has been no response by Hernandez to the defendants' motion which was filed on December 12, 2002.

The defendants' motion has been referred to this court for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). *See also,* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Legal Effect Of Plaintiff's Failure To Oppose Defendants' Motion*

The first issue to be addressed is the legal significance, if any, of Hernandez's failure to oppose the defendants' summary judgment motion, and specifically, whether such a failure automatically entitles the defendants to dismissal based upon their motion.

Local Rule 7.1(b)(3) provides that

[w]here a properly filed motion is unopposed and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22143709 (N.D.N.Y.)

(Cite as: 2003 WL 22143709 (N.D.N.Y.))

Court determines that the moving party has met its burden demonstrating entitlement to the relief requested therein, failure by the non-moving party to file or serve any papers as required by this Rule shall be deemed by the court as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

Even while recognizing that *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions (see *Jemzura v. Public Service Comm'n,* 961 F.Supp. 406, 415 (N.D .N.Y.1997) (McAvoy, C.J.)), courts in this district have found it appropriate to grant a dispositive motion pursuant to Local Rule 7.1(b)(3) based upon a *pro se* plaintiff's failure to respond. *Robinson v. Delgado,* 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. and Hurd, M.J.); *Cotto v. Senkowski,* 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. and Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N .D.N.Y.1997) (Pooler, J. and Hurd, M.J.). As can be seen by the face of the rule, before an opposed motion can be granted, the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

B. *Rule 12(b)(6) Standard of Review*

**\*3** As previously noted, the defendants' motion is styled as seeking alternative relief, either in the form of dismissal of Hernandez's complaint for failure to state a cognizable claim or, in the alternative, summary judgment in their favor. Because Hernandez has not received notice of the court's intention to treat the motion as one for summary judgment, and hence an opportunity to respond in that context, and in light of the fact that the portion of the defendants' motion seeking dismissal for failure to exhaust available administrative remedies is susceptible of resolution through resort to Hernandez's complaint, which acknowledges this failure, this court recommends the motion be treated in the first instance as seeking dismissal for failure to state a claim upon which relief may be granted.

A court may not dismiss an action pursuant to Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1171-72 (2d Cir.1994) (citing, *inter alia, Conley v. Gibson,* 355 U.S. 41, 45-46(1957)). In deciding a 12(b)(6) motion, the court must accept the material facts alleged in the complaint as true. *Id.* (citing *Cooper v. Pate,* 378 U.S. 546, 546 (1964) (per curiam)).

When determining whether a complaint states a cause of action, a court should afford great liberality to *pro se* litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted). In fact, the Second Circuit has held that a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also,* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"). "These liberal pleading rules apply with particular stringency to complaints of civil rights violations." *Phillip v. University of Rochester,* 2003 WL 139522 (2d Cir. Jan. 21, 2003).

C. *Failure To Exhaust*

The primary thrust of the defendants' motion, at least to the extent that it challenges the facial sufficiency of Hernandez's complaint, surrounds his conceded failure to exhaust available administrative remedies.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Moreover, under the PLRA, a prisoner pursuing a federal lawsuit, including a *Bivens* action like this one, is required to exhaust the available administrative remedies before a court may hear his or her case. *See Porter v. Nussle,* 534 U.S. 516, 524-25 (2002). The Court has further held that the PLRA requires administrative exhaustion even where the grievance process does not permit award of money damages and the prisoner seeks only money damages, so long as the grievance tribunal has authority to take some responsive action. *See Booth v.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22143709 (N.D.N.Y.)

(Cite as: 2003 WL 22143709 (N.D.N.Y.))

*Churner,* 532 U.S. 731, 741 (2001). However, "a dismissal of an action for failing to comply with the PLRA is without prejudice." *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

**\*4** The available administrative remedies for a *Bivens* claim, consist of a four-step set of procedures set forth in the Bureau Of Prisons' Administrative Remedy Program, 28 C.F.R. § 542, which include: (1) attempting informal resolution with prison staff; (2) submitting a formal written "Administrative Remedy Request" to the warden within twenty days of the triggering event; (3) appealing the warden's decision to the appropriate regional director within twenty days of the formal request being denied; and, (4) appealing the Regional Director's decision to the BOP General Counsel's Office within thirty days. *See* 28 C.F.R. §§ 542.13(a), 542.14(a), 542.15(a)

In his complaint, Hernandez acknowledges that FCI Ray Brook had an internal grievance procedure. However, he admits that he failed to file a grievance. (*Dkt. No. 1, P. 4* ). Hernandez explains this failure by simply stating: "I am seeking monetary damages that cannot be addressed via the grievance program." Unfortunately for him, however, it is now well established that the mere non-existence of monetary relief as a remedy which is available to an inmate through the grievance process does not excuse a plaintiff from first pursuing that avenue before resorting to the institution of suit in a federal court. Because Hernandez's complaint on its face readily reveals a critical failure on his part to exhaust available administrative remedies, this court finds that the defendants are entitled to dismissal of Hernandez's complaint, without prejudice, based upon his failure to exhaust available administrative remedies.[FN3]

> FN3. In their motion papers, the defendants suggest that Hernandez's failure to exhaust divests this court of subject matter jurisdiction. "District courts within this circuit have reached contrary conclusions about the nature of the PLRA's exhaustion requirement." *Delio v. Morgan,* 00Civ.7167, 2003 WL 21373168, at *2 (S.D.N.Y. June 13, 2003) (citing and comparing *Arnold v. Goetz,* 245 F.Supp .2d 527, 531-533 (S.D.N.Y.2003) (collecting cases and joining

"chorus of voices" concluding that the PLRA's exhaustion requirement is an affirmative defense and not a jurisdictional prerequisite), with *Harris v. Totten,* 244 F.Supp.2d 229, 231 (S.D.N.Y.2003) ("when a defendant moves for dismissal on the ground that the plaintiff has failed to exhaust administrative remedies, the defendant is raising a challenge to the court's jurisdiction"), and *Long v. Lafko,* 00Civ.723, 2001 WL 863422, at *2 (S.D.N.Y. July 31, 2001) (plaintiff's failure to exhaust all administrative remedies "deprives this court of subject matter jurisdiction")). However, this court finds that under either a jurisdictional or affirmative defense interpretation of the PLRA exhaustion requirement, this case must be dismissed because the defendants have asserted the defense and Hernandez's failure to exhaust appears on the face of the pleadings.

IV. *SUMMARY AND RECOMMENDATION*

It is by now well-established that prisoner claims of the nature now asserted by Hernandez in this action are subject to the PLRA's exhaustion of remedies requirement, notwithstanding unavailability of monetary relief through that avenue. Since Hernandez, by his own admission, failed to exhaust available administrative remedies by filing a grievance and pursuing it through the appropriate channels at FCI Ray Brook before commencement of this action, his complaint is subject to dismissal, without prejudice. In light of this determination, this court finds that conversion is inappropriate and will not address the various other arguments raised by the defendants, many of which may ultimately be determined to be meritorious should Hernandez choose to reinstitute this action following his pursuit of the matter through the available grievance process.

Based upon the foregoing, it is hereby

RECOMMENDED that the defendants' motion to dismiss Hernandez's complaint for failure to state a claim upon which relief may be granted (*Dkt. No. 19* ) be GRANTED and that Hernandez's complaint be DISMISSED, without prejudice, and that the defendants' motion, in the alternative, for summary judgment (*Dkt. No.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2003 WL 22143709 (N.D.N.Y.)

(Cite as: 2003 WL 22143709 (N.D.N.Y.))

*19* ) be DENIED as moot, in light of this determination.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties have TEN (10) DAYS ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**5** It is further ORDERED that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties by regular mail.

N.D.N.Y.,2003.

Hernandez v. Nash
Not Reported in F.Supp.2d, 2003 WL 22143709 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

---

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER, Corrections Officer, Great Meadow
Correctional Facility; S. Griffin, Corrections Officer,
Great Meadow Correctional Facility; M. Terry,
Corrections Officer, Great Meadow Correctional
Facility; F. Englese, Corrections Officer, Great Meadow
Correctional Facility; Sergeant Edwards, Great Meadow
Correctional Facility; K. Bump, Sergeant, Great
Meadow Correctional Facility; K.H. Smith, Sergeant,
Great Meadow Correctional Facility; A. Paolano,
Facility Health Director: and Ted Nesmith, Physicians
Assistant, Defendants.
No. 9:03-CV-1010 (DNH/GLS).

June 20, 2008.
James Murray, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, James Seaman, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

### ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff, James Murray, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a 51 page Report
Recommendation dated February 11, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted in part (i.e., to the extent that it
requests the dismissal with prejudice of plaintiff's claims
against defendant Paolano and Nesmith); and denied in
part (i.e., to the extent that it requests dismissal of
plaintiff's claims against the remaining defendants on the
grounds of plaintiff's failure to exhaust available
administrative remedies) for the reasons stated in the

Report Recommendation. Lengthy objections to the
Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

2. Plaintiff's complaint against defendants Paolano
and Nesmith is DISMISSED with prejudice;

3. Defendants' motion for summary judgment is
DENIED, to the extent that their request for dismissal of
plaintiff's assault claims under the Eighth Amendment
against the remaining defendants on the grounds of
plaintiff's failure to exhaust available administrative
remedies as stated in the Report-Recommendation.

IT IS SO ORDERED.

JAMES MURRAY, Plaintiff,

-v.-

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow
C.F.; F. ENGLESE, Corrections Officer, Great Meadow
C.F.; P. EDWARDS, Sergeant, Great Meadow C.F.; K.
BUMP, Sergeant, Great Meadow C.F.; K.H. SMITH,
Sergeant, Great Meadow C.F.; A. PAOLANO, Health
Director, Great Meadows C.F.; TED NESMITH,
Physicians Assistant, Great Meadows C.F., Defendants.

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

C.F.; Counter Claimants,

-v.-

JAMES MURRAY, Counter Defendant.

### ORDER and REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 78.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

### I. BACKGROUND

#### A. Plaintiff's Second Amended Complaint

In his Second Amended Complaint, James Murray ("Plaintiff") alleges that nine correctional officials and health care providers employed by the New York State Department of Correctional Services ("DOCS") at Great Meadow Correctional Facility ("Great Meadow C.F .") violated his rights under the Eighth Amendment on August 17, 2000, when (1) Defendants Palmers, Griffin, Terry, and Englese assaulted him without provocation while he was incapacitated by mechanical restraints, (2) Defendants Edwards, Bump, and Smith witnessed, but did not stop, the assault, and (3) Defendants Paolano and Nesmith failed to examine and treat him following the assault despite his complaints of having a broken wrist. (Dkt. No. 10, ¶¶ 6-7 [Plf.'s Second Am. Compl.].)

#### B. Defendants' Counterclaim

*2 In their Answer to Plaintiff's Second Amended Complaint, three of the nine Defendants (Palmer, Griffin and Terry) assert a counterclaim against Defendant for personal injuries they sustained as a result of Plaintiff's assault and battery upon them during the physical struggle that ensued between them and Plaintiff due to his threatening and violent behavior on August 17, 2000, at Great Meadow C.F. (Dkt. No. 35, Part 1, ¶¶ 23-30 [Defs.' Answer & Counterclaim].)

I note that the docket in this action inaccurately indicates that this Counterclaim is asserted also on behalf of Defendants Englese, Edwards, Bump, Smith, Paolano, and "Nejwith" (later identified as "Nesmith"). (*See* Caption of Docket Sheet.) As a result, at the end of this Report-Recommendation, *I direct the Clerk's Office to correct the docket sheet to remove the names of those individuals as "counter claimants" on the docket.*

I note also that, while such counterclaims are unusual in prisoner civil rights cases (due to the fact that prisoners are often "judgment proof" since they are without funds), Plaintiff paid the $150 filing fee in this action (Dkt. No. 1), and, in his Second Amended Complaint, he alleges that he received a settlement payment in another prisoner civil rights actions in 2002. (Dkt. No. 10, ¶ 10 [Plf.'s Second Am. Compl.].) Further investigation reveals that the settlement resulted in a payment of $20,000 to Plaintiff. *See Murray v. Westchester County Jail,* 98-CV-0959 (S .D.N.Y.) (settled for $20,000 in 2002).

### II. DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE

#### A. Defendants' Motion

In their motion for summary judgment, Defendants argue that Plaintiff's Second Amended Complaint should be dismissed for four reasons: (1) Plaintiff has failed to adduce any evidence establishing that Defendant Paolano, a supervisor, was personally involved in any of the constitutional violations alleged; (2) Plaintiff has failed to adduce any evidence establishing that Defendant Nesmith was deliberately indifferent to any of Plaintiff's serious medical needs; (3) at the very least, Defendant Nesmith is protected from liability by the doctrine of qualified immunity, as a matter of law; and (4) Plaintiff has failed to adduce any evidence establishing that he exhausted his available administrative remedies with respect to his assault claim, before filing that claim in federal court. (Dkt. No. 78, Part 13, at 2, 4-13 [Defs.' Mem. of Law].)

In addition, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

to honor non-life-sustaining medical prescriptions written at a former facility. (*Id.* at 3.) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

**\*3** Defendants' motion is accompanied by a Statement of Material Facts, submitted in accordance with Local Rule 7.1(a)(3) ("Rule 7.1 Statement"). (Dkt. No. 78, Part 12.) Each of the 40 paragraphs contained in Defendants' Rule 7.1 Statement is supported by an accurate citation to the record evidence. (*Id.*) It is worth mentioning that the record evidence consists of (1) the affirmations of Defendants Nesmith and Paolano, and exhibits thereto, (2) the affirmation of the Inmate Grievance Program Director for DOCS, and exhibits thereto, (3) affirmation of the Legal Liaison between Great Meadow C.F. and the New York State Attorney General's Office during the time in question, and exhibits thereto, and (4) a 155-page excerpt from Plaintiff's deposition transcript. (Dkt. No. 78.)

**B. Plaintiff's Response**

After being specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and after being granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83), Plaintiff submitted a barrage of documents: (1) 49 pages of exhibits, which are attached to neither an affidavit nor a memorandum of law (Dkt. No. 84); (2) 113 pages of exhibits, attached to a 25-page affidavit (Dkt. No. 85); (3) 21 pages of exhibits, attached to a 12-page supplemental affidavit (Dkt. No. 86); and (4) a 29-page memorandum of law (Dkt. No. 86); and a 13-page supplemental memorandum of law (Dkt. No. 88).

Generally in his Memorandum of Law and Supplemental Memorandum of Law, Plaintiff responds to

the legal arguments advanced by Defendants. (*See* Dkt. No. 86, Plf.'s Memo. of Law [responding to Defs.' exhaustion argument]; Dkt. No. 88, at 7-13 [Plf.'s Supp. Memo. of Law, responding to Defs.' arguments regarding the personal involvement of Defendant Paolano, the lack of evidence supporting a deliberate indifference claim against Defendant Nesmith, the applicability of the qualified immunity defense with regard to Plaintiff's claim against Defendant Nesmith, and the sufficiency and timing of Plaintiff's prescription-review claim against Defendant Paolano].) Those responses are described below in Part IV of this Report-Recommendation.

However, unfortunately, not among the numerous documents that Plaintiff has provided is a *proper* response to Defendants' Rule 7.1 Statement. (*See* Dkt. No. 85, Part 2, at 45-52 [Ex. N to Plf.'s Affid.].) Specifically, Plaintiff's Rule 7.1 Response (which is buried in a pile of exhibits) fails, with very few exceptions, to "set forth ... specific citation[s] to the record," as required by Local Rule 7.1(a)(3). (*Id.*) I note that the notary's "sworn to" stamp at the end of the Rule 7.1 Statement does not transform Plaintiff's Rule 7.1 Response into record evidence so as to render that Response compliant with Local Rule 7.1. First, Local Rule 7.1 expressly states, "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." N.D.N.Y. L.R. 7.1(a)(3). In this way, the District's Local Rule, like similar local rules of other districts, contemplates citations to a record that is independent of a Rule 7.1 Response. *See, e.g., Vaden v. GAP, Inc.,* 06-CV-0142, 2007 U.S. Dist. LEXIS 22736, at *3-5, 2007 WL 954256 (M.D.Tenn. March 26, 2007) (finding non-movant's verified response to movant's statement of material facts to be deficient because it did cite to affidavit or declaration, nor did it establish that non-movant had actual knowledge of matters to which he attested); *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 4-5 (D.D.C.2000) (criticizing party's "Verified Statement of Material Facts," as being deficient in citations to independent record evidence, lacking "firsthand knowledge," and being purely "self-serving" in nature). Moreover, many of Plaintiff's statements in his Rule 7.1 Response are either argumentative in nature or lacking in specificity and personal knowledge, so as to disqualify those statements from having the effect of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

sworn testimony for purposes of a summary judgment motion. *See, infra,* notes 10-12 of this Report-Recommendation.

## III. GOVERNING LEGAL STANDARD

**\*4** Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists,[FN1] the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN2]

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN2. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN3] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN4] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN5]

> FN3. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary

judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN5. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to *properly* respond to a defendant's Rule 7.1 Statement of Material Facts is that the facts as set forth in that Rule 7.1 Statement will be accepted as true [FN6] to the extent that (1) those facts are supported by the evidence in the record,[FN7] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.[FN8]

> FN6. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ) [emphasis in original].

> FN7. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted].

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

FN8. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Implied in the above-stated standard is the fact that a district court has no duty to perform an *independent* review of the record to find proof of a factual dispute, even if the non-movant is proceeding *pro se.*[FN9] In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory.[FN10] (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.)[FN11] Finally, even where an affidavit is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN12]

FN9. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## IV. ANALYSIS

## A. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Paolano Was Personally Involved in the Constitutional Violations Alleged

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN14] If the defendant is a supervisory official, such as a correctional facility superintendent or a facility health services director, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN17]

FN13. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN14. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN15. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN16. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN17. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*5** Defendants argue that Plaintiff has not adduced evidence establishing that Defendant Paolano, the Great Meadow C.F. Health Services Director during the time in question, was personally involved in the constitutional violations alleged. (Dkt. No. 78, Part 13, at 2 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that, during the time in which Plaintiff was incarcerated at Great Meadow C.F. (i . e., from early August of 2000 to late November of 2000), Defendant Paolano never treated Plaintiff for any medical condition, much less a broken wrist on August 17, 2000. (*Id.; see also* Dkt. No. 78, Part 4, ¶¶ 7-8 [Paolano Affid.]; Dkt. No. 78, Part 5 [Ex. A to Paolano Affid.]; Dkt. No. 78, Part 11, at 32-33 [Plf.'s Depo.].)

Plaintiff responds that (1) Defendant Paolano was personally involved since he "treated" Plaintiff on August 17, 2000, by virtue of his supervisory position as the Great Meadow C.F.'s Health Services Director, and (2) Defendant Paolano has the "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F. (Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites a paragraph of his Supplemental Affidavit, and an administrative decision, for the proposition that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care." (*Id.; see also* Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14.)

**1. Whether Defendant Paolano Was Personally Involved in Plaintiff's Treatment on August 17, 2000**

With respect to Plaintiff's first point (regarding Defendant Paolano's asserted "treatment" of Plaintiff on August 17, 2000), the problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants' assert, Defendant Paolano did not, in fact, treat Plaintiff on August 17, 2000 (or at any time when Plaintiff was incarcerated at Great Meadow C.F.). This was the fact asserted by Defendants in Paragraphs 38 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶ 38 [Defs.' Rule 7.1 Statement].) Defendants supported this

factual assertion with record evidence. (*Id.* [providing accurate record citations]; *see also* Dkt. No. 78, Part 12, ¶¶ 37-38 [Defs.' Rule 7.1 Statement, indicating that it was Defendant Nesmith, not Defendant Paolano, who treated Plaintiff on 8/17/00].) Plaintiff has failed to specifically controvert this factual assertion, despite having been given an adequate opportunity to conduct discovery, and having been specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and having been granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83). Specifically, Plaintiff fails to cite any record evidence in support of his denial of Defendants' referenced factual assertion. (*See* Dkt. No. 85, Part 2, at 50 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

**\*6** The Court has no duty to perform an independent review of the record to find proof disputing this established fact. *See, supra,* Part III and note 9 of this Report-Recommendation. Moreover, I decline to exercise my discretion, and I recommend that the Court decline to exercise its discretion, to perform an independent review of the record to find such proof for several reasons, any one of which is sufficient reason to make such a decision: (1) as an exercise of discretion, in order to preserve judicial resources in light of the Court's heavy caseload; (2) the fact that Plaintiff has already been afforded considerable leniency in this action, including numerous deadline extensions and liberal constructions; and (3) the fact that Plaintiff is fully knowledgeable about the requirements of a non-movant on a summary judgment motion, due to Defendants' notification of those requirements, and due to Plaintiff's extraordinary litigation experience.

With regard to this last reason, I note that federal courts normally treat the papers filed by *pro se* civil rights litigants with special solicitude. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" that is normally afforded *pro se* litigants.[FN18] Generally, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

rationale for diminishing special solicitude (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending special solicitude to a *pro se* litigant in the first place.[FN19] The Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions.[FN20] Similarly, I decide to do so, here, and I recommend the Court do the same.

> FN18. *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept.26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted].

> FN19. *Koehl,* 2007 WL 2846905, at *3 & n. 18 [citations omitted].

> FN20. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

Plaintiff is no stranger to the court system. A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") System reveals that Plaintiff has filed at least 15 other federal district court actions,[FN21] and at least three federal court appeals.[FN22] Furthermore, a review of the New York State Unified Court System's website reveals that he has filed at least 20 state court actions,[FN23] and at least two state court appeals.[FN24] Among these many actions he has had at least one victory, resulting in the payment of $20,000 to him in

settlement proceeds.[FN25]

> FN21. *See Murray v. New York,* 96-CV-3413 (S.D.N.Y.); *Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y.); *Murray v. McGinnis,* 99-CV-1908 (W.D.N.Y.); *Murray v. McGinnis,* 99-CV-2945 (S.D.N.Y.); *Murray v. McGinnis,* 00-CV-3510 (S.D.N.Y.); *Murray v. Jacobs,* 04-CV-6231 (W.D.N.Y.); *Murray v. Bushey,* 04-CV-0805 (W.D.N.Y.); *Murray v. Goord,* 05-CV-1113 (N.D.N.Y.); *Murray v. Wissman,* 05-CV-1186 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1579 (N.D.N.Y.); *Murray v. Doe,* 06-CV-0205 (S.D.N.Y.); *Murray v. O'Herron,* 06-CV-0793 (W.D.N.Y.); *Murray v. Goord,* 06-CV-1445 (N.D.N.Y.); *Murray v. Fisher,* 07-CV-0306 (W.D.N.Y.); *Murray v. Escrow,* 07-CV-0353 (W.D.N.Y.).

> FN22. *See Murray v. McGinnis,* No. 01-2533 (2d Cir.); *Murray v. McGinnis,* No. 01-2536 (2d Cir.); *Murray v. McGinnis,* No. 01-2632 (2d Cir.).

> FN23. *See Murray v. Goord,* Index No. 011568/1996 (N.Y. Sup.Ct., Westchester County); *Murray v. Goord,* Index No. 002383/1997 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002131/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002307/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002879/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002683/2004 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002044/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. McGinnis,* Index No. 002099/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Sullivan,* Index No. 002217/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002421/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002495/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002496/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002888/2006 (N.Y. Sup.Ct., Chemung

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

County); *Murray v. LeClaire,* Index No. 002008/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002009/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No.002010/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002011/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. Fisher,* Index No. 002762/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. New York,* Claim No. Claim No. 108304, Motion No. 67679 (N.Y.Ct.Cl.); *Murray v. New York,* Motion No. M-67997 (N.Y.Ct.Cl.).

FN24. *See Murray v. Goord,* No. 84875, 709 N.Y. S.2d 662 (N.Y.S.App.Div., 3d Dept.2000); *Murray v. Goord,* No. 83252, 694 N.Y.S .2d 797 (N.Y.S.App.Div., 3d Dept.1999).

FN25. *See Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y .) (settled for $20,000 in 2002).

I will add only that, even if I were inclined to conduct such an independent review of the record, the record evidence that Plaintiff cites regarding this issue in his Supplemental Memorandum of Law does not create such a question of fact. (*See* Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law, citing Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14].) It appears entirely likely that Defendant Paolano had the ultimate responsibility for providing medical treatment to the inmates at Great Meadow C.F.FN26 However, this duty arose solely because of his supervisory position, i.e., as the Facility Health Services Director. It is precisely this sort of supervisory duty that does *not* result in liability under 42 U.S.C. § 1983, as explained above.

FN26. To the extent that Plaintiff relies on this evidence to support the proposition that Defendant Paolano had the "sole" responsibility for such health care, that reliance is misplaced. Setting aside the loose nature of the administrative decision's use of the word "sole," and the different context in which that word was used (regarding the review of Plaintiff's grievance about having had his prescription

discontinued), the administrative decision's rationale for its decision holds no preclusive effect in this Court. I note that this argument by Plaintiff, which is creative and which implicitly relies on principles of estoppel, demonstrates his facility with the law due to his extraordinary litigation experience.

**\*7** As for the other ways through which a supervisory official may be deemed "personally involved" in a constitutional violation under 42 U.S.C. § 1983, Plaintiff does not even argue (or allege facts plausibly suggesting) FN27 that Defendant Paolano *failed to remedy* the alleged deliberate indifference to Plaintiff's serious medical needs on August 17, 2000, after learning of that deliberate indifference through a report or appeal. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano created, or allowed to continue, *a policy or custom* under which the alleged deliberate indifference on August 17, 2000, occurred. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano had been *grossly negligent* in managing subordinates (such as Defendant Nesmith) who caused the alleged deliberate indifference. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that Defendant Nesmith was violating Plaintiff's constitutional rights.

FN27. *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." ) [emphasis in

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

original].

In the alternative, I reach the same conclusion (that Plaintiff's claim against Defendant Paolano arising from the events of August 17, 2000, lacks merit) on the ground that there was no constitutional violation committed by Defendant Nesmith on August 17, 2000, in which Defendant Paolano could have been personally involved, for the reasons discussed below in Part IV.B. of this Report-Recommendation.

**2. Whether Defendant Paolano Was Personally Involved in the Review of Plaintiff's Prescriptions in Early August of 2000**

With respect to Plaintiff's second point (regarding Defendant Paolano's asserted "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F.), there are three problems with this argument.

First, the argument regards a claim that is not properly before this Court for the reasons explained below in Part IV.E. of this Report-Recommendation.

Second, as Defendants argue, even if the Court were to reach the merits of this claim, it should rule that Plaintiff has failed to adduce evidence establishing that Defendant Paolano was personally involved in the creation or implementation of DOCS' prescription-review policy. It is an uncontroverted fact, for purposes of Defendants' motion, that (1) the decision to temporarily deprive Plaintiff of his previously prescribed pain medication (i.e., pending the review of that medication by a physician at Great Meadow C.F.) upon his arrival at Great Meadow C.F. was made by an "intake nurse," not by Defendant Paolano, (2) the nurse's decision was made pursuant to a policy instituted by DOCS, not by Defendant Paolano, and (3) Defendant Paolano did not have the authority to alter that policy. These were the facts asserted by Defendants in Paragraphs 6 through 9 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 6-9 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits two of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at

46-47 [Ex. N to Plf.'s Affid.].)

**\*8** For example, in support of his denial of Defendants' factual assertion that "[t]his policy is not unique to Great Meadow, but applies to DOCS facilities generally," Plaintiff says that, at an unidentified point in time, "Downstate CF honored doctors proscribed [sic] treatment and filled by prescriptions from Southport Correctional Facility .... Also I've been transferred to other prisons such as Auburn [C.F.] in which they honored doctors prescribe[d] orders." (*Id.*) I will set aside the fact that Defendants' factual assertion is not that the policy applies to every single DOCS facility but that it applies to them as a general matter. I will also set aside the fact that Plaintiff's assertion is not supported by a citation to independent record evidence. The main problem with this assertion is that it is not specific as to what year or years he had these experiences, nor does it even say that his prescriptions were immediately honored without a review by a physician at the new facility.

The other piece of "evidence" Plaintiff cites in support of this denial is "Superintendent George B. Duncan's 9/22/00 decision of Appeal to him regarding [Plaintiff's Grievance No.] GM-30651-00." (*Id.*) The problem is that the referenced determination states merely that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care, and has the final say regarding all medical prescriptions." (Dkt. No. 86, at 14 [Ex. 14 to Plf.'s Suppl. Affid.].) For the sake of much-needed brevity, I will set aside the issue of whether an IGP Program Director's broadly stated *rationale* for an appellate determination with respect to a prisoner's grievance can ever constitute evidence sufficient to create proof of a genuine issue of fact for purposes of a summary judgment motion. The main problem with this "evidence" is that there is absolutely nothing inconsistent between (1) a DOCS policy to temporarily deprive prisoners of non-life-sustaining prescription medications upon their arrival at a correctional facility, pending the review of those medical prescriptions by a physician at the facility, and (2) a DOCS policy to give Facility Health Service Directors the "final say" regarding the review of those medical prescriptions.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Because Plaintiff has failed to support his denial of these factual assertions with citations to record evidence that actually controverts the facts asserted, I will consider the facts asserted by Defendants as true. N.D.N.Y. L.R. 7.1(a)(3). Under the circumstances, I decline, and I recommend the Court decline, to perform an independent review of the record to find proof disputing this established fact for the several reasons described above in Part IV.A.1. of this Report-Recommendation.

Third, Plaintiff has failed to adduce evidence establishing that the policy in question is even unconstitutional. I note that, in his Supplemental Memorandum of Law, Plaintiff argues that "deliberate indifference to serious medical needs is ... shown by the fact that prisoners are denied access to a doctor and physical examination upon arrival at [Great Meadow] C.F. to determine the need for pain medications which aren't life sustaining ...." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) As a threshold matter, Plaintiff's argument is misplaced to the extent he is arguing about the medical care other prisoners may not have received upon their arrival at Great Meadow C.F. since this is not a class-action. More importantly, to the extent he is arguing about any medical care that he (allegedly) did not receive upon his arrival at Great Meadow C.F., he cites no record evidence in support of such an assertion. (*Id.*) Indeed, he does not even cite any record evidence establishing that, upon his arrival at Great Meadow C.F. in early 2000, either (1) he asked a Defendant in this action for such medical care, or (2) he was suffering from a serious medical need for purposes of the Eighth Amendment. (*Id.*)

**\*9** If Plaintiff is complaining that Defendant Paolano is liable for recklessly causing a physician at Great Meadow C.F. to excessively delay a review Plaintiff's pain medication upon his arrival at Great Meadow C.F., then Plaintiff should have asserted that allegation (and some basic facts supporting it) in a pleading in this action so that Defendants could have taken adequate discovery on it, and so that the Court could squarely review the merits of it. (Dkt. No. 78, Part 11, at 53 [Plf.'s Depo.].)

For all of these reasons, I recommend that Plaintiff's claims against Defendant Paolano be dismissed with prejudice.

**B. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Nesmith Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Generally, to state a claim for inadequate medical care, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that, even assuming that Plaintiff's broken wrist constituted a sufficiently serious medical condition for purposes of the Eighth Amendment, Plaintiff has not adduced evidence establishing that, on August 17, 2000, Defendant Nesmith acted with deliberate indifference to that medical condition. (Dkt. No. 78, Part 13, at 4-9 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that Defendant Nesmith sutured lacerations in Plaintiff's forehead, ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. (*Id.* at 7-9 [providing accurate record citations].) Moreover, argue Defendants, Plaintiff's medical records indicate that he did not first complain of an injury to his wrist until hours after he experienced that injury. (*Id.* at 8 [providing accurate record citation].)

Plaintiff responds that "[he] informed P.A. Nesmith that his wrist felt broken and P.A. Nesmith ignored plaintiff, which isn't reasonable. P.A. Nesmith didn't even care to do a physical examination to begin with[,] which would've revealed [the broken wrist] and is fundamental medical care after physical trauma." (Dkt. No. 88, at 11 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites *no* record evidence. (*Id.* at 11-12.)

The main problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants have argued, Defendant Nesmith (1) sutured lacerations in Plaintiff's forehead within hours if not minutes of Plaintiff's injury and (2) ordered an x-ray

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. These facts were asserted by Defendants in Paragraphs 27 through 32 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 27-32 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits most of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 48-50 [Ex. N to Plf.'s Affid.].)

**\*10** The only denial he supports with a record citation is with regard to when, within the referenced 24-hour period, Defendant Nesmith ordered his wrist x-ray. This issue is not material, since I have assumed, for purposes of Defendants' motion, merely that Defendant Nesmith ordered Plaintiff's wrist x-ray within 24 hours of the onset of Plaintiff's injury.[FN28] (Indeed, whether the wrist x-ray was ordered in the late evening of August 17, 2000, or the early morning of August 18, 2000, would appear to be immaterial for the additional reason that it would appear unlikely that any x-rays could be conducted in the middle of the night in Great Meadow C.F.)

FN28. Furthermore, I note that the record evidence he references (in support of his argument that the x-ray was on the morning of August 18, 2000, not the evening of August 17, 2000) is "Defendants exhibit 20," which he says "contains [an] 11/20/00 Great Meadow Correctional Facility Investigation Sheet by P. Bundrick, RN, NA, and Interdepartmental Communication from defendant Ted Nesmith P.A. that state [that the] X ray was ordered on 8/18/00 in the morning." (*Id.*) I cannot find, in the record, any "exhibit 20" having been submitted by Defendants, who designated their exhibits by letter, not number. (*See generally* Dkt. No. 78.) However, at Exhibit G of Defendant Nesmith's affidavit, there is the "Investigation Sheet" to which Plaintiff refers. (Dkt. No. 78, Part 3, at 28 [Ex. G to Nesmith

Affid.].) The problem is that document does not say what Plaintiff says. Rather, it says, "Later that evening [on August 17, 2000] ... [a]n x-ray was ordered for the following morning ...." (*Id.*) In short, the document says that the x-ray was not ordered *on* the morning of August 18, 2007, but *for* that morning. Granted, the second document to which Plaintiff refers, the "Interdepartmental Communication" from Defendant Nesmith, does say that "I saw him the next morning and ordered an xray ...." (*Id.* at 29.) I believe that this is a misstatement, given the overwhelming record evidence to the contrary.

Moreover, in confirming the accuracy of Defendants' record citations contained in their Rule 7.1 Statement, I discovered several facts further supporting a finding that Defendant Nesmith's medical care to Plaintiff was both prompt and responsive. In particular, the record evidence cited by Defendants reveals the following specific facts:

(1) at approximately 10:17 a.m. on August 17, 2000, Plaintiff was first seen by someone in the medical unit at Great Meadow C.F. (Nurse Hillary Cooper);

(2) at approximately 10:40 a.m. on August 17, 2000, Defendant Nesmith examined Plaintiff; during that examination, the main focus of Defendant Nesmith's attention was Plaintiff's complaint of the lack of feeling in his lower extremities; Defendant Nesmith responded to this complaint by confirming that Plaintiff could still move his lower extremities, causing Plaintiff to receive an x-ray examination of his spine (which films did not indicate any pathology), and admitting Plaintiff to the prison infirmary for observation;

(3) at approximately 11:00 a.m. on August 17, 2000, Defendant Nesmith placed four sutures in each of two 1/4" lacerations on Plaintiff's left and right forehead;

(4) by 11:20 a.m. Plaintiff was given, or at least prescribed, Tylenol by a medical care provider;

(5) Plaintiff's medical records reflect no complaint by Plaintiff of any injury to his wrist at any point in time other than between 4:00 p.m. and midnight on August 17,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

2000;

(6) at some point after 9:00 p.m. on August 17, 2000, and 9:00 a.m. on the morning of August 18, 2000, Defendant Nesmith ordered that Plaintiff's wrist be examined by x-ray, in response to Plaintiff's complaint of an injured wrist; that x-ray examination occurred at Great Meadow C.F. at some point between 9:00 a.m. on August 17, 2000, and 11:00 a.m. on August 18, 2000, when Defendant Nesmith personally performed a "wet read" of the x-rays before sending them to Albany Medical Center for a formal reading by a radiologist;

(7) at approximately 11:00 a.m. on August 18, 2000, Defendant Nesmith placed a splint on Plaintiff's wrist and forearm with the intent of replacing it with a cast in a couple of days; the reason that Defendant Nesmith did not use a cast at that time was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith believed, based on 30 years experience treating hundreds of fractures, that it was generally not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides;

*11 (8) on August 22, 2000, Defendant Nesmith replaced the splint with a cast;

(9) on August 23, 2000, Plaintiff was discharged from the infirmary at Great Meadow C.F.; and

(10) on August 30, 2000, Defendant Nesmith removed the sutures from Plaintiff's forehead. (*See generally* Dkt. No. 78, Part 2, ¶¶ 3-15 [Aff. of Nesmith]; Dkt. No. 78, Part 3, Exs. A-E [Exs. to Affid. of Nesmith].)

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," FN29 one that is "equivalent to criminal recklessness." FN30 There is no evidence of such criminal recklessness on the part of Defendant Nesmith, based on the uncontroverted facts before the Court, which show a rather prompt and responsive level of medical care given by Defendant Nesmith to Plaintiff, during the hours and days following the onset of his injuries.

FN29. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN30. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *cf. Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").

In his argument that his treatment in question constituted deliberate indifference to a serious medical need, Plaintiff focuses on the approximate 24-hour period that appears to have elapsed between the onset of his injury and his receipt of an x-ray examination of his wrist. He argues that this 24-hour period of time constituted a delay that was unreasonable and reckless. In support of his argument, he cites two cases. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). However, the facts of both cases are clearly distinguishable from the facts of the case at hand.

In *Brown v. Hughes,* the Eleventh Circuit found a genuine issue of material fact was created as to whether a correctional officer knew of a prisoner's foot injury during the four hours in which no medical care was provided to the prisoner, so as to preclude summary judgment for that officer. *Brown,* 894 F.2d at 1538-39. However, the Eleventh Circuit expressly stated that the question of fact was created because the prisoner had "submitted affidavits stating that [the officer] was called to his cell because there had been a fight, that while [the officer] was present [the prisoner] began to limp and then hop on one leg, that his foot began to swell severely, that he told [the officer] his foot felt as though it were broken, and that [the officer] promised to send someone to look at it but never did." *Id.* Those are *not* the facts of this case.

In *Loe v. Armistead,* the Fourth Circuit found merely that, in light of the extraordinary leniency with which *pro se* complaints are construed, the court was unable to conclude that a prisoner had failed to state a claim upon which relief might be granted for purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b) (6) because the prisoner had alleged that the defendants-*despite being (at some point) "notified" of the prisoner's injured arm*-had inexplicably delayed for 22 hours in giving him medical treatment for the injury. *Loe,* 582 F.2d at 1296. More specifically, the court expressly construed the prisoner's complaint as alleging that, following the onset of the plaintiff's injury at 10:00 a.m. on the day in question, the plaintiff was immediately taken to the prison's infirmary where a nurse, while examining the prisoner's arm, heard him complain to her about pain. *Id.* at 1292. Furthermore, the court construed the prisoner's complaint as alleging that, "[t]hroughout the day, until approximately 6:00 p.m., [the prisoner] repeatedly requested that he be taken to the hospital. He was repeatedly told that only the marshals could take him to a hospital and that they had been notified of his injury." *Id.* at 1292-93. Again, those are *not* the facts of this case.

**\*12** Specifically, there is no evidence in the record of which I am aware that at any time before 4:00 p.m. on August 17, 2000, Defendant Nesmith either (1) heard Plaintiff utter a complaint about a wrist injury sufficient to warrant an x-ray examination or (2) observed physical symptoms in Plaintiff's wrist (such as an obvious deformity) that would place him on notice of such an injury. As previously stated, I decline, and I urge the Court to decline, to tediously sift through the 262 pages of documents that Plaintiff has submitted in the hope of finding a shred of evidence sufficient to create a triable issue of fact as to whether Plaintiff made, and Defendant Nesmith heard, such a complaint before 4:00 p.m. on August 17, 2000.

I note that, in reviewing Plaintiff's legal arguments, I have read his testimony on this issue. That testimony is contained at Paragraphs 8 through 12, and Paragraph 18, of his Supplemental Affidavit. (*See* Dkt. No. 86, at ¶¶ 8-10, 18 [Plf.'s Supp. Affid., containing two sets of Paragraphs numbed "5" through "11"].) In those Paragraphs, Plaintiff swears, in pertinent part, that "[w]hile I was on the x-ray table I told defendant Ted Nesmith, P.A. and/or Bill Redmond RN ... that my wrist felt broken, and was ignored." (*Id.* at ¶ 9.) Plaintiff also swears that "I was [then] put into a room in the facility clinic[,] and I asked defendant Ted Nesmith, PA[,] shortly thereafter for [an] x-ray of [my] wrist[,] pain medication and [an] ice pack but wasn't given it [sic]." (*Id.* at ¶ 10.) Finally, Plaintiff swears as follows: "At one point on 8/17/00 defendant Nesmith told me that he didn't give a damn when I kept complaining that my wrist felt broken and how I'm going to sue him cause I'm not stupid

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

[enough] to not know he's supposed to do [a] physical examination [of me], [and not] to ignore my complaints about [my] wrist feeling broke and feeling extreem [sic] pain. He told me [to] stop complaining [and that] he's done with me for the day." (*Id.* at ¶ 18.)

This last factual assertion is important since a response of "message received" from the defendant appears to have been critical in the two cases cited by Plaintiff. It should be emphasized that, according to the undisputed facts, when Plaintiff made his asserted wrist complaint to Defendant Nesmith during the morning of August 17, 2000, Defendant Nesmith was either suturing up Plaintiff's forehead or focusing on Plaintiff's complaint of a lack of feeling in his lower extremities. (This complaint of lack of feeling, by the way, was found to be inconsistent with Defendant Nesmith's physical examination of Plaintiff.)

In any event, Defendant Nesmith can hardly be said to have, in fact, "ignored" Plaintiff since he placed him under *observation* in the prison's infirmary (and apparently was responsible for the prescription of Tylenol for Plaintiff). FN31 Indeed, it was in the infirmary that Plaintiff was observed by a medical staff member to be complaining about his wrist, which resulted in an x-ray examination of Plaintiff's wrist.

> FN31. In support of my conclusion that this fact alone is a sufficient reason to dismiss Plaintiff's claims against Defendant Nesmith, I rely on a case cited by Plaintiff himself. *See Brown,* 894 F.2d at 1539 ("Although no nurses were present [in the hospital] at the jail that day, the procedure of sending [the plaintiff] to the hospital, once employed, was sufficient to ensure that [the plaintiff's broken] foot was treated promptly. Thus, [the plaintiff] has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.").

**\*13** Even if it were true that Plaintiff made a wrist complaint directly to Defendant Nesmith (during Defendant Nesmith's examination and treatment of Plaintiff between 10:40 a.m. and 11:00 a.m. on August 17,

2000), and Defendant Nesmith heard that complaint, and that complaint were specific and credible enough to warrant an immediate x-ray examination, there would be, at most, only some *negligence* by Defendant Nesmith in not ordering an x-ray examination until 9:00 p.m. that night.

As the Supreme Court has observed, "[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.FN32 For this reason, this Court has actually held that a *17-day* delay between the onset of the prisoner's apparent wrist fracture and the provision of an x-ray examination and cast did not constitute deliberate indifference, as a matter of law. *Miles v. County of Broome,* 04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at *27-28, 2006 WL 561247 (N.D.N.Y. Mar. 6, 2006)* (McAvoy, J.) (granting defendants' motion for summary judgment with regard to prisoner's deliberate indifference claim).

> FN32. *See also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (prisoner's "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention [with regard to the treatment of his broken finger], are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]; *cf. O'Bryan v. Federal Bureau of Prisons,* 07-CV-0076, 2007 U.S. Dist. LEXIS 65287, at *24-28 (E.D.Ky. Sept. 4, 2007) (holding no deliberate indifference where prisoner wore wrist brace/bandage on his broken wrist for two months even though he had asked for a cast; finding that "the type of wrap would only go the difference of opinion between a patient and doctor about what should be done, and the Supreme Court has stated that a difference of opinion regarding the plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

diagnosis and treatment does not state a constitutional claim.").

As I read Plaintiff's complaints about the medical care provided to him by Defendant Nesmith in this action, I am reminded of what the Second Circuit once observed:

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

For all of these reasons, I recommend that Plaintiff's claims against Defendant Nesmith be dismissed with prejudice.

**C. Whether Defendant Nesmith Is Protected from Liability by the Doctrine of Qualified Immunity, As a Matter of Law**

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " FN33 In determining whether a particular right was *clearly established,* courts in this Circuit consider three factors:

FN33. *Williams,* 781 F.2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

*14 (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. FN34

FN34. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

Regarding the issue of whether *a reasonable person would have known* he was violating a clearly established right, this "objective reasonableness" FN35 test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." FN36 As the Supreme Court explained,

FN35. See *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights are clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

FN36. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

should be recognized.[FN37]

> FN37. *Malley,* 475 U.S. at 341.

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law."[FN38]

> FN38. *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases].)

Here, I agree with Defendants that, based on the current record, it was not clearly established that, between August 17, 2000, and August 22, 2000, Plaintiff possessed an Eighth Amendment right to receive an x-ray examination and casting of his wrist any sooner than he did. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].) I note that neither of the two decisions cited by Plaintiff (discussed earlier in this Report-Recommendation) were controlling in the Second Circuit. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). I also note that what was controlling was the Supreme Court's decision in *Estelle v. Gamble,* holding that "the question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.

Furthermore, I agree with Defendants that, at the very least, officers of reasonable competence could have believed that Defendant Nesmith's actions in conducting the x-ray examination and casting when he did were legal.[FN39] In his memorandum of law, Plaintiff argues that Defendant Nesmith *intentionally* delayed giving Plaintiff an x-ray for 12 hours, and that the four-day delay of placing a hard cast on Plaintiff's wrist caused Plaintiff *permanent injury to his wrist.* (Dkt. No. 88, at 12-13 [Plf.'s Supp. Memo. of Law].) He cites no portion of the

record for either assertion. (*Id.*) Nor would the fact of permanent injury even be enough to propel Plaintiff's Eighth Amendment claim to a jury.[FN40] I emphasize that it is an undisputed fact, for purposes of Defendants' motion, that the reason that Defendant Nesmith placed a splint and not a cast on Plaintiff's wrist and arm on the morning of August 18, 2000, was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith's medical judgment (based on his experience) was that it was not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides.[FN41] Officers of reasonable competence could have believed that decision was legal.

> FN39. (*Id.*)

> FN40. This particular point of law was recognized in one of the cases Plaintiff himself cites. *Loe,* 582 F.2d at 1296, n. 3 ("[Plaintiff's] assertion that he suffered pain two and one-half weeks after the injury and that the fracture had not healed do not establish deliberate indifference or lack of due process. Similarly, his allegation that he has not achieved a satisfactory recovery suggests nothing more than possible medical malpractice. It does not assert a constitutional tort.").

> FN41. (Dkt. No. 78, Part 12, ¶¶ 31-33 [Defs.' Rule 7.1 Statement]; *see also* Dkt. No. 78, Part 2, ¶¶ 11-13 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Ex. C [Exs. to Affid. of Nesmith] )

**\*15** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Nesmith based on the doctrine of qualified immunity.

**D. Whether Plaintiff Has Adduced Evidence Establishing that He Exhausted His Available Administrative Remedies with Respect to His Assault Claim**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

or other correctional facility until such administrative remedies as are available are exhausted." [FN42] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN43] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN44]

FN42. 42 U.S.C. § 1997e.

FN43. *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN44. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[FN45] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal. It is important to emphasize that *any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.* [FN46]

FN45. 7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

FN46. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g ., Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN47] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[FN48] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN49] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN50] *Third,* if the remedies were available and some of the defendants did not forfeit, and

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN51]

> FN47. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

> FN48. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

> FN49. *Hemphill,* 380 F.3d at 686 (citation omitted).

> FN50. *Id.* [citations omitted].

> FN51. *Id.* [citations and internal quotations omitted].

**\*16** Defendants argue that Plaintiff never exhausted his available administrative remedies with regard to his claim arising out of the assault that allegedly occurred on August 17, 2000. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)

Plaintiff responds with four different legal arguments. First, he appears to argue that he handed a written grievance to an unidentified corrections officer but never got a response from the IGRC, and that filing an appeal under such a circumstance is merely optional, under the PLRA (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) Second, he argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (*Id.* at 25-29.) In support of this argument, he cites unspecified record evidence that, although he sent a letter to one "Sally Reams" at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) Third, he argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (*Id.* at 30-38.) Fourth, he argues that Defendants rendered any

administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (*Id.* at 39-45.) [FN52]

> FN52. I note that the breadth of Plaintiff's creative, thoughtful and well-developed legal arguments further demonstrates his extraordinary experience as a litigant.

For the reasons set forth below, I reject each of these arguments. However, I am unable to conclude, for another reason, that Plaintiff has failed to exhaust his administrative remedies as a matter of law, based on the current record.

**1. Plaintiff's Apparent Argument that an Appeal from His Lost or Ignored Grievance Was "Optional" Under the PLRA**

Plaintiff apparently argues that filing an appeal to CORC when one has not received a response to one's grievance is merely optional under the PLRA. (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) If this is Plaintiff's argument, it misses the point.

It may be true that the decision of whether or not to file an appeal in an action is always "optional"-from a metaphysical standpoint. However, it is also true that, in order to satisfy the PLRA's exhaustion requirement, one *must* file an appeal when one has not received a response to one's grievance (unless one of the exceptions contained in the Second Circuit's three-party inquiry exists). *See, supra,* note 46 of this Report-Recommendation.

**2. Plaintiff's Argument that Defendants "Can't Realistically Show" that Plaintiff Never Sent any Grievances or Appeals to the Great Meadow C.F. Inmate Grievance Clerk**

Plaintiff also argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (Dkt. No. 86,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

at 25-29 [Plf.'s Memo. of Law].) This argument also fails.

**\*17** Plaintiff appears to misunderstand the parties' respective burdens on Defendants' motion for summary judgment. Even though a failure to exhaust is an affirmative defense that a defendant must plead and prove, once a defendant has met his initial burden of establishing the absence of any genuine issue of material fact regarding exhaustion (which initial burden has been appropriately characterized as "modest"),[FN53] the burden then shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial regarding exhaustion. *See, supra,* Part III of this Report-Recommendation.

> FN53. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at \*9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at \*17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.).

Here, it is an uncontroverted fact, for purposes of Defendants' motion, that (1) grievance records at Great Meadow C.F. indicate that Plaintiff never filed a timely grievance alleging that he had been assaulted by corrections officers at Great Meadow C.F. in 2000, and (2) records maintained by CORC indicate that Plaintiff never filed an appeal (to CORC) regarding any grievance alleging that he had been so assaulted. (*See* Dkt. No. 78, Part 12, ¶¶ 39-40 [Defs.' Rule 7.1 Statement, providing accurate record citations].) Plaintiff has failed to properly controvert these factual assertions with specific citations to record evidence that actually creates a genuine issue of fact. (*See* Dkt. No. 85, Part 2, at 50-51 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

With respect to Plaintiff's argument that the referenced factual assertions are basically meaningless because Great Meadow C.F. did not (during the time in question) have a grievance "receipt system," that argument also fails. In support of this argument, Plaintiff cites unspecified record evidence that, although he sent a letter to Sally Reams (the IGP Supervisor at Great Meadow C.F. in May 2003) at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) (*See* Dkt. No. 86, at 29 [Plf.'s Memo. of Law].) After examining Plaintiff's original Affidavit and exhibits, I located and carefully read the documents in question. (Dkt. No. 85, Part 1, ¶ 23 [Plf.'s Affid.]; Dkt. No. 85, Part 2 [Exs. F and G to Plf.'s Affid.].)

These documents do not constitute sufficient evidence to create a triable question of fact on the issue of whether, in August and/or September of 2000, Great Meadow C.F. did not have a grievance "receipt system." At most, they indicate that (1) at some point, nearly three years after the events at issue, Plaintiff (while incarcerated at Attica C.F.) wrote to Ms. Reams complaining about the alleged assault on August 17, 2000, (2) she responded to Plaintiff, on May 5, 2003, that he must grieve the issue at Attica C .F., where he must request permission to file an untimely grievance, and (3) at some point between April 7, 2003, and June 23, 2003, Ms. Reams informed Mr. Eagen that she did not "remember" receiving "correspondence" from Plaintiff. (*Id.*) The fact that Ms. Reams, after the passing of several weeks and perhaps months, did not retain an independent memory (not record) of receiving a piece of "correspondence" (not grievance) from Plaintiff (who was not an inmate currently incarcerated at her facility) bears little if any relevance on the issue of whether Great Meadow C.F. had, in April and/or May of 2003, a mechanism by which it recorded its receipt of *grievances.* Moreover, whether or not Great Meadow C.F. had a grievance "receipt system" in April and/or 2003 bears little if any relevance to whether it had a grievance "receipt system" in August and/or September of 2000.

**\*18** It should be emphasized that Defendants have adduced record evidence specifically establishing that, in August and September 2000, Great Meadow C.F. had a *functioning* grievance-recording process through which,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

when a prisoner (and specifically Plaintiff) filed a grievance, it was "assign[ed] a number, title and code" and "log[ged] ... into facility records." (Dkt. No. 78, Part 6, ¶¶ 7-9 [Bellamy Decl.]; Dkt. No. 78, Part 7, at 2 [Ex. A to Bellamy Decl.] Dkt. No. 78, Part 8, ¶ 4 [Brooks Decl.]; Dkt. No. 78, Part 9, at 6 [Ex. B to Brooks Decl.].)

Finally, even if Great Meadow C.F. did not (during the time in question) have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level. *See, supra,* note 46 of this Report-Recommendation.

### 3. Plaintiff's Argument that the Determination He Received from CORC Satisfied the PLRA's Exhaustion Requirement

Plaintiff argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (Dkt. No. 86, at 30-38 [Plf.'s Memo. of Law].) This argument also fails.

Plaintiff does not clearly articulate the specific portion of the record where this determination is located. (*See id.* at 30 [Plf .'s Affid., referencing merely "plaintiff's affidavit and exhibits"].) Again, the Court has no duty to *sua sponte* scour the 209 pages that comprise Plaintiff's "affidavit and exhibits" for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed what I believe to be the material portions of the documents to which Plaintiff refers. I report that Plaintiff appears to be referring to a determination by the Upstate C.F. Inmate Grievance Program, dated June 20, 2003, stating, "After reviewing [your June 11, 2003, Upstate C.F.] grievance with CORC, it has been determined that the grievance is unacceptable. It does not present appropriate mitigating circumstances for an untimely filing." (Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.]; *see also* Dkt. No. 85, Part 1, ¶¶ 22-34 [Plf.'s Affid.].)

There are two problems for Plaintiff with this document. First, this document does *not* constitute a written determination by *CORC* on a written appeal by

Plaintiff to *CORC* from an Upstate C.F. written determination. (*See* Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.].) This fact is confirmed by one of Plaintiff's own exhibits, wherein DOCS IGP Director Thomas Eagen advises Plaintiff, "Contrary to the IGP Supervisor's assertion in his memorandum dated June 20, 2003, the IGP Supervisor's denial of an extension of the time frames to file your grievance from Great Meadow in August 2000 has not been reviewed by the Central Office Review Committee (CORC). The IGP Supervisor did review the matter with Central Office staff who is [sic] not a member of CORC." (*See* Dkt. No. 85, Part 2, at 39 [Ex. K to Plf.'s Affid.].) At best, the document in question is an indication by Upstate C.F. that the success of an appeal by Plaintiff to CORC would be unlikely.

**\*19** Second, even if the document does somehow constitute a written determination by CORC on appeal by Plaintiff, the grievance to which the determination refers is a grievance filed by Plaintiff on June 11, 2003, at Upstate C.F., not a grievance filed by Plaintiff on August 30, 2000, at Great Meadow C.F. (Dkt. No. 85, Part 2, at 32-35 [Ex. I to Plf.'s Affid.].) Specifically, Plaintiff's June 11, 2003, grievance, filed at Upstate C.F., requested permission to file an admittedly *untimely* grievance regarding the injuries he sustained during the assault on August 17, 2000. (*Id.*)

A prisoner has not exhausted his administrative remedies with CORC when, years after failing to file a timely appeal with CORC, the prisoner requests *and is denied* permission to file an untimely (especially, a two-year-old) appeal with CORC due to an unpersuasive showing of "mitigating circumstances." *See Burns v. Zwillinger,* 02-CV-5802, 2005 U.S. Dist. LEXIS 1912, at *11 (S.D.N .Y. Feb. 8, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") [collecting cases]. If the rule were to the contrary, then, as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement. The very reason for requiring that a prisoner obtain permission before filing an untimely appeal presumes that the permitted appeal would be required to complete the exhaustion requirement. Viewed from another standpoint, a decision by CORC to refuse the filing of an untimely appeal does not involve a review of the merits of the appeal.

**4. Plaintiff's Argument that Defendants Rendered any Administrative Remedies "Unavailable" to Plaintiff**

Plaintiff also argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (Dkt. No. 86, at 39-45 [Plf.'s Memo. of Law].) This argument also fails.

In support of this argument, Plaintiff "incorporates by reference all the previously asserted points, Plaintiff's Affidavit in Opposition with supporting exhibits, as well as[ ] the entire transcripts of Defendants['] deposition on [sic] Plaintiff ...." (*Id.* at 40, 45.) Again, the Court has no duty to *sua sponte* scour the 265 pages that comprise Plaintiff's Affidavit, Supplemental Affidavit, exhibits, and deposition transcript for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed the documents to which Plaintiff refers, and I report that I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.

**\*20** For example, Plaintiff has adduced no evidence

that he possesses any *personal knowledge* (only speculation) of any Defendant in this action having "trashed" his alleged grievance(s) and appeal(s),[FN54] nor has he even adduced evidence that it was *one of the named Defendants in this action* to whom he handed his alleged grievance(s) and appeal(s) for delivery to the Great Meadow C.F. Inmate Grievance Program Clerk on August 30, 2000, September 13, 2000, and September 27, 2000.[FN55] Similarly, the legal case cited by Plaintiff appears to have nothing to do with any Defendant to this action, nor does it even have to do with Great Meadow C.F.[FN56]

FN54. (*See* Dkt. No. 85, Part 1, ¶¶ 13-14, 16-17 [Plf.'s Affid., asserting, "Prison officials trashed my grievances and appeals since they claim not to have them despite [the] fact I sent them in a timely manner. It's [the] only reason they wouldn't have them.... Prison officials have a history of trashing grievances and appeals.... I've been subjected to having my grievances and appeals trashed prior to and since this matter and have spoken to alot [sic] of other prisoners whom [sic] said that they were also subjected to having their grievances and appeals trashed before and after this incident, in alot [sic] of facilities.... Suspecting foul play with respect to my grievances and appeals, I wrote, and spoke to[,] prison officials and staff that did nothing to rectify the matter, which isn't surprising considering [the] fact that it's an old problem ...."].)

FN55. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk ... which contained the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail, in F-Block

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

SHU [at] Great Meadow CF ...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

FN56. (*See* Dkt. No. 85, Part 1, ¶ 15 [Plf.'s Affid., referencing case]; Dkt. No. 85, Part 2, at 16-17 [Ex. B to Plf.'s Affid., attaching a hand-written copy of case, which mentioned a prisoner's grievances that had been discarded in *1996* by an *unidentified* corrections officer at *Sing Sing Correctional Facility* ].)

**5. Record Evidence Creating Genuine Issue of Fact**

Although I decline to *sua sponte* scour the lengthy record for proof of a triable issue of fact regarding exhaustion, I have, while deciding the many issues presented by Defendants' motion, had occasion to review in detail many portions of the record. In so doing, I have discovered evidence that I believe is sufficient to create a triable issue of fact on exhaustion.

Specifically, the record contains Plaintiff's testimony that (1) on August 30, 2000, he gave a corrections officer a grievance regarding the alleged assault on August 17, 2000, but he never received a response to that grievance, (2) on September 13, 2000, he gave a corrections officer an appeal (to the Superintendent) from that non-response, but again did not receive a response, and (3) on September 27, 2000, he gave a corrections officer an appeal (to CORC) from that non-response, but again did not receive a response.FN57

FN57. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk in which contained [sic] the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent

by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail; in F-Block SHU [at] Great Meadow CF ...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid ., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

The remaining issue then, as it appears to me, is whether or not this affidavit testimony is so self-serving and unsubstantiated by other direct evidence that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." FN58 Granted, this testimony appears self-serving. However, based on the present record, I am unable to find that the testimony is so wholly unsubstantiated by other direct evidence as to be incredible. Rather, this testimony appears corroborated by two pieces of evidence. First, the record contains what Plaintiff asserts is the grievance that he handed to a corrections officer on August 30, 2000, regarding the alleged assault on August 17, 2000. (Dkt. No. 85, Part 2, at 65-75 [Ex. Q to Plf.'s Affid.].) Second, the record contains two pieces of correspondence between Plaintiff and legal professionals *during or immediately following the time period in question* containing language suggesting that Plaintiff had received no response to his grievance. (Dkt. No. 85, Part 2, at 19-21 [Exs. C-D to Plf.'s Affid .].)

FN58. *See, supra,* note 12 of this Report-Recommendation (collecting cases).

Stated simply, I find that sufficient record evidence exists to create a genuine issue of fact as to (1) whether Plaintiff's administrative remedies were, with respect to his assault grievance during the time in question, "available" to him, for purposes of the first part of the Second Circuit's three-part exhaustion inquiry, and/or (2) whether Plaintiff has shown "special circumstances" justifying his failure to comply with the administrative procedural requirements, for purposes of the third part of the Second Circuit's three-part exhaustion inquiry.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

*21 As a result, I recommend that the Court deny this portion of Defendants' motion for summary judgment.

**E. Whether Plaintiff Has Sufficiently Alleged, or Established, that Defendants Were Liable for the Policy to Review the Non-Life-Sustaining Medical Prescriptions of Prisoners Upon Arrival at Great Meadow C.F.**

As explained above in Part II.A. of this Report-Recommendation, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (Dkt. No. 78, Part 13, at 3 [Defs.' Mem. of Law].) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (Id.) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (Id.)

Plaintiff responds that "[he] didn't have to get in particular [sic] about the policy [of] discontinuing all incoming prisoners['] non[-]life[-]sustaining medications without examination and indiscriminately [sic] upon arrival at [Great Meadow] C.F. in [his Second] Amended Complaint. Pleading[s] are just supposed to inform [a] party about [a] claim[,] and plaintiff informed defendant [of] the nature of [his] claims including [the claim of] inadequate medical care. And discovery revealed [the] detail[s] [of that claim] as [Plaintiff had] intended." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) In addition, Plaintiff responds that Defendant Paolano must have been personally involved in the creation and/or implementation of the policy in question since he was the Great Meadow Health Services Director. (Id. at 10.)

I agree with Defendants that this claim is not properly

before this Court. Plaintiff's characterization of the notice-pleading standard, and of the contents of his Amended Complaint, are patently without support (both legally and factually). It has long been recognized that a "claim," under Fed.R.Civ.P. 8, denotes "the aggregate of operative facts which give rise to a right enforceable in the courts." [FN59] Clearly, Plaintiff's Second Amended Complaint alleges no facts whatsoever giving rise to an asserted right to be free from the application of the prescription-review policy at Great Meadow C.F. Indeed, his Second Amended Complaint-which asserts Eighth Amendment claims arising *solely* out of events that (allegedly) transpired on August 17, 2000-says nothing at all of the events that transpired immediately upon his arrival at Great Meadow C.F. in early August of 2000, nor does the Second Amended Complaint even casually mention the words "prescription," "medication" or "policy." (*See generally* Dkt. No. 10 [Second Am. Compl.].)

FN59. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir.1943); *United States v. Iroquois Apartments, Inc.,* 21 F.R.D. 151, 153 (E.D.N.Y.1957); *Birnbaum v. Birrell,* 9 F.R.D. 72, 74 (S.D.N.Y.1948).

*22 Furthermore, under the notice-pleading standard set forth by Fed.R.Civ.P. 8(a)(2), to which Plaintiff refers in his Supplemental Memorandum of Law, Defendants are entitled to *fair notice* of Plaintiff's claims.[FN60] The obvious purpose of this rule is to protect defendants from undefined charges and to facilitate a proper decision on the merits. [FN61] A complaint that fails to provide such fair notice "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN62] This fair notice does not occur where, as here, news of the claim first springs up in a deposition more than two years after the action was commenced, approximately seven months after the amended-pleading deadline expired, and approximately two weeks before discovery in the action was scheduled to close. (*Compare* Dkt. No. 1 [Plf.'s Compl., filed 8/14/03] *with* Dkt. No. 42, at 1-2 [Pretrial Scheduling Order setting amended-pleading deadline as 2/28/05] *and* Dkt. No. 78, Part 11, at 52-53 [Plf.'s Depo.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Transcript, dated 9/30/05] *and* Dkt. No. 49 [Order setting discovery deadline as to 10/14/05].)

FN60. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (the statement required by Fed.R.Civ.P. 8 [a][2] must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

FN61. *Ruffolo v. Oppenheimer & Co., Inc.,* 90-CV-4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb.5, 1991); *Howard v. Koch,* 575 F.Supp. 1299, 1304 (E.D.N.Y.1982); *Walter Reade's Theatres, Inc. v. Loew's Inc.,* 20 F.R.D. 579, 582 (S.D.N.Y.1957).

FN62. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

Under the circumstances, the mechanism by which to assert such a late-blossoming claim was a motion to reopen the amended-pleading filing deadline (the success of which depended on a showing of cause), coupled with a motion for leave file a Third Amended Complaint (the success of which depended, in part, on a showing of lack of prejudice to Defendants, as well as a lack of futility). Plaintiff never made such motions, nor showed such cause.

I acknowledge that, generally, the liberal notice-pleading standard set forth by Fed.R.Civ.P. 8 is applied with even greater force where the plaintiff is proceeding *pro se.* In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are

generally construed with an *extra* degree of liberality. As an initial matter, I have already concluded, based on my review of Plaintiff's extensive litigation experience, that he need not be afforded such an extra degree of leniency since the rationale for such an extension is a *pro se* litigant's inexperience with the court system and legal terminology, and here Plaintiff has an abundance of such experience. *See, supra,* notes 21-25 of this Report-Recommendation. Moreover, even if he were afforded such an extra degree of leniency, his phantom prescription-review claim could not be read into his Second Amended Pleading, for the reasons discussed above. (I note that, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended.") FN63

FN63. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Nor could Plaintiff's late-blossoming prescription-review claim properly be read into his papers in opposition to Defendants' motion for summary

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

judgment. Granted, a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.[FN64]

> FN64. *See Auguste v. Dept. of Corr.,* 424 F.Supp.2d 363, 368 (D.Conn.2006) ("Auguste [a *pro se* civil rights plaintiff] cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment.") [citations omitted].

**\*23** Finally, in the event the Court decides to construe Plaintiff's Second Amended Complaint as somehow asserting this claim, I agree with Defendants that the Court should dismiss that claim, also for the reasons discussed above in Part IV.A.2. of this Report-Recommendation. Specifically, Plaintiff has failed to adduce evidence establishing that Defendant Paolano (or any named Defendant in this action) was personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided evidence establishing that the policy is even unconstitutional. *See, supra,* Part IV.A.2. of this Report-Recommendation.

     **ACCORDINGLY,** it is

     **ORDERED** that the Clerk's Office shall, in accordance with note 1 of this Order and Report-Recommendation, correct the docket sheet to remove the names of Defendants Englese, Edwards, Bump, Smith, Paolano, and Nesmith as "counter claimants" in this action; and it is further

     **RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 78) be **GRANTED in part** (i.e., to the extent that it requests the dismissal with prejudice of Plaintiff's claims against Defendants Paolano and Nesmith) and **DENIED in part** (i.e., to the extent that it requests dismissal of Plaintiff's claims against the

remaining Defendants on the grounds of Plaintiff's failure to exhaust available administrative remedies) for the reasons stated above.

     Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Murray v. Palmer
Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dennis FLANAGAN, Plaintiff,
v.
J. MALY, Captain at Downstate Corr. Fac., A. Sedlak,
Sergeant at Downstate Corr. Fac., P. Artuz, Corr.
Officer at Downstate Corr. Fac ., S. KIERNAN, Corr.
Officer at Downstate Corr. Fac., J. Whalen, Corr.
Officer at Downstate Corr. Fac., D. Alfonso, Corr.
Officer at Downstate Corr. Fac., Individually and in
their Official Capacity, Defendants.
**No. 99 CIV 12336 GEL.**

Jan. 29, 2002.

Dennis Flanagan, for Plaintiff Dennis Flanagan, pro se.

Eliot Spitzer, Attorney General of the State of New York
(Melinda Chester-Spitzer, Assistant Attorney General of
the State of New York,), for Defendants J. Maly, A.
Sedlak, P. Artuz, S. Kiernan, J. Whalen, D. Alfonso, of
counsel.

*OPINION AND ORDER*

LYNCH, J.

**\*1** Dennis Flanagan, a New York State prisoner, brings
this action against a number of corrections officers at
Downstate Correctional Facility, where he was formerly
incarcerated, charging that they violated his constitutional
rights. Specifically, he alleges that all the defendants
except John Maly used excessive force against him in an
altercation on June 4, 1999; that Maly, who conducted a
disciplinary hearing on charges brought against Flanagan
as a result of that incident, denied him due process of law;
and that the defendants collectively denied him access to

medical care and to the law library. Defendants move for
dismissal of the complaint and/or summary judgment, on
a variety of grounds. The motion is granted in substantial
part as to all claims except the excessive force claim, as to
which proceedings will be stayed pending the Supreme
Court's decision in *Porter v. Nussle,* 122 S.Ct. 455 (2001).

The facts underlying plaintiff's claims will be addressed,
to the extent necessary, in the discussion of the defendants'
various arguments.

*DISCUSSION*

I. *Exhaustion of Administrative Remedies*

Defendants argue that the entire complaint should be
dismissed for failure to exhaust available administrative
remedies as required by 42 U.S.C. § 1997a(e), which
provides:

No action shall be brought with respect to prison
conditions under section 1983 of this title, or any other
Federal law, by a prisoner confined in any jail, prison, or
other correctional facility until such administrative
remedies as are available have been exhausted.

A. *Medical and Legal Needs*

Unquestionably, Flanagan's claims about inadequate
access to medical care and legal materials are complaints
about "prison conditions" within the meaning of this
statute. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435,
439-440 (S.D.N.Y.2000) (deliberate indifference to
medical needs and access to courts are "prison
conditions"); *Cruz v. Jordan,* 80 F.Supp.2d 109
(S.D.N.Y.1999) (deliberate indifference to medical needs
are "prison conditions"); *Carter v. Kiernan,* 2000 WL
760303 (S.D.N .Y. June 12, 2000) (same). Equally
unquestionably, Flanagan has failed to exhaust available
administrative remedies with respect to those claims.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

New York permits inmates to file internal grievances as to virtually any issue affecting their confinement. *See* N.Y. Corr. Law § 139 (authorizing inmate grievances); 7 N.Y.C.R.R. § 701.7 (establishing procedures for processing such grievances); *Petit v. Bender* 2000 U.S. Dist LEXIS 3536 at *6-8 (S.D.N.Y. March 22, 2000) (describing procedures); *Vasquez v. Artuz,* 1999 WL 440631 at *5 (S.D.N.Y. June 28, 1999) (same).

Prison records show no written grievances filed by Flanagan with respect to his medical or legal access. (Hughes Aff. Ex. BB at 4 ¶ 13.) Flanagan essentially concedes that he filed no such written grievance.[FN1] He does contend that he made an oral complaint to both the area supervisor, Sergeant Sedlak, (Pl.'s Br. at 3 ¶ 10), and a grievance supervisor, Skip Hughes -contentions which both officers deny (Sedlak Aff. Ex. G at 7 ¶ 26; Hughes Aff. Ex. BB at 4 ¶ 17).

> [FN1.] Flanagan states under oath that he submitted a "verbal grievance" to Sergeant Sedlak and "another verbal grievance" to supervisor Hughes who "ignored" his complaint. (Flanagan Aff. ¶¶ 3-4; Pl.'s Br. 1.) Although Flanagan's brief opposing summary judgment later states that "plaintiff did file a written grievance," the remainder of the same sentence suggests that he unintentionally omitted the word "not," as plaintiff proceeds to explain why an oral grievance should be considered the equivalent of a written grievance. (Pl.'s Br. 8.) Evaluating this in conjunction with Flanagan's affidavit, which nowhere states that he made a written complaint, it is clear that Flanagan is not claiming to have made a written report.

**\*2** But even if Flanagan made oral complaints or filed a written report of some kind, that would not satisfy the statutory requirement. To comply with 1997(e), a prisoner must "exhaust[ ]" his administrative remedies, meaning that he must pursue his challenge to the conditions in question through the highest level of administrative review prior to filing his suit. *Sonds v. St. Barnabas Hosp. Corr. Health Serve.,* 2001 U.S. Dist. LEXIS 7839 at *4 (S.D.N.Y. May 21, 2001); *Santiago,* 89 F.Supp.2d at 438, 438. The New York procedures provide for several levels of administrative review, beginning with

the filing of a written grievance, 7 N.Y.C.R.R. § 701.7(a)(1), and continuing through several levels of administrative appeal, 7 N.Y.C.R.R. § 701.7(a)(4), (b), and (c). The record demonstrates that Flanagan was fully aware of the availability of these grievance procedures. They are described in a booklet provided to all inmates on arrival, (Defs.' Br. 15), and Flanagan himself filed grievances over other issues.[FN2] Flanagan does not claim, let alone provide any evidence, that he pursued his grievance through these channels. [FN3]

> [FN2.] Prison records indicate that Flanagan filed a written grievance regarding the prison food served in the Downstate Correctional Facility. (Hughes Aff. Ex. BB at 4 ¶¶ 13, 17; Ex. CC.)

> [FN3.] As previously stated, Flanagan claims that he submitted only verbal grievances to complaint supervisor Hughes and defendant Sedlak, who reacted with hostility to the complaint and threatened plaintiff with violence if he continued to complain. (Pl.'s Br. at 1, 6, 8-9; Flanagan Aff. ¶ 3.) No doubt, under some circumstances, behavior by prison officials that prevented a prisoner from complying with § 1997a(e) would excuse compliance. But Flanagan alleges nothing approaching conduct that would present this issue. He evidently made no effort to file a written grievance, and verbal discouragement by individual officers does not prevent an inmate from filing a grievance.

Accordingly, Flanagan's claims of deliberate indifference to his medical needs and denial of access to the law library must be dismissed for failure to exhaust administrative remedies.

*B. Due Process*

Flanagan's due process claim, in contrast, cannot be so easily dismissed on exhaustion grounds. Flanagan argues that in conducting his disciplinary hearing, which resulted in a sentence of 24 months in Special Housing and various other administrative sanctions, Maly denied him due process by denying him the right to call a witness and to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

introduce certain medical records. Flanagan appealed this decision internally, to no avail. (Spitzer Decl. Ex. X.)

To require Flanagan to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of § 1997a(e), by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

Defendants essentially concede as much. Although their brief asserts that Flanagan's entire "action" should be dismissed for failure to exhaust (Defs.' Br. 13), the brief goes on to argue extensively for such dismissal of the medical and legal access claims (*id.* 14-16), and of the excessive force claim (*id.* 16-21), without directing any argument toward the exhaustion of the due process claim.[FN4]

FN4. The exhaustion rule does require a plaintiff to have appealed his disciplinary case to the fullest extent provided by administrative regulations. *Sonds,* 2001 U.S. Dist. LEXIS 7830 at *4. It is not entirely clear on this record that Flanagan did. Given that (1) it is clear that Flanagan unsuccessfully pursued some appeal of the result of his hearing, (2) defendants have not pointed out any further levels of appeal available to him that he failed to utilize, and (3) the due process claim must be dismissed on the merits in any event, there is no need to pursue further clarification of the matter.

**\*3** For these reasons, the motion to dismiss the due process claim for failure to exhaust administrative remedies must be denied.[FN5]

FN5. Flanagan's complaint, construed liberally as pro se pleadings must be, also appears to claim that certain defendants conspired to file false reports against him. (Compl.¶¶ 21-22.) Defendants do not address an exhaustion argument specifically to this claim. Arguably, the same logic set out above as to the due process claim would permit the conclusion that, by contesting the reports at his hearing and exhausting his appeals, Flanagan has exhausted his remedies as to this claim as well. Assuming without deciding that the exhaustion requirement has been met, this claim must nevertheless be dismissed for failure to state a claim, since a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," *Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir.1986); see also Boddie v. Schneider, 105 F.3d 857, 862 (2d Cir.1997),* and there is no claim here that the false report constituted retaliation for exercise of a constitutional right, rather than simply a rationalization for the use of allegedly excessive force. *Cf. Franco v. Kelly 854 F.2d 584, 588 (2d Cir.1988).*

C. *Excessive Force*

Flanagan's excessive force claim also survives the defendants' exhaustion argument. The claim that individual officers assaulted an inmate on a particular occasion does not fit easily within the ordinary meaning of "[an] action ... with respect to prison conditions," and the Second Circuit has ruled that such a complaint is not subject to the exhaustion requirement. *Nussle v. Willette, 224 F.3d 95 (2d Cir.2000).*

Defendants structure much of their argument against the excessive force claim as an attack on the Second Circuit's decision in *Nussle,* recommending that this Court, in effect, overrule *Nussle* from below. Defendants' arguments that *Nussle* was wrongly decided are appropriately addressed only to higher authority - and have been. The Supreme Court has granted certiorari in *Nussle, Porter v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

*Nussle,* 122 S.Ct. 455 (2001).[FN6] While that Court's recent decision in *Booth v. Churner,* 121 S.Ct. 1819 (2001), suggests that the Court might reverse, until and unless it does, *Nussle* remains the law of this circuit, and requires denial of defendants' motion to dismiss the excessive force claim.

> FN6. Indeed, New York's Attorney General has himself presented his arguments for reversal of *Nussle* in an amicus brief in that case. *See* Brief of Amici Curiae New York, *et al., Porter v. Nussle* (No. 00-853), 122 S.Ct. 455 (2001).

II. *Summary Judgment*

Defendant Maly moves in the alternative for summary judgment on Flanagan's due process claim. That motion will be granted.

When adjudicating a motion for summary judgment, all ambiguities must be resolved in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the plaintiff " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F.3d at 114 (quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp.,* 81 F.3d 275, 277 (2d Cir.1996) (quoting *Liberty Lobby,* 477 U.S. at 252).

**\*4** It is settled that the "[p]rocedures established by the New York Department of Correctional Services governing disciplinary hearings comport with the due process procedural rights to which prison inmates are entitled." *Rodriguez v. Ghoslaw,* 2001 WL 755398 at *9 (S.D.N.Y. July 5, 2001), citing *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Flanagan nevertheless claims that Maly deprived him of due process by evidentiary rulings made during the hearing.

The facts relating to these claims are essentially undisputed, and on those facts no denial of due process can be found. Flanagan offers no evidence to dispute Maly's testimony that the witness Flanagan sought to call, an inmate named Sanabria, refused to testify at the hearing. (Spitzer Decl. Ex. U at 24.) Indeed, upon learning that Sanabria would not appear at the hearing, Maly went to Sanabria's cell to inquire further, and Sanabria again refused.[FN7] (*Id.* at 25; Spitzer Decl. Ex. V at 19.) It is thus not true that Maly precluded a relevant witness from testifying.

> FN7. Sanabria told Maly he would not testify because he had been threatened by a corrections officer named Lee. There is, of course, no admissible evidence that this was so, Sanabria's statement being hearsay. But even if such a threat had occurred, nothing in the record casts doubt on Maly's testimony that he reassured Sanabria that his safety would be guaranteed if he testified, as three other inmates, including Flanagan, did. (Maly Aff. Ex. U at ¶¶ 25-26.)

As for the documentary evidence, Maly refused to admit photographs taken of Flanagan on the date of the incident, which Flanagan asserted would show that his hands were not bruised, arguably tending to show that he had not assaulted a corrections officer as charged. Maly ruled the photos irrelevant. The photographs were of limited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

probative value, and while the better course might have been to admit them, it can hardly be said that their exclusion was prejudicial error, let alone that it rises to the level of a denial of due process.

Maly heard testimony from Flanagan and two inmate witnesses, as well as from three corrections officers and the nurse who treated Flanagan and the officers after the fight. He also reviewed various medical records. The hearing provided Flanagan an opportunity to be heard "at a meaningful time and in a meaningful manner," *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976), and thus comported with the requirements of due process. At a minimum, Maly is entitled to qualified immunity against Flanagan's claims, since his conduct of the hearing did not violate any "clearly established statutory or constitutional right," *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989), as established by Supreme Court or Second Circuit precedent, *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

Accordingly, Maly's motion for summary judgment must be granted.

III. *Stay of Proceedings*

Defendants do not seek summary judgment on the one remaining claim, for the alleged use of excessive force. Nor could they successfully do so, since the parties' conflicting testimony as to the events precipitating the use of force and the degree of force used presents classic questions of fact for jury resolution.[FN8] Accordingly, Flanagan's excessive force claim can proceed to trial.

> FN8. The only one of defendants' remaining arguments that applies to this claim is their weakly-presented contention that the Court lacks jurisdiction under the Eleventh Amendment to the extent that they are sued in their official capacities. (Defs.' Br. at 39-40.) However, according to Flanagan's complaint the liberal construction to which he is entitled, it is clear that he means to assert an ordinary claim that defendants as individuals violated his rights

under color of state law.

It would be imprudent, however, to schedule a trial at this time, in view of the pending Supreme Court decision in *Nussle.* Oral argument has already been heard, and a decision is likely within a few months. If the Supreme Court reverses and holds that exhaustion of administrative remedies is required in excessive force cases, Flanagan's one remaining claim will have to be dismissed, and any additional proceedings in this matter will have been wasted. If the Court affirms, in contrast, neither party will have been prejudiced by a brief delay. Therefore, proceedings in this case will be stayed pending the Supreme Court's decision.

*CONCLUSION*

**5** For the reasons set forth above, plaintiff's claim that defendants deprived him of access to medical care and to the courts are dismissed for failure to exhaust administrative remedies. Plaintiff's claim that defendants conspired to file false disciplinary reports is dismissed for failure to state a claim on which relief can be granted. Summary judgment for defendant Maly is granted on plaintiff's claim that he was denied due process of law at his disciplinary hearing; since this is the only claim against Maly, the case is terminated as to him.

The remaining defendants' motions to dismiss or for summary judgment with respect to plaintiff's claim of excessive force are denied, and further proceedings on that claim are stayed pending the Supreme Court's decision in *Porter v. Nussle.*

SO ORDERED:

S.D.N.Y.,2002.
Flanagan v. Maly
Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2003 WL 22327110 (S.D.N.Y.)

(Cite as: 2003 WL 22327110 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Anthony PALMER, Plaintiff
v.
Ronald GOSS, Corrections Officer; William Connelly,
Deputy Superintendent; Paul Richards, Deputy
Superintendent; Donald Selsky, Director of Special
Housing; Defendants.
No. 02 Civ. 5804(HB).

Oct. 10, 2003.

State prisoner brought pro se civil rights action under § 1983 against corrections officer and prison officials, alleging that officer used excessive force to subdue him in an altercation that followed a pat-frisk, and that officials violated his right to due process in course of resulting disciplinary hearing and grievance. On defendants' motion for summary judgment, the District Court, Baer, J., held that: (1) prisoner made reasonable efforts to exhaust his administrative remedies with respect to excessive force claim; (2) genuine issue of material facts existed as to whether prisoner had liberty interest in not being placed in segregated housing unit, and whether he received all the process that was purportedly due, precluding summary judgment on due process claim; (3) prison superintendent who allegedly tampered with tape recording of disciplinary hearing was not entitled to qualified immunity; but (4) officials who merely exercised their discretion to not intervene in disciplinary hearing were entitled to qualified immunity.

Motion granted in part, and denied in part.

West Headnotes

**[1] Civil Rights 78 ☞  1319**

78 Civil Rights

78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
78k1319 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
State prisoner made reasonable efforts to exhaust his administrative remedies with respect to claim that corrections officer used excessive force to subdue him in an altercation that followed a pat-frisk, as required under the Prison Litigation Reform Act of 1995 (PLRA) to bring pro se civil rights action under § 1983 against officer, although he did not appeal superintendent's adverse decision on his grievance to administrative review committee, where he did file grievance with prison's inmate grievance resolution committee, and by time grievance was denied, he was aware that key piece of evidence which he believed corroborated his version of events had allegedly been destroyed under suspicious circumstances. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. §§ 1983; Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a); 7 N.Y.C.R.R. § 701.7.

**[2] Federal Civil Procedure 170A ☞  2491.5**

170A Federal Civil Procedure

170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
Genuine issue of material fact existed as to whether state prisoner's confinement for 77 days in segregated housing unit was atypical and significant hardship in relation to ordinary incidents of prison life sufficient to implicate a liberty interest, precluding summary judgment for prison officials on prisoner's claim under § 1983 that he was denied due process at disciplinary hearing. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[3] Federal Civil Procedure 170A ☞  2491.5**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327110 (S.D.N.Y.)

(Cite as: 2003 WL 22327110 (S.D.N.Y.))

170A Federal Civil Procedure

    170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases

Genuine issue of material fact existed as to whether state prisoner received all the process he was due at disciplinary hearing, precluding summary judgment for prison officials on prisoner's claim under § 1983 that he was denied due process at disciplinary hearing. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[4]** Civil Rights 78 ⬤⟿ 1376(7)

78 Civil Rights

    78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
          78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Prison superintendent who allegedly tampered with tape recording of disciplinary hearing was not entitled to qualified immunity from prisoner's claim under § 1983 that he was denied due process at disciplinary hearing, since alleged tampering was illegal. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[5]** Civil Rights 78 ⬤⟿ 1376(7)

78 Civil Rights

    78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
          78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Prison officials who merely exercised their discretion to not intervene in disciplinary hearing were entitled to qualified immunity from prisoner's claim under § 1983 that he was denied due process at disciplinary hearing, since their failure to intervene was not a clear violation of clearly established law. U.S.C.A. Const.Amend. 14; 42

U.S.C.A. § 1983.

*OPINION & ORDER*

BAER, J.

   **\*1** Defendants move for summary judgment on plaintiff's claims. For the following reasons, defendant's motion is granted in part and denied in part.

           I. BACKGROUND

A. Introduction

   *Pro se* plaintiff Anthony Palmer's action pursuant to 42 U.S.C. § 1983 stems for an altercation he had with defendant Corrections Officer Ronald Goss ("C.O.Goss") at Sing Sing Correctional Facility on August 17, 2000. Palmer, who was convicted in 1997 in New York Supreme Court of first-degree robbery and sentenced to 14 years' imprisonment, alleges that on August 17, 2000, C.O. Goss used excessive force in violation of the Eighth Amendment to subdue him in an altercation that followed a pat-frisk. Palmer contends that C.O. Goss assaulted him without justification and that C.O. Goss's actions were retaliatory, because C.O. Goss had charged Palmer a year earlier with a prison infraction that was later expunged. Palmer's due-process claim against defendant Deputy Superintendent Paul Richards ("Dep.Supt.Richards") relates to Palmer's allegation that Dep. Supt. Richards purposefully erased a portion of the tape of a disciplinary hearing that was allegedly favorable to Palmer's version of this incident. He claims that Donald Selsky, the Director of Special Housing/Inmate Disciplinary Program, improperly affirmed the disposition of the disciplinary hearing, despite the fact that Palmer had apprised him that a portion of the tape of his disciplinary hearing which corroborated Palmer's account was erased. Palmer's claim against Connolly is that he ignored letters that Palmer wrote about the incident. Palmer claims that he lost a tooth as a result of the assault and was improperly placed in a segregated housing unit, which caused him to lose his privilege to participate in a family-reunion program which subsequently led his wife to file for divorce and cease all contact with him.

B. Facts

   Palmer and C.O. Goss tell two markedly different versions of the events between them at around 11 a.m. on

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327110 (S.D.N.Y.)

(Cite as: 2003 WL 22327110 (S.D.N.Y.))

August 17, 2000. On the day of the event, C.O. Goss filed an Inmate Misbehavior Report which charged Palmer with disobeying a direct order (Rule Violations 106.10), harassing employees (Rule Violations 107.11), and violent conduct (Rule Violations 104.11). (This report—or "ticket" as Palmer refers to it—was endorsed by C.O. Valentin and C.O. Wyllie.) Meanwhile Palmer filed a grievance with the inmate grievance resolution committee ("IGRC"). (*See* Fleischmann Decl. Ex. T.) Also on August 17, he sent a nearly identical letter to Dept. Supt. Connolly in which he described the event as follows:

> Today I was assaulted by C.O. Goss for no apparent reason. Let me explain. I was on my way back from by program, which is the state shop. (10:52 am) As I was walking on H–Gallery an inmate in H–4 was giving me some cheese doodles. Ten bags to be exact. I was behind the line and not on his gate. When I got the chips Officer Goss told me to get on the wall and give him my bag. I complied as I was told too. Once the search was completed C.O. Goss took my bag and threw it on the floor at my feet. I looked at him with questioning eyes, (but did not speak) He said "what the fuck are you looking at, I found it on the floor, now go lock in." I proceeded to do as I was told. On my way upstairs on A–Block Bridge, I looked down at him and asked "if you got a problem with me, why don't you get me transferred off the gallery instead of bothering me." He ran up the stairs and said "what the fuck did you say?" I repeated it, and he just punched me in the face. Just like that. I swear on my kids. I was wrestled to the ground by C.O. Wiley [sic] and C.O. Valentin, handcuffed and escorted to E.R. where pictures were taken and the visual procedures. I want you to know that this officer has written me up before and the ticket was dismissed. He also told me he would prevent me from going on my trailer [FN1] if I wasn't careful. Why he said it, I don't know. I do not say nothing to this officer except to answer him when he comes around doing his "go round." I was scheduled to go on my trailer on 8/22/00—in 5 days. I have not had a ticket in two years and was going to honor block. Sir, I wasn't out of place. I wasn't interfering with this officers duties. I did not threaten him or raise my voice or hand at him. I've been programming steadily. All C.O.s in the receiving room can vouch that I have never been a problem.....

**FN1.** That is, participating in a family reunion program with his wife and children. *See* Palmer Dep. 38.

**\*2** (*See* Fleischmann Decl. Ex. V.) Palmer noted in this letter and in his grievance that he was scheduled to participate in the family-reunion program—"going to the trailer," in Palmer's words—on August 22 and requested that he remain eligible for this prized program. (*See* Fleischmann Decl. Ex. V.) Sergeant McNamara conducted an investigation of the incident, which included an interview with Palmer and the submission of memoranda by C.O. Wyllie and C.O. Valentin about what each witnessed.[FN2]

> **FN2.** In a memorandum to Sergeant McNamara dated August 17, 2000 C.O. Wyllie stated that he heard yelling and saw C.O. Goss struggling with Palmer and taking him to the floor and that C.O. Goss gave Palmer several orders to stop and not get up, with which Palmer complied. (*See* Fleischmann Decl. Ex. G.) C.O. Valentin described how he heard someone yell "Do you have a problem with me" and "What's your fucking problem?" and that when he arrived at the area he saw C.O. Goss restraining Palmer. C.O. Valentin ordered Palmer to stop resisting, an order with which Palmer complied. (*See* Fleischmann Decl. Ex. H.)

1. Palmer's disciplinary hearing

In his Inmate Misbehavior Report, C.O. Goss described the incident as follows:

> On the above date and approximate time after being pat frisked this inmate began yelling "Fuck you Goss, you had no right to search my bag. Fuck you, motherfucker" and other statements of this type. I gave the inmate a direct order to go lock in; the inmate dropped the bag from his hand, took a fighting stance and moved toward me, still yelling. Force was used to take control of the inmate.

Fleischmann Decl. Ex. D.[FN3] On August 21 and 25, Dep. Supt. Richards presided over a hearing on C.O. Goss's charges against Palmer. (*See* Fleischmann Decl.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327110 (S.D.N.Y.)

(Cite as: 2003 WL 22327110 (S.D.N.Y.))

Exs. I and J.) For this hearing, Palmer received assistance from one L. Robles, who spoke with several corrections officers (Wyllie, Valentin, and Busick) and an inmate (Kenyon Baker) prior to the hearing. Palmer testified at the hearing to similar effect as what he stated in his grievance and letter to Dep. Supt. Connolly. At Palmer's request, C.O. Wyllie and inmate Baker also testified. (*See* Richards Aff. ¶ 5; Palmer Dep. 72.) Palmer did not seek to question C.O. Goss, nor was he deprived the opportunity to have any other witness appear. (*See* Richards Aff. ¶ 5; Palmer Dep. 81.) Dep. Supt. Richards found Palmer guilty of the three infractions charged and based this disposition on C.O. Goss's report. (*See* Fleischmann Decl. Ex. J.) Dep. Supt. Richards also stated that he found Kenyon Baker, the inmate witness, to be noncredible. (*See id.*) Dep. Supt. Richards imposed a 90–day keeplock sentence and 90–day loss of packages, commissary, and telephone usage. (*See id.*) Palmer was sent to an administrative segregated housing unit for the 90 days, of which he served 77 days.

> FN3. He also filed a Use of Force Report in which he described the incident as follows:
>
> This inmate became loud and abusive after being pat frisked, when ordered to go lock in, the inmate dropped the bag from his hands, took a fighting stance and moved toward me.
>
> I wrapped both arms around the inmate's upper arms and chest turning the inmate and bringing him to the floor on his back. Handcuffs were supplied by responding staff, when the inmate complied with orders, I place him in handcuffs.
>
> (Fleischmann Decl. Ex. E.)

On August 25, 2000, Palmer appealed Dep. Supt. Richards's disposition to Director Selsky, the Director of Special Housing/Inmate Disciplinary Program. In this appeal, Palmer contended that C.O. Wyllie's testimony at the hearing was inconsistent with the Inmate Misbehavior Report prepared and signed by C.O. Goss that which C.O. Wyllie endorsed. (*See* Fleischmann Decl. Ex. K.) FN4 On August 31, 2000, Palmer wrote Director Selsky a letter in

which he stated that the tape of the hearing contained only a small portion of the events at the hearing and that he could not properly appeal this disposition without the complete tape. (*See* Fleischmann Decl. Ex. L.) Palmer wrote Director Selsky again on October 11, 2000 to request the status of his appeal, to which Director Selsky responded on October 17 that Palmer's papers had been received and he would be notified of the results. (*See* Fleischmann Decl. Ex. M.) On October 31, Director Selsky informed Palmer that the Dep. Supt. Richards' decision was affirmed. (*See* Fleischmann Decl. Ex. O.)

> FN4. He explained the reason for his appeal as follows:
>
> 1) C.O. Wyllie's testimony is inconsistent. 2) C.O. Goss's *post* is, on the day in question, the gym door, why was he one flight up on the A–Block Bridge 3) C.O. Wyllie mentions on tape about "seeing us fighting" but there is nothing about "us fighting" on the ticket." He goes on to explain: CO Wyllie and CO Valentin endorsed the ticket as witnessing the incident when CO Wyllie was asked if he heard me use *any* profanity, he states that "I heard statements like if there is a problem" and a lot of shouting. But he didn't say I said one curse word. (107.11) I asked if he seen my "drop my bag and get into a fighting stance" as he endorsed the ticket. "He states when he came down we were already fighting." (There is nothing on the ticket about fighting) I also asked him where was CO Goss and where was I when he heard statements. On the tape he said "CO Goss was on the flats (H–South) and I was on the bridge (one flight up) so why couldn't he hear exactly what came out my mouth? *Plus* how can be say he came when we "were fighting" when he was standing there plainly seeing CO Goss on the flats, which was before the incident actually occured [sic]?

**\*3** On October 24, 2000, Palmer submitted a notice of intention to file a claim with the New York Supreme Court, Westchester County. On March 1, 2001, Palmer filed an Article 78 petition to challenge Director Selsky's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327110 (S.D.N.Y.)

(Cite as: 2003 WL 22327110 (S.D.N.Y.))

affirmance on the grounds that 1) the evidence was insufficient to sustain the findings, and 2) Palmer was denied procedural due process because the tape was defective. (*See* Fleischmann Decl. Ex. P.) First Deputy Superintendent W.E. Phillips conducted a discretionary review of the disciplinary hearing. On June 29, 2001, he expunged the records of the hearing because he found the tape of the hearing "defective halfway through the hearing." [FN5] Palmer's Article 78 proceeding was then dismissed as moot. The court noted "it would not be possible for the Court to properly review the record on the instant petition." (*See* Fleischmann Decl. Ex. S.) On March 6, 2001, Palmer filed a claim with the N.Y. Court of Claims, in which he claimed that New York was negligent with respect to C.O. Goss's use of force. (*See* Fleischmann Decl. Ex. X.) After a trial, Judge Terry Jane Ruderman found that the force used by C.O. Goss under the circumstances was reasonable and dismissed the action on June 5, 2002. (*See* Fleischmann Decl. Ex. Y.)

> FN5. In his memorandum, First Deputy Superintendent Phillips stated: "This decision in no way reflects on the findings of the Hearing Officer assigned, nor does it indicate the outcome of this hearing should have been different. Because we do not possess a full recording of the hearing, a complete review cannot be accomplished." (*See* Fleischmann Decl. Ex. Q.)

2. Palmer's grievance

As noted, Palmer filed a grievance against C.O. Goss. In this grievance, Palmer contended that C.O. Goss assaulted him for no reason. Palmer noted that he was scheduled to participate in the family-reunion program on August 22, a fact that in his view reflects both his good behavior as an inmate and his great incentive to stay out of trouble. Palmer again wrote Dep. Supt. Connolly on August 31, 2000 in which he explained that he was unable to file a proper appeal because the hearing tape was defective. Palmer's grievance was eventually denied on November 14, 2000 by the superintendent. (*See* Fleischmann Decl. Ex. U.) The superintendent's decision credited the results of an investigation by Sergeant McNamara who concluded that C.O. Goss did not assault

Palmer; he found that C.O. Wyllie and Valentine's statements supported C.O. Goss account of events and also noted that when Palmer was medically evaluated afterwards there were no injuries found. (*See id.*) [FN6] Palmer did not appeal this disposition, although the form that contained the superintendent's disposition advised the grievant that he must sign below and return the form within 4 days if he wishes to appeal. (*See id.*)

> FN6. In this memo of September 5, 2000 to a Captain Haubert, Sergeant McNamara stated concluded that Palmer's complaint "was written for the sole purpose of being able to state to the hearing Officer 'I have a grievance against this Office' " and "I find the allegations to be an effort to influence the outcome of a disciplinary hearing, Which [sic] apparently were unsuccessful since the inmate was found guilty of violent conduct, harassment and direct order in a Tier III hearing on 8/25/00." Palmer notes that he never told Dep. Supt. Richards in the disciplinary hearing about his grievance.

II. DISCUSSION

Defendants move for summary judgment on Palmer's excessive-force claim against C.O. Goss on the basis that Palmer failed to exhaust his administrative remedies. Defendants move for summary judgment on his due-process claim against Dep. Supt. Connolly, Dep. Supt. Richards, and Director Selsky on the grounds that 1) no protected liberty interest was implicated and that he was afforded all the process due, and 2) that these defendants are entitled to qualified immunity.

**\*4** A court may grant a motion for summary judgment if it determines that there is no genuine issue of material fact to be tried. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249. The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *See Cronin v.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327110 (S.D.N.Y.)

(Cite as: 2003 WL 22327110 (S.D.N.Y.))

*Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995). If the moving party meets its burden, the opposing party must then produce admissible evidence sufficient to raise a material question to defeat the motion for summary judgment. *See, e.g.,* Rivera v. Goord, 253 F.Supp.2d 735, 745 (S.D.N.Y.2003). Moreover, because Palmer appears pro se, his complaint is read liberally. *See, e.g.,* Lisbon v. Goord, No. 02 Civ. 3567(HB), 2003 U.S. Dist. LEXIS 7135, at *4 (S.D.N.Y. Apr. 29, 2002) (citing *Elliott v. Bronson,* 872 F.2d 20, 21 (2d Cir.1989)).

A. Failure to exhaust administrative remedies

[1] The Prison Litigation Reform Act of 1995 ("PLRA") requires that any prisoner who brings a § 1983 action with respect to prison conditions must exhaust "such administrative remedies as are available." 42 U.S.C. § 1997e(a). The Supreme Court has ruled that this exhaustion requirement applies to excessive-force claims, as Palmer raises here. *See* Porter v. Nussle, 534 U.S. 516, 520, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In New York state prisons, there is a three-step grievance procedure. First, an inmate submits a complaint to the institution's inmate grievance resolution committee ("IGRC"). The IGRC, which consists of five members including two inmates, investigates and reviews the grievance. *See* 7 N.Y.C.R.R. § 701.7; *id.* § 701.7; N.Y. Correct. Law § 139. Second, the inmate then can appeal the IGRC's determination to the superintendent of the facility. *See* 7 N.Y.C.R.R. § 701.7. Finally, the inmate can appeal the superintendent's decision to the Central Office Review Committee ("CORC"), the body that makes the final administrative determination. *See id.*

There is no dispute that Palmer failed to exhaust the administrative remedies available to inmates in New York state prisons. Although he filed a grievance on August 17, the day of the incident, he did not further appeal the adverse decision he received on November 14, 2000 to the Central Office Review Committee, which is the third and final step in the administrative grievance procedure.

As I have noted elsewhere, while *Porter* is clear that excessive-force claims such as Palmer's are within 42 U.S.C. § 1997e(a), *Porter* is less clear as to "the circumstances that may serve to satisfy the requirement of when 'administrative remedies as are available are

exhausted.' " *O'Connor v. Featherstone,* No. 01 Civ. 3251(HB), 2002 WL 818085, at *2 (S.D.N.Y. Apr.29, 2002). There, I also noted that courts have denied motions to dismiss on failure-to-exhaust grounds where an inmate has made a reasonable attempt to exhaust his administrative remedies, "especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts." *Id.* (citing cases). This is such a case.

**\*5** Although Palmer failed to pursue his grievance against C.O. Goss through all three levels, he did take reasonable steps to vindicate his claim, only—accepting as true his evidence and drawing reasonable inferences in his favor—to desist when it appeared to him that Dep. Supt. Richards had intentionally destroyed evidence that supported his version of the incident and significantly deprived him of any possibility of relief through the grievance procedure. Palmer filed his grievance the day of the incident, but—as far as I can tell from the record before me—there was never any investigation or review by the IGRC into his allegations. When the superintendent denied Palmer's grievance three months later he based his conclusion entirely on Sergeant McNamara's investigation and conclusions. It does not appear that any investigation was ever performed—as is apparently required—by the five-member panel of the IGRC that includes two inmates. Moreover, Palmer wrote Connolly a letter on August 31 in which he stated that he was unable to file a proper appeal because the hearing tape was defective—a view that was implicitly confirmed by both the prison administration when First Dep. Supt. Phillips expunged the records of the hearing and the New York Supreme Court when it dismissed as moot his Article 78 proceeding and noted that "it would not be possible for the Court to properly review the record on the instant petition." Thus, by the time Palmer's grievance was denied, he was aware that the key piece of evidence which he believed corroborated his version and undermined C.O. Goss's—and thus Dep. Supt. Richards' disposition of his disciplinary hearing—was destroyed under suspicious circumstances. Specifically, Palmer testified at his deposition that after he explained to Dep. Supt. Richards that C.O. Wyllie's testimony supported Palmer's version, Dep. Supt. Richards adjourned for 15 minutes to review the evidence—i.e., the tape—and then ruled against Palmer. Palmer testified that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327110 (S.D.N.Y.)

(Cite as: 2003 WL 22327110 (S.D.N.Y.))

the tape-recording contains in their entirety his testimony, which was at the start of the tape, and inmate Baker's testimony, which was at the end, but that C.O. Wyllie's testimony, which was in the middle, is entirely blank. If, as Palmer alleges, the tape is fine in the beginning and end, but blank in the middle, it is reasonable to conclude that it was intentionally altered.

Under these circumstances, it appears that Palmer has more than made reasonable efforts to exhaust his administrative remedies. Defendants' motion to dismiss Palmer's excessive-use-of-force claim against C.O. Goss is denied.

B. Failure to state a claim for relief

With respect to Palmer's due-process claim, defendants move to dismiss on the ground that there was no deprivation of a protected liberty interest and, moreover, he received all the process due.

To properly state a claim under § 1983 for denial of due process at a disciplinary hearing, Palmer must first identify a liberty interest of which he was deprived and which is protected by the Due Process Clause. See Lisbon v. Goord, No. 02 Civ. 3567(HB), 2003 U.S. Dist. LEXIS 7135 (S.D.N.Y. Apr. 29, 2002) (citing Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999)). Second, he must show that "the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). Finally—if he has met these first two requirements—Palmer must show that the defendants' deprivation of that interest occurred without due process of law. See Taylor v. Rodriguez, 2398 F.3d 188, 191–92 (2d Cir.2001); see also Jenkins, 179 F.3d at 28.

**\*6** [2] A inmate's confinement to SHU does not automatically implicate a liberty interest. See Sandin v. Conner, 515 U.S. 472, 483–86, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). To prevail on his § 1983 claim, Palmer must establish that the confinement created an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sims v. Artuz, 230 F.3d 14, 22–23 (2d Cir.2003); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). Although there is no

bright-line rule for what length of SHU confinement would constitute an "atypical and significant hardship," and although this determination requires a fact-intensive inquiry by the district court, see Sims, 230 F.3d at 22–23, the decisions in this Circuit generally require that the duration of SHU confinement be at least 100 days in order to be considered an atypical and significant hardship. See Sims, 230 F.3d at 23; see also Lisbon v. Goord, No. 02 Civ. 3567(HB), 2003 U.S. Dist. LEXIS 7135, at *8 (S.D.N.Y. Apr. 29, 2002) (citing cases and noting that 101 days seems to be the minimum threshold). Although Palmer's punishment—he was sentenced to 90 days of keeplock and served 77 days in a segregated housing unit—was less than this threshold, it is undisputed that Palmer was deprived the privilege of participating in the family-reunion program. While defendant is correct that Palmer has no liberty interest in participation in the family-reunion program, see Hernandez v. Coughlin, 18 F.3d 133, 137–38 (2d Cir.1994), this fact, it seems to me, is sufficiently relevant to the determination of whether Palmer's confinement constituted an atypical and significant hardship in relation to the ordinary incidents of prison life sufficient to deny defendant's motion of summary judgment on whether any liberty interest was implicated, especially where there is a plausible suggestion of retaliation by C .O. Goss. Cf. Colon v. Howard, 215 F.3d 227, 230 (2d Cir.2000) ("The content of the Sandin standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." (citing Sealey v. Giltner (Sealey II), 197 F.3d 578, 585 (2d Cir.1999)); Sealey v. Giltner (Sealey I), 116 F.3d 47, 51 (2d Cir.1997) ("[W]e have indicated the desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement."). Moreover, Palmer should have the opportunity to demonstrate that the conditions of his confinement vis-a-vis both the conditions in administrative confinement and in the general prison population were sufficiently harsh to compensate for its comparative shortness. See Sealey II, 197 F.3d at 589.

[3] I also disagree with defendants' argument that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327110 (S.D.N.Y.)

(Cite as: 2003 WL 22327110 (S.D.N.Y.))

Palmer was granted all the process he was due. Defendants note that Palmer was provided written notice of his disciplinary hearing, that he was permitted to call any witnesses he chose, and that Dep. Supt. Richards provided a written statement of the evidence relied on and the reason for his decision. Defendants also contend that he has no constitutional right to a tape so "the fact that it was apparently defective does not rise to the level of constitutional deprivation." Defendants' argument here rests on an inappropriate supposition at this stage of the litigation—namely that the tape was defective and not intentionally erased by corrections department employee. Although Dep. Supt. Richards attested that he did not erase the tape, Palmer has presented sufficient evidence that a reasonable jury could conclude otherwise and that the hearing that Richards presided over not only lacked the process due as a result but may have been tainted from the get-go. As noted above, Palmer testified that the tape is blank for the entirety of C.O. Wyllie's testimony but is otherwise fine and that at the end of the hearing he demonstrated to Dep. Supt. Richards that C.O. Wyllie supported Palmer's rather than C.O. Goss's version of the incident.

**\*7** Thus, defendants' contention that Palmer has failed to state a claim for relief is denied.

C. Qualified immunity ^FN7^

> FN7. Defendants also claim that to the extent that Palmer sues them in their official capacity, rather than their individual capacity, they are shielded by the Eleventh Amendment. However, sovereign immunity and qualified immunity are mutually exclusive. *See* *Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("To the extent that such a claim is asserted against the state official in his official capacity, he may assert the state's Eleventh Amendment immunity against suit, but he may not assert a personal official privilege of absolute or qualified immunity. To the extent that such a claim is asserted against him in his individual capacity, he may assert privileges of absolute or qualified immunity but may not assert immunity under the Eleventh Amendment."). Here, it is clear that Palmer is

suing these officials in their individual capacities—*i.e.,* to the extent that each was personally and actually involved in denying him due process. *Cf.* *Huang v. Johnson,* 251 F.3d 65, 69–70 (2d Cir.2001) (sovereign immunity extends to state officials who are acting on behalf of the state where the state is the "real, substantial party in interest").

The doctrine of qualified immunity protects state actors sued in their individual capacity from suit for monetary damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Baskerville v. Blot,* 224 F.Supp.2d 723, 737 (S.D.N.Y.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). These state officials are shielded by qualified immunity if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001).

[4][5] Based on the evidence before the Court, Dep. Supt. Richards is not entitled to qualified immunity. The allegation here is that he intentionally tampered with the tape-recording of a hearing. It is beyond dispute that such an action to destroy evidence was illegal, and defendants do not seriously contest otherwise. Instead, they argue that Richards conducted the hearing in an objectively reasonable manner—but again this seems the very nub of what the factfinder must determine. In contrast, Director Selsky and Dep. Supt. Connolly are entitled to qualified immunity. While Palmer alerted both of them to Dep. Supt. Richards's alleged impropriety, it is clear that their failure to intervene did not constitute a clear violation of clearly established law. Unlike Dep. Supt. Richards, neither Director Selsky or Dep. Supt. Connolly affirmatively violated any law or any duty clearly imposed on them—they merely exercised their discretion to not intervene in the grievance procedure or the disciplinary hearing. *Cf.* *Sealey I,* 116 F.3d at 51 (affirming dismissal against prison administrator to whom the inmate who alleged due-process violations had sent two letters).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327110 (S.D.N.Y.)

(Cite as: 2003 WL 22327110 (S.D.N.Y.))

Thus, defendants' motion to dismiss Palmer's claim on the grounds of qualified immunity is denied with respect to Dep. Supt. Richards but granted with respect to Dep. Supt. Connolly and Director Selsky.

### III. CONCLUSION

For the foregoing reasons, defendant's motion is granted in part and denied in part. Defendants' motion to dismiss Palmer's excessive-force claim against C.O. Goss is denied. Defendants' motion to dismiss Palmer's due-process claim is denied with respect to Dep. Supt. Richards but granted with respect to Dep. Supt. Connolly and Director Selsky. The trial of this matter is scheduled for October 20, 2003 and thus any writs, etc., should be sought forthwith and the Attorney General is directed to cooperate with the plaintiff on this score.

IT IS SO ORDERED.

S.D.N.Y.,2003.

Palmer v. Goss
Not Reported in F.Supp.2d, 2003 WL 22327110 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.